UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

ERNEST N. LOTCHES,

                Petitioner,

    v.

JEFF PREMO, Superintendent,
Oregon State Penitentiary,

                Respondent.

Case No. 6:14-cv-00369-MO

OPINION AND ORDER

Fidel Cassino-Ducloux
Federal Public Defender
C. Renee Manes
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon 97204

      Attorneys for Petitioner

Ellen F. Rosenblum
Attorney General
Timothy A. Sylwester
Ryan P. Kahn
Assistant Attorneys General
Department of Justice
1162 Court Street NE
Salem, Oregon 97301

      Attorneys for Respondent

1 - OPINION AND ORDER

MOSMAN, District Judge.

Petitioner brings this capital habeas corpus action pursuant to 28 U.S.C. § 2254 in which he challenges his convictions and death sentence for aggravated murder. For the reasons set forth below, the Court denies the Petition for Writ of Habeas Corpus and enters Judgment dismissing this action with prejudice.

## FACTUAL BACKGROUND

The facts regarding the aggravated murder and other crimes for which petitioner was convicted and sentenced to death are set forth in *State v. Lotches*, 331 Or. 455 (2000), *cert. denied*, 534 U.S. 833 (2001). Briefly, in the afternoon of August 22, 1992, a Saturday, petitioner engaged in a scuffle with Donald Hedges at a park near downtown Portland. Hedges reported the incident to a Portland Guide[1] and told the guide that he wanted to file a report. Eventually, three guides, Valencia Edwards, Vanessa Calderon and James Riley, began to follow petitioner as he walked through downtown Portland. Petitioner noticed them following him and quickened his pace. William Hall, an armed EID officer, then approached petitioner and asked to have a word with him. Riley also closed in on petitioner at this time. Petitioner threw his hand up toward Riley and appeared to take a swing at him which Riley blocked. Petitioner took off running with Hall, Riley, Edwards and Calderon in pursuit. At some point petitioner slowed down and Hall shouted, "He's got a gun. Get down." Shots were fired. During the ensuing incident, petitioner raised his gun,

---

[1] "The Portland Guides [was] an unarmed unit of the Economic Improvement District (EID), a program funded by a confederation of Portland merchants to provide security and information to visitors to the city. Portland Guides carr[ied] radios and [wore] distinctive green caps, blue slacks, and white shirts. EID ha[d] its own officers, who [wore] blue caps, blue slacks, and blue shirts. EID officers carr[ied] weapons." *Lotches*, 331 Or. at 457 n.2.

aimed it at Edwards, and shot her. Bullets hit Edwards in the left breast and right arm. Hall engaged in more gunfire with petitioner and pursued him when he fled.

Eventually petitioner approached a car stopped at a light and pointed his gun through the open window at the driver's head, telling her she was going to take him somewhere. She refused and attempted to accelerate away, but her car stalled. She unbuckled her 9-year-old grandson's seatbelt and he managed to exit the car. As this was happening, Hall yelled at petitioner and directed him to get away from the car. The boy ran toward Hall. Petitioner shot in Hall's direction and Hall left the cover of the pillar he was standing near to pull the boy to safety. Hall also shot out two of the car's tires. In the gun skirmish, petitioner shot Hall twice, including a fatal shot that entered Hall's arm, passed through his lungs, and hit his heart.

Petitioner fled, approached a truck, pointed his gun through the open window at the driver's head and ordered the driver and his wife to get out. He drove the truck away. Heading the wrong direction down Third Avenue and swerving to avoid oncoming cars, petitioner drove over the Burnside Bridge and turned onto Martin Luther King Boulevard. He then took a turn too fast and the truck jumped the curb. It hit several cars and came to a stop.

A man came to petitioner's aid and asked him if he was going to run. Petitioner responded, "Hell, yes, I got to get out of here." Several police cars came on scene, including one driven by Officer Scott Elliot who pulled up near the truck. After Officer Elliot stopped his car, petitioner pulled his gun out of the truck, turned, aimed the gun in the officer's direction and began walking toward him. Petitioner then stopped and assumed a combat stance, holding the gun in front of him with two hands. Officer Elliot leaned away and put the car in reverse. Petitioner fired at him twice, the second shot narrowly missing the officer.

3 - OPINION AND ORDER

Petitioner tried to flee again, managing to take over a vehicle on his second attempt. But, as he tried to start that car, he found himself surrounded by officers. He threw down his gun and surrendered. Experts later opined that petitioner likely had a blood-alcohol content of approximately .17 at the time of the crimes.

## PROCEDURAL BACKGROUND

Petitioner was initially tried, convicted and sentenced to death in 1993. On direct review, the Oregon Supreme Court reversed the convictions of aggravated murder on Counts One and Two and remanded those matters to the trial court for further proceedings, but otherwise affirmed the remaining convictions and sentence of death. *See Lotches*, 331 Or. 455.

In November 2001, the Multnomah County Circuit Court dismissed Counts One and Two on application of the District Attorney. Accordingly, petitioner's current death sentence rests solely on his aggravated murder conviction for intentionally causing Hall's death in an effort to conceal petitioner's identity as the perpetrator of the crime of attempted murder (Count Three).

Petitioner next filed for post-conviction relief ("PCR") in state court. *Lotches v. Czerniak*, Marion County Circuit Court Case No. 01C-18545. The PCR court held an evidentiary trial and denied relief. Respondent's Exhibits 558, 565 & 566. The Oregon Court of Appeals affirmed on appeal and the Oregon Supreme Court denied review. *Lotches v. Premo*, 257 Or. App. 513, *rev. denied*, 354 Or. 597 (2013).

On June 23, 2015, petitioner timely filed a Petition for Writ of Habeas Corpus. The Petition (ECF No. 47). raises seventeen (17) claims and numerous sub-claims. The parties have briefed issues related to exhaustion, procedural default, and exceptions to procedural default, as well as the merits of these claims.

4 - OPINION AND ORDER

<u>**APPLICABLE LAW**</u>

## I.    STANDARDS FOR HABEAS RELIEF

An application for writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable. *Williams*, 529 U.S. at 409-10. A federal habeas court reviews the state court's "last reasoned decision." *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that

"the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court."); *see Murray v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014) ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1)."). According to the Ninth Circuit, this evidentiary limitation is applicable to § 2254(d)(2) claims as well. *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (9th Cir. 2013).

Therefore:

> for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d).

*Id.* at 993-94.

## II.     EXHAUSTION AND PROCEDURAL DEFAULT

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722 (1991). To exhaust state remedies, the petitioner must fairly present his claims to the state's highest court in a procedurally appropriate manner. A claim is fairly presented if the petitioner has described the operative facts and the federal legal theory on which his claim is based. *Anderson v. Harless*, 459 U.S. 4, 6 (1982). He must clearly alert the state court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). He must make the federal basis of the claim explicit either by citing specific provisions of federal law or federal cases, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir.

1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

If the petitioner presents claims in state court, but that court finds them defaulted on state procedural grounds, a federal habeas court will find them procedurally defaulted so long as the state procedural bar was independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). While federal courts retain the power to consider the merits of procedurally defaulted claims, generally, the court will not review the merits of a procedurally defaulted claim unless the petitioner demonstrates cause for his failure to exhaust the claim in state court and prejudice from the alleged constitutional violation or shows that a fundamental miscarriage of justice would result if the federal court did not reach the merits of the claim. *Coleman*, 501 U.S. at 750.

While *Coleman* held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim, the Supreme Court announced a new, narrow exception to that rule in *Martinez v. Ryan*, 566 U.S. 1, 17 (2012):

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

Accordingly, to demonstrate cause and prejudice under *Martinez* sufficient to excuse the procedural default of an ineffective assistance of trial counsel claim, a petitioner must make two showings:

> First, to establish "cause," he must establish that his counsel in the state post conviction proceeding was ineffective under the standards of *Strickland* [*v. Washington*, 466 U.S. 668 (1984)]. *Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent deficient performance, the result of the post-conviction proceedings would have been different.

7 - OPINION AND ORDER

*Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015). Determining whether there was a reasonable probability of a different outcome "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id*. at 377-78.

And second, to establish prejudice under *Martinez*, a petitioner must show that the ineffective assistance of trial counsel claim was "substantial" or had "some merit." A claim is substantial if it meets the standard for the issuance of a certificate of appealability, *Martinez*, 566 U.S. at 14, that is, "reasonable jurists could debate whether (or, for that matter agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations and internal quotations omitted). A court should conduct a "general assessment of the merits" of the underlying ineffective assistance claim to determine whether counsel's performance fell below an objective standard of reasonableness and that the deficiency prejudiced the petitioner. *Id*. at 336-37. Notably, the court should measure this by the prevailing professional norms at the time of representation. Moreover, "the inquiry of counsel's performance under *Strickland* is 'highly deferential,' the court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' and 'the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019) (quoting *Strickland,* 466 U.S. at 688-89). In *Ramirez*, the court first examined the question of whether the underlying ineffective assistance claim is substantial and then evaluated PCR counsel's performance under *Strickland*.

## III.    INEFFECTIVE ASSISTANCE OF COUNSEL

For petitioner's claims of ineffective assistance of trial counsel, discussed in Section XI of this opinion, the Supreme Court has established a two-part test to determine whether a petitioner has received ineffective assistance of counsel. First, the petitioner must show that his lawyer's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 686-87. Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id.* at 689.

Second, the petitioner must show that his lawyer's performance prejudiced the defense. The appropriate test for prejudice is whether the defendant can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial.

When considering ineffective assistance of counsel claims under 28 U.S.C. § 2254(d), "it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curium). Moreover, where a state court has adjudicated an ineffective assistance of counsel claim on the merits, a habeas court's review of a claim under the *Strickland* standard is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105-06 (2011); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

## **<u>DISCUSSION</u>**

As noted above, the Petition raises 17 claims, along with numerous sub-claims.

## I.    Claim 1 - Failure to Hold Required Competency Hearing and Trial While Incompetent

Underlying Claims 1.B.-1.F.[2] are petitioner's contentions: that he was not competent either to stand trial or to pursue post-conviction relief; that sufficient evidence of his potential incompetency was before the trial court requiring that court to hold a competency hearing *sua sponte*; that he was involuntarily medicated before and during his trial; and that Oregon's procedures for determining a defendant's competency for trial were unconstitutional. To begin, the Court briefly outlines events referenced during petitioner's state-court proceedings that occurred in the years prior to his trial and relate to his alleged incompetence.[3]

In 1975, petitioner was convicted of robbery in the third degree and escape in the second degree and sentenced to prison. In 1977, he was charged and convicted of aggravated robbery and sent to the Colorado State Penitentiary. While it appears that some mental health evaluations were administered during this period, petitioner did not raise an insanity defense in either of these cases.

On or about June 16, 1980, a few months from his release date at the Colorado State Penitentiary, petitioner took a pickup and drove it through the front entrance of the prison. A few days later, on June 20, he stole an automobile and wallet at gunpoint. On June 22, he robbed a donut shop at gunpoint. And on June 23, he took a car from woman at gun point. Authorities apprehended him in Kansas the next day and returned him to Colorado to face charges. At his counsel's request, Dr. Dean J. Plazak, evaluated petitioner on February 7 & 11, 1981 at the Denver County Jail.

---

[2] There is no "Claim" 1.A. in the Petition. For ease of tracking, the Court refers to the claims that it identifies as petitioner numbered them in the Petition.

[3] This summary tracks closely with the history reported by petitioner himself. *See* Petition at 32-40. The Court also notes that in addition to spending nearly his entire adult life institutionalized in either a state hospital or correctional facility, petitioner's involvement in the juvenile justice system began in his early teens.

Ultimately, Dr. Plazak concluded that petitioner "was so diseased in mind" at the time of the alleged crimes that he was legally insane under Colorado law. Respondent's Exhibit 653.[4] Drs. Whittington and Dietvorst also evaluated petitioner at this time and largely concurred with Dr. Plazak's findings.

On October 15, 1980, while awaiting trial on the above charges, petitioner attempted, with the aid of accomplices, an armed escape from a Denver courthouse. In February 1981, a jury found him legally insane on two of the three aforementioned robbery charges and the court determined he was legally insane on the third. However, petitioner pled guilty to the escape and attempted escape charges. He spent time at the Colorado State Hospital and was eventually transferred to prison and then paroled in 1984.

Petitioner committed another robbery in 1984 and was charged as a habitual offender. Drs. Plazak, Whittington and Dietvorst were again involved in that case and prosecutors agreed to a plea deal wherein petitioner was deemed legally insane and committed to the Colorado State Hospital. Petitioner's counsel successfully argued in that matter that the guilty pleas petitioner entered in 1981, related to the 1980 escape and attempted escape charges, were not freely, voluntarily, and knowingly entered into due to petitioner's mental status at the time.

In March 1988, petitioner walked away from the State hospital. He was convicted and sentenced to probation. He did not raise an insanity defense in that case and was released from the hospital in 1989 at which time he returned to Oregon. In 1989, petitioner was charged with robbery in the first degree. Dr. True examined him and concluded that he suffered from borderline

---

[4] Specifically, Dr. Plazak opined that petitioner was "incapable of distinguishing right from wrong with respect to those acts, and had suffered such an impairment of mind by disease as to destroy the will power by rendering him incapable of choosing the right and refraining from doing the wrong." *Id*.

personality disorder. An Oregon jury found him guilty but insane under Oregon law. In November 1989. petitioner was arrested and charged with assault in the first degree. He did not raise an insanity defense, was convicted of assault in the third degree and sentenced to prison. He was paroled on June 16, 1992, a little more than two months prior to the crimes at issue here.

> A.    Claims 1.B and 1.C. - The trial court violated petitioner's Constitutional rights under *Pate*, *Drope* and *Dusky* when it failed *sua sponte* to hold a competency hearing notwithstanding existence of sufficient reason to doubt petitioner's competency. And at the time of his trial and to date, petitioner was and is incompetent to aid and assist in his own defense.

> 1.    *Fair Presentation*

In his automatic direct appeal to the Oregon Supreme Court of his convictions and death sentence, petitioner did not raise either of these claims. Nevertheless, he insists that he fairly presented them to the Oregon Supreme Court in the state habeas corpus action he filed in or about February 15, 2000, during the pendency of his direct appeal.

As noted above, generally, a state petitioner must exhaust all available state court remedies either on direct appeal or through collateral proceedings before a federal court may consider granting habeas corpus relief. 28 U.S.C. § 2254(b)(1). A state prisoner satisfies the exhaustion requirement by "fairly presenting" his claim to the appropriate state courts at all appellate stages afforded under state law. *Castille v. Peoples*, 489 U.S. 346, 351 (1989). The presentation of a federal claim "for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons" for doing so does not satisfy the exhaustion requirement. *Id*. at 351 (internal quotations omitted).

Here, while respondent acknowledges that petitioner included these competency-related claims in his state habeas petition, he insists they were not presented to the State's high court in a

procedural context in which their merits would be considered and that it is evident that the court did not do so. Petitioner relies on opinions suggesting that when a state appellate court's decision is *ambiguous* as to whether it is a merits decision and it is *plausible* to conclude that the court addressed the merits of a federal claim, there is a presumption that the state court did in fact consider the merits of the federal claim. *See, e.g., Chambers v. McDaniel*, 549 F.3d 1191 (2008); *Smith v. Oregon Bd. of Parole and Post-Prison Supervision*, 736 F.3d 857, 860-62 (9th Cir. 2013). The Court's examination of relevant case law and the facts at hand, however, makes clear that petitioner failed to "fairly present" these claims to the Oregon Supreme Court for exhaustion purposes.

First, petitioner did not invoke "one complete round of the State's established appellate review process" of either his procedural due process claim alleging that the trial court failed to *sua sponte* hold a competency hearing or his substantive due process claim alleging that he was incompetent when he was tried and convicted. Rather, in February 2000, during the pendency of his automatic direct appeal, he raised these issues in a state habeas corpus petition along with a motion to stay his direct appeal. Because petitioner *did* bring these claims to the attention of the Oregon Supreme Court, the question of whether they were fairly presented for exhaustion purposes depends on how that court resolved the state writ. If it denied the writ on procedural grounds and did not adjudicate its merits, the claims are procedurally defaulted. *Chambers*, 549 F.3d at 1195-96. Critically, in *Chambers*, the Nevada Supreme Court noted in its brief order denying the state writ that the petition filed there was proper, that it had considered the petition on file, and that it was not satisfied that its intervention was warranted. It also noted that it had "considered all proper person documents filed or received in this matter, and [] conclude[d] that the relief requested [wa]s not warranted." *Id.* at 1196. Finding that the Nevada Supreme Court had considered the merits of

the state petition claims, *Chambers* held that "unless a court expressly (not implicitly) states that it is relying upon a procedural bar, we must construe an *ambiguous* state court response as acting on the merits of claim, if such construction is *plausible*." *Id*. at 1197 (emphasis added).

Here, the parties agree that petitioner raised his competency-related claims for the first time in a state habeas corpus petition and that the scope of the Oregon Supreme Court's original jurisdiction in habeas corpus proceedings is within that court's discretion. In *Sweet v. Cupp*, 640 F.2d 233, 238 (9th Cir. 1981), however, the Ninth Circuit noted that the Oregon Supreme Court "rarely exercises its original jurisdiction in this regard [and] [i]n *Jerman*, the first case in which the Supreme Court of Oregon was invited to exercise its original habeas corpus jurisdiction, the court determined that it would decline jurisdiction if the petitioner has a plain, speedy, and adequate remedy in the courts below." (citations omitted). Accordingly, given the Oregon Supreme Court's "longstanding" policy of declining exercise of its original jurisdiction when a remedy designed to replace the extraordinary writ exists, that court concluded that the Oregon Supreme Court had denied the state habeas petition on procedural grounds. *Id*. Similarly here, petitioner had an adequate remedy to pursue these claims on automatic direct review to the Oregon Supreme Court from his conviction and death sentence. Indeed, petitioner concedes this fact by alleging that his direct appellate counsel was constitutionally ineffective in failing to raise these claims in the normal course on direct appellate review.

Further buttressing the Court's conclusion that the Oregon Supreme Court *did not* consider the merits of petitioner's state habeas petition is the fact that approximately two weeks after petitioner filed the petition, and prior to receiving any response from the state, it summarily denied the petition as follows:

Upon consideration by the court.

Plaintiff's petition for writ of habeas corpus is denied. Plaintiff's motion to stay the [direct appeal] proceedings [] is denied as moot. Plaintiff's request for oral argument is denied.

Respondent's Exhibit 891, Volume 31-5.

Petitioner argues that the Oregon Supreme Court considers four factors, including "the hardships to the petitioner incident to a denial of the writ," in determining whether to exercise its jurisdiction in a particular case. Brief in Support of Petition at 30 (ECF No. 76) (citing *Ex parte Jerman*, 112 P. 416, 418 (Or. 1910)). As such, he contends that the Oregon Supreme Court necessarily considered what claims were being raised and whether they had a likelihood of success, *i.e.*, whether the claims had merit. Similarly, petitioner argues that for the Oregon Supreme Court to assess whether petitioner showed special and important reasons why the petition should be considered on the merits, the standard respondent proffers, it necessarily had to consider the merits of the claims to see whether they rise to that level. Considered in this context, petitioner insists that the Oregon Supreme Court's above denial is ambiguous and that it is plausible that it reached the merits of the subject federal claims.

The Court disagrees and finds that *Castille* controls its decision here. In contrast to the facts set out in *Chambers*, the Oregon Supreme Court's summary denial of relief here was not ambiguous on its face. Moreover, considering that petitioner's direct appeal was pending, and the court denied the petition just two weeks after it was filed with no input from the state, it is not plausible that such denial was on the merits. In addition, petitioner had a remedy via direct appeal to present these

15 - OPINION AND ORDER

claims to the Oregon Supreme Court.[5] Although the Oregon Supreme Court has discretion to exercise original jurisdiction over state habeas corpus actions in some cases, there is no ambiguity or plausible reason to believe that it did so here when it promptly denied petitioner's petition without comment. As the Ninth Circuit reiterated in *Chambers*, in the absence of any ambiguity created by the language used by the state appellate court, the presumption that the state court considered the merits of the federal claim does not apply:

> Had the Nevada Supreme Court denied the petition without opinion, that denial would have brought Chambers' claim within the reach of the Supreme Court's holding in *Castille*, . . . that exhaustion is not satisfied "where the claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor." However, *Castille* does not address the question presented here, as *Castille* involved only a state court's rejection without comment of a new claim in an extraordinary motion and does not tell us what to do when a court has in fact spoken on the issue.

*Chambers*, 549 F.3d at 1196. The Court is satisfied that the Oregon Supreme Court rejected the state habeas petition wholly on procedural grounds. Accordingly, given the time for raising these grounds in state court has long expired, they are procedurally defaulted.

### 2.    *Exceptions to Procedural Default*

Petitioner suggests that *Martinez* excuses any procedural default of these claims due to the ineffective assistance of his PCR counsel in failing to fault direct appellate counsel with raising these claims on appeal. However, *Martinez* cannot excuse the procedural default of either trial court error or ineffective assistance of appellate counsel claims. *See Davila v. Davis*, 582 U.S. 521, 525

---

[5] "[W]e are also of the opinion that, before taking jurisdiction in [an application for habeas corpus], we should carefully consider, first, the condition of the business of this court; second, the hardships to the petitioner incident to a denial of the writ; third, whether the petitioner has any plain, speedy, adequate remedy in the circuit court; and fourth, **whether he has a remedy by appeal**." *Ex parte Jerman*, 112 P. at 418 (emphasis added).

(2017) (*Martinez* does not apply to underlying claims of ineffective assistance of direct appellate counsel. It applies only to procedurally defaulted claims of ineffective assistance of trial counsel). In addition, the Court rejects petitioner's argument that I should excuse the procedural default of these claims because Oregon's procedural rule barring review of alleged errors not objected to at trial and raised on direct review is inadequate. Moreover, as petitioner acknowledges, the Ninth Circuit has rejected the argument that a claim of incompetency to stand trial may not be procedurally defaulted. And finally, the Court rejects petitioner's argument, unsupported by any controlling authority, proof, or analysis, that I should excuse the default of these claims based on the miscarriage of justice exception to procedural default.

### 3.    The Merits

For the reasons set forth above, petitioner's default of these claims precludes federal habeas relief. However, because the procedural default issue is complex and the issue of petitioner's competency is serious and permeates this case, the Court also addresses the merits of these claims.

> "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subject to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). Furthermore, in some trials, there comes a point where the defendant's behavior displays such marked indicia of incompetence that the trial court violates due process by not *sua sponte* suspending proceedings and conducting a hearing into defendant's competency to stand trial. *See*, *e.g.*, *Drope*, 420 U.S. at 180; *Pate v. Robinson*, 383 U.S. 375, 385 (1966); *de Kaplany v. Enomoto*, 540 F.2d 975, 979-81 (9th Cir. 1976).

> "Where the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the judge on his own motion *must* impanel a jury and conduct a sanity hearing pursuant to" the relevant state procedures. *Pate*, 383 U.S. at 385 (emphasis added) (citing *People v. Shrake*, 182 N.E.2d 754 (Ill. 1962)). Since *Pate*, courts, including the Ninth Circuit, have generally adopted the "bona fide doubt" standard as to when a trial court is required to order a competency hearing before proceedings may continue. [] *See*, *e.g.*, *de Kaplany*, 540 F.2d at 979. A few years later the Supreme Court explained that the "import" of its decision in *Pate* "is that evidence

of a defendant's irrational behavior, his demeanor at trial, and any prior medical
opinion on competence to stand trial are all relevant in determining whether further
inquiry is required, but that even one of those factors standing alone may, in some
circumstances, be sufficient." *Drope*, 420 U.S. at 180.

*Anderson v. Gipson*, 902 F.3d 1126, 1133-34 (9th Cir. 2018).

Petitioner suggests that his past adjudications of guilty but insane in and of themselves
created a presumption of insanity and a bona fide doubt as to his competency sufficient to trigger
the necessity for the trial court to hold a competency hearing on its own motion. However, he fails
to cite authority, and the Court can find none, establishing that a prior adjudication of guilty but
insane definitively answers the question of whether a court has a bona fide doubt as to a defendant's
competency. To the contrary, relevant authority establishes that having mental illness does not
necessarily mean that a defendant is incompetent to stand trial. As noted in *Pate*, a defendant's
history of mental illness, demeanor at trial, defense counsel's opinion, and available psychiatric
evaluations are all factors to be considered, but no one factor is necessarily sufficient to raise a
bona fide doubt regarding mental incompetence. 383 U.S. at 387; *see also, Boyde v. Brown*, 404
F.3d 1159, 1166-67 (9th Cir. 2005) (finding inmate's "major depression" and "paranoid delusions"
did not raise a doubt regarding his competence to stand trial); *United States v. Garza*, 751 F.3d
1130, 1135-37 (9th Cir. 2014) (finding no need for a competency hearing where defendant was
diagnosed with anxiety and dementia but his behavior, in and out of court, was not erratic and there
was no clear connection between any mental disease and a failure on defendant's part to understand
the proceedings or assist in his own defense).

Moreover, the trial judge here stated on the record that he had no doubt whatsoever as to
petitioner's competency and the record is replete with evidence supporting this conclusion.

First, the Court's review of the transcript reveals that during the guilt-phase portion of his trial petitioner waited to engage in combative outbursts and exchanges with the court and/or prosecutors until he was *out of the presence of the jury*. In addition, when he considered testifying, he asked to have his ankle bracelets taken off when he testified. This awareness by him of the impression he could have on the jury during the guilt phase of his trial speaks to his understanding of what was at stake and the critical role the jury played in the proceedings. Additionally, his engagement in the proceedings and his ability to articulate legal points underscores his understanding and familiarity with the legal proceedings. For example, in his criticism of the trial court's refusal to admit a tape of witness Mary Gates, petitioner noted that the tape was relevant evidence, that it should have been presented to the jury and that Gates only changed her testimony after she was pressured, confused and intimidated by the DA's office. In another exchange, again had outside the jury's presence, petitioner complained about the court's refusal to allow him to confer with one of his expert witnesses before the witness testified. The court stated: "Keep in mind, Mr. Lotches. I authorized about $100,000 to bring all these witnesses from all over the country for you. Mr. Jurdem wouldn't be here except for the fact I paid for it." Transcript Designation, Part P at 25. After a bit of back-and-forth petitioner admonished the judge as follows: "Don't tell me it was your $100,000. It was the taxpayers' $100,000. They are the ones that pay your fees." *Id*. at 26. Finally, during the penalty-phase portion of his trial, petitioner informed his counsel that he did not want to argue against the death penalty. He instructed them, against their advice, not to call witnesses or to otherwise mount a defense. In response his counsel suggested that the court, out of an abundance of caution, might want to have petitioner's competency

reexamined. Petitioner insisted that there was no need for a mental health evaluation and the court

agreed:

> With respect to the issue of competency, I think Mr. Lotches is perfectly competent
> to proceed. I don't see that anybody gains anything by delaying these proceedings
> to have further mental examinations. Mr. Lotches has had numerous examinations
> over the years, the jury has heard quite a bit about that, so has the court.
>
> * * *
>
> My perception of what's gone on for the past couple of months is that Mr. Lotches
> is competent to aid and assist counsel, he is aware of what's going on, he does not
> suffer from a mental disease or defect, and he's perfectly capable of making these
> decisions. So I would deny the request for a delay for any kind of mental status exam
> or anything of that sort.

Transcript Designation, Part T at 115-16.

Second, in September 1992 shortly after petitioner committed the crimes at issue, his

counsel hired Dr. Lazere to evaluate petitioner's ability to aid and assist his counsel at trial. Dr.

Lazere concluded that he was competent to aid and assist his counsel. While petitioner insists Dr.

Lazere's evaluation is of limited worth because counsel did not provide the doctor with sufficient

records to give him the full picture of petitioner's mental health issues, this expert's finding that

petitioner was competent is one more highly relevant factor consistent with the trial court's

conclusion and more evidence that the court did not violate petitioner's constitutional rights when

it failed *sua sponte* to hold a competency hearing.

Third, as briefly summarized above, petitioner was a defendant in several previous criminal

cases and trials. Whether those cases ended in convictions or not guilty due to insanity verdicts,

and regardless of whether he was entitled to a so-called "continuity of insanity" presumption, the

trial court here was entitled to presume that he had been deemed *competent* to aid and assist in

those proceedings. Indeed, one of petitioner's own witnesses, Judge Thomas Reed, who represented

petitioner in connection with the serious robbery charges pending in Colorado following his escape in 1980 and who hired mental health experts to examine him prior to his being found not guilty by reason of insanity on those serious charges, testified that during his entire representation of petitioner he never thought he was incompetent as opposed to insane. He explained that under Colorado law people can be insane and competent at the same time and that competency to proceed involves the defendant being aware of the charges against him, understanding the courtroom proceedings and function of the judges, prosecutors, defense attorneys and being able to assist in his own defense. Reed testified that if found incompetent one is shipped off to a state hospital to restore competency and then brought back to trial. Similarly, Drs. Whittington and Plazak, both hired by Reed to examine petitioner and who determined that petitioner was legally insane, indicated in their testimony that they found petitioner competent to proceed in earlier legal proceedings. Dr. Whittington testified that in 1980 and 1981 petitioner had a good grasp of the legal proceedings and that he was capable and competent to proceed to trial.

Fourth, petitioner's own trial counsel say he was competent during his trial. While they suggested to the trial court during the penalty phase that it may want to conduct a competency hearing, at no point did they opine that they thought their client was incompetent. On the whole, the relevant factors in petitioner's case paint a consistent picture of an individual competent to aid and assist in his own defense.

Accordingly, based on the foregoing, the Court denies these claims on the basis that they are procedurally defaulted and petitioner cannot show entitlement to excuse their default. Alternatively, on *de novo* review, the Court denies them on the merits.

B.    Claim 1.D. - Petitioner's procedural and substantive due process rights were violated when the jail subjected him to involuntary medication with powerful anti-psychotics from the time he was first incarcerated through the time of his trial.

Petitioner concedes that this claim is defaulted but argues that the Court should excuse the default because his PCR trial counsel failed to adequately prosecute a related ineffective assistance claim during the PCR proceedings and because Oregon's preservation rule requiring that claims of trial court error be preserved at trial and raised on direct appeal are inadequate. Respondent argues that this claim is defaulted because even though evidence that jail personnel medicated petitioner came in at trial, neither petitioner nor his counsel raised an objection alleging that it was being involuntarily administered. Regardless, respondent maintains that this claim fails on the merits because there is no evidence in the record to show that petitioner was ever *forcibly* medicated. In fact, in denying the related ineffective assistance claim the PCR court specifically found that "[n]o credible evidence shows that [petitioner] was medicated against his will," and "[n]o evidence in the record establishes that petitioner was inappropriately medicated[.]" Respondent's Exhibit 565, Volume 28-14 at 5.

As a preliminary matter, the Court notes that any failing on PCR counsel's part cannot excuse the default of this trial court error claim. As noted, *Martinez* only applies to claims of ineffective assistance of trial counsel. In addition, for the reasons discussed in Claim 3, below, the Court concludes that Oregon's preservation rule is adequate to support a state-court judgment. Accordingly, because this claim is procedurally defaulted and petitioner cannot demonstrate entitlement to excuse the default, the Court denies it on that basis. Alternatively, it finds that

respondent's arguments surrounding the absence of evidence that petitioner was forcibly medicated are well taken and deny this claim on the merits.[6]

C.    Claim 1.E. - Petitioner continued to suffer incompetency and the inability to aid and assist throughout his post-conviction proceedings. The state court failed to appropriately address these issues and protect his right to competency in these capital proceedings.

By way of background, petitioner's PCR counsel requested that the court look into petitioner's competency to proceed in those proceedings. The court appointed Dr. Richard Kolbell to evaluate petitioner. Dr. Kolbell opined that petitioner suffered from a mental disorder "characterized by prominently paranoid and grandiose delusions, and difficulty remaining on track during conversations and interviews, reflecting derailment in his thinking which, in [his] opinion, likely reflects a psychotic disorder." Respondent's Exhibit 521, Volume 28-12 at 6. He determined that petitioner was unable to effectively participate with his attorney in the preparation of his defense due to mental disease. In light of this evaluation, the PCR court granted petitioner's motion for appointment of a guardian ad litem and appointed an attorney-guardian to make decisions on petitioner's behalf as to which claims to pursue in his PCR case.

Prior to the actual PCR hearing, however, the State moved to vacate the order appointing the guardian on the grounds that such appointment was neither necessary nor permitted by Oregon law. The State argued that Dr. Kolbell failed to consider ample evidence that petitioner had malingered or faked symptoms in the past or contemporaneous evidence tending to refute petitioner's statements to Dr. Kolbell about his counsel and the PCR process. Specifically, the State

_____

[6] Petitioner states that he will file a motion seeking an evidentiary hearing to expand the record with testimony and documentary evidence to further support this claim and his response to the procedural default defense. Petitioner has filed no such motion, and regardless, the Court concludes that a hearing is unnecessary for resolution of this subclaim.

submitted recordings of telephone calls petitioner had with a relative after Dr. Kolbell evaluated

him where petitioner *cogently* complained about his counsel and talked about the posture of his

case.[7] The State further suggested that Dr. Kolbell's conclusions were unreliable because he did

not conduct any personality testing and made no findings suggesting an impairment of cognitive

abilities. Finally, the State argued that petitioner was not entitled to a guardian based solely on his

inability to assist his attorneys in the PCR case. The State insisted that he had to show that he was

"incapacitated" – a showing he had not and could not meet. Ultimately, the PCR court granted the

State's motion to vacate the guardian ad litem.

Here, petitioner suggests that his rights were violated: (1) when the PCR court granted the

State's motion to vacate guardian ad litem; and (2) when, on appeal, the Oregon Court of Appeals

failed to order a competency evaluation on his request. With regard to petitioner's claim

challenging the PCR court's grant of the State's motion, respondent argues that because petitioner

did not challenge such action on appeal, but instead made a request for a new competency

evaluation, any claim faulting the PCR trial court with granting the State's motion is procedurally

defaulted. Petitioner appears to concede this point, but states that he will "soon" file a motion for

evidentiary hearing to prove facts related to his competency which his PCR counsel neither alleged

nor proved, such as expert and non-expert testimony and documentary evidence demonstrating that

---

[7] As will be discussed further below, this appears to be yet another data point in the record indicating that petitioner faked symptoms of significant mental illness in an exam by a doctor in an effort to influence a court matter. Dr. Kolbell reported that petitioner referenced beliefs that his attorneys were working with the prosecution and that they were suppressing evidence as part of a "cabal," but there was no discussion of such cabal or conspiracy in the recorded phone calls. Rather, petitioner complained that his attorneys were adding to the delay in his case, he discussed the 9 steps of the appeals process and how little progress he was making there, and complained about the quality of his court-appointed counsel. Respondent's Exhibit 548, Volume 28-14 at 8-9.

he was incompetent throughout his PCR proceedings and that his PCR trial counsel was deficient in failing to seek a competency evaluation shortly before trial (or "later") and in failing to share historical information he had about petitioner's mental health challenges and the jail's mental health observations, diagnosis, and treatment of him since shortly after his arrest. Brief in Support of Petition at 34-36. On the merits, petitioner relies on the arguments presented in his habeas petition. He suggests that due to his delusional belief that because he had been found insane in his Colorado court proceedings the Oregon PCR court would reach the same conclusion and release him, he was unable to "rationally assess the comparative strengths of his potential defenses, what the actual and potential advantages and disadvantages there would be to testifying, what information about the offense he should share with his lawyers, and what information about his life's history he should share with his lawyers." *Id*. at 35.

To the extent that petitioner alleges that the Oregon Court of Appeals violated his rights in not ordering a competency evaluation, respondent argues that even if petitioner exhausted this claim, it fails on the merits under the AEDPA because: (1) petitioner identifies no federal authority establishing that a petitioner in a state PCR proceeding has a constitutional right to competency in a collateral appeal; (2) at a minimum, there is no Supreme Court precedent supporting this claim such that a state-court decision could be contrary to, or an unreasonable application of, such precedent; (3) petitioner did not convince the PCR court that he was incompetent; and (4) on appeal, the Oregon Court of Appeals gave petitioner's counsel an opportunity to obtain a competency evaluation, but counsel either chose not to do so, or did not report the outcome of that evaluation. In either case, petitioner cannot demonstrate that the Oregon courts violated his constitutional rights in its handling of this issue.

25 - OPINION AND ORDER

As noted above, petitioner acknowledges that his PCR appellate counsel failed to pursue the PCR trial court claim. Nevertheless, he suggests that the Court should extend the rationale utilized in *Martinez* to excuse its default. It declines to do so. As petitioner concedes, *Martinez* does not apply to claims of ineffective assistance of PCR appellate counsel. Accordingly, the Court denies this claim on the basis that it is procedurally defaulted and petitioner cannot show entitlement to excuse its default.

Regarding petitioner's claim faulting the Oregon Court of Appeals with failing to order a competency evaluation, the Court bypasses the issue of procedural default and denies this claim on the merits. First, it is apparent that State PCR courts have inherent authority and discretion to order competency or other mental examinations when helpful or necessary given the nature, scope and substance of the PCR claims at issue. However, petitioner points to no authority, and the Court can find none, establishing that a petitioner has a Constitutional right to competency in a PCR appeal. Accordingly, he cannot demonstrate on this record that the Oregon Court of Appeals' alleged denial of a competency evaluation during his PCR appeal proceedings was contrary to, or involved an unreasonable application of Supreme Court precedent. Moreover, as noted above, and contrary to petitioner's representation, the record shows that the Oregon Court of Appeals *did* authorize petitioner's counsel to obtain a competency evaluation, but counsel failed to either follow through with the evaluation or to share any evaluation that was obtained. For these reasons, the Court concludes that petitioner cannot show that any denial by the Oregon courts on the merits of this subclaim was contrary to, or involved and unreasonable application of Supreme Court precedent. Accordingly, the Court denies it on the merits.

D.    Claim 1.F. - The State of Oregon's competency provisions are constitutionally insufficient. Specifically, to the extent that Oregon law leaves the determination of whether to hold a competency hearing to the discretion of the trial court, the law fails to comport with the Due Process protections recognized in *Pate*, *Dusky*, *Drope* and their progeny.

Petitioner concedes that this claim is procedurally defaulted. He contends that the procedural default occurred when his trial counsel failed to challenge Oregon's procedures for determining competency and suggests that such default should be excused pursuant to *Martinez* and/or because Oregon's preservation rule is inadequate.

As noted above, *Martinez* applies only to ineffective assistance of trial counsel claims and cannot excuse the default of a claim alleging Oregon's procedures for determining competency are unconstitutional. In addition, petitioner's argument that Oregon's preservation rule is inadequate is without merit for the reasons discussed in Claim 3, below. Accordingly, the Court denies this claim on the basis that it is procedurally defaulted and petitioner cannot show entitlement to excuse the default. Alternatively, the Court finds that respondent's arguments are well taken and denies the claim on the merits.[8]

## II.    Claim 2 - Insufficient Evidence and Actual Innocence

In separate, if related, grounds for relief, petitioner alleges that the evidence presented in the guilt-phase portion of his trial was insufficient under *Jackson v. Virginia*, 443 U.S. 307 (1979) to establish the elements satisfying Count Three of the indictment for aggravated murder; and that based on *all* the evidence presented at trial and proffered here, he is "actually innocent" of

---

[8] Again, Petitioner states that he will file a motion seeking an evidentiary hearing to expand the record with testimony and documentary evidence to further support this claim and his response to the procedural default defense, but has filed no such motion. In any event, the Court concludes that a hearing would not assist it in resolving this subclaim.

aggravated murder. In addition, he asserts that he is actually innocent of being a future danger and therefore ineligible for a death sentence.

A.    Sufficiency of the Evidence Claim Pertaining to Aggravated Murder Conviction

Petitioner alleges that there was insufficient evidence to establish: (1) that he shot and killed Hall to conceal his attempted murder of Edwards; (2) that he "was aware" he had shot Edwards; (3) that he intended to murder Edwards; (4) that he was fleeing the scene after shooting Hall to conceal his identity; (5) that he was attempting to conceal any crime in shooting Hall; and (6) that he committed the crime of attempted murder of Edwards. Petition at 111-13.

1.    Exhaustion and Procedural Default

Respondent argues that these subclaims are procedurally defaulted because petitioner failed to fairly present them to the Oregon courts either on direct review or during his PCR proceedings. Respondent does concede that petitioner exhausted a subclaim alleging that the evidence at trial was insufficient to prove Count Three of the indictment, but only as to whether the jury reasonably could infer that petitioner was attempting to avoid capture, and thereby conceal his identity, when he shot Hall, and then only on state-law grounds.[9]

At trial, petitioner's counsel moved for acquittal on several counts including Count Three where he argued that because petitioner shot Hall in broad daylight in front of numerous witnesses, no juror could reasonably infer that he killed Hall to conceal his identity. The trial court denied this motion. On direct review, the Oregon Supreme Court, referencing the sufficiency of the evidence

---

[9] Respondent asserts that the Oregon Supreme Court addressed Count Three on direct review *sua sponte*. The Court notes, however, that although petitioner's brief on direct review did not specifically address this sufficiency of the evidence claim, it expressly incorporated trial counsel's motion for acquittal on the same issue. *See* Transcript Designation, Part M at 57-60; Respondent's Exhibit 450, Volume 28-7 at 208.

standard relied on in *State v. Cunningham*, 320 Or. 47, 63 (1994)[10], adopted the State's position and affirmed the trial court as follows:

> The state responded that there was no evidence that any of the witnesses knew defendant's identity, and there was evidence that defendant was attempting to flee the scene of the attempted murder when he shot and killed Hall. From that, the state argued, the jury reasonably could infer that defendant was attempting to avoid capture and thereby attempting to conceal his identity when he killed Hall. We agree that the jury was entitled to draw the inference that the state described. Accordingly, we find sufficient evidence to support the conviction on [C]ount 3.

*Lotches*, 331 Or. at 498.

Petitioner maintains that because the legal standard set out in *Jackson* is identical to the state standard in *Cunningham*, the Oregon Supreme Court effectively addressed the federal claim and it is properly exhausted. Generally, for a petitioner to present a federal issue via citation to a state decision addressing relevant state and federal issues, the citation must include some indication that the state case involved federal issues. *Casey*, 386 F.3d at 912 n.13. Although expressly leaving the question open, neither the Supreme Court nor the Ninth Circuit has held that invoking a state constitutional provision is sufficient to fairly present a federal claim under the Federal Constitution. *See id.* at 914; *Baldwin v. Reese*, 541 U.S. 27, 33-34 (2004); *Arrendondo v. Neven*, 763 F.3d 1122, 1138-39 (9th Cir. 2014).[11] Respondent concedes that by invoking the relevant legal standard in *Cunningham*, the Oregon Supreme Court essentially employed the *Jackson* standard. Response at 68-69 (ECF No. 61); *State v. Rogers*, 313 Or. 356, 384 (1992) (noting that the sufficiency of the

---

[10] "[W]hether a rational factfinder, viewing the evidence in the light most favorable to the state, and accepting all reasonably inferences and credibility choices, could find the elements of the crime beyond a reasonable doubt." *Lotches*, 331 Or. at 498.

[11] However, other circuits have adopted the standard proposed by petitioner. *See Gartrell v. Lynaugh*, 833 F.2d 527, 529 (5th Cir. 1987); *Jackson v. Edwards*, 404 F.3d 612, 621 (2d Cir. 2005).

evidence standard is the same under Oregon law and under the Fourteenth Amendment). Accordingly, the Court will consider the merits of petitioner's sufficiency of the evidence argument to the extent it involves the question of whether the jury reasonably could infer that petitioner was attempting to avoid capture for shooting and injuring Edwards, and thereby attempting to conceal his identity, when he killed Hall.

As to the remaining subclaims alleging that there was insufficient evidence to prove that petitioner "was aware" that he had shot Edwards, that he intended to kill her, or that he attempted to murder her, however, the Court declines to consider these on the merits because petitioner did not raise them on direct appeal or in his PCR proceedings. Insofar as petitioner alleges that there was insufficient evidence to convict him of attempting to murder Edwards, the Court notes that his counsel moved for acquittal on that basis at trial but did not raise it on direct appeal or in his PCR proceedings. Petitioner suggests that the Court should nevertheless excuse the default of this claim based on ineffective assistance of direct appellate counsel or PCR counsel in failing to raise a claim of ineffective assistance of direct appellate counsel, but *Martinez* does not apply to claims alleging ineffective assistance of direct appellate counsel. *See Davila*, 582 U.S. at 530. Moreover, for the reasons discussed at length in Claim 3, below, the Court rejects petitioner's argument that it should excuse the default of these subclaims because Oregon's procedural rule barring review of alleged errors not objected to at trial and raised on direct review is inadequate to support a state court judgment because it is not consistently applied.

2.    *Merits*

a.    <u>*Legal Standard*</u>

There is a "heavy burden" on a petitioner challenging a conviction for sufficiency of evidence on federal due process grounds. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). A federal habeas court reviews challenges to the sufficiency of the evidence by determining whether in "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (citations omitted). "A reviewing court must consider all of the evidence admitted by the trial court, regardless whether that evidence was admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010). Sufficiency of the evidence claims raised in § 2254 proceedings must be measured with reference to substantive requirements as defined by state law. *Jackson*, 443 U.S. at 324 n.16. In cases where the evidence is unclear or would support conflicting inferences, the federal court "must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflict in favor of the prosecution and must defer to that resolution." *Id*. at 326. To prevail here, petitioner must show that the prosecution's case against him was so lacking that the trial court should have entered a judgment of acquittal. *McDaniel*, 558 U.S. at 131.

In addition, AEDPA adds another layer of deference over the already deferential *Jackson* standard. Under AEDPA, the federal court may not grant a habeas petition unless it finds that the state court unreasonably applied the principles underlying the *Jackson* standard when reviewing the petitioner's claim. *See e.g., Juan H.*, 408 F.3d at 1275 n.12; *Jones v. Wood*, 114 F.3d 1002,

1013 (9th Cir. 1997) (recognizing that the "unreasonable application" standard applies to insufficient evidence claim).

*b.*        *Evidence Presented at Trial*

As summarized in some detail above, in the early afternoon on August 22, 1992, petitioner became involved in an altercation in O'Bryant Square in downtown Portland. What apparently began as a joke ended with petitioner striking Donald Hedges (on the helmet he wore) and yelling obscenities at him. After petitioner left the park, Hedges reported the incident to a Portland Guide. Based on the description from Hedges, two guides, Edwards and Calderon, spotted petitioner near Pioneer Courthouse Square and began to follow him as he walked north on SW Fifth Avenue. Petitioner appeared to become aware that the guides were following him because he increased his pace and eventually turned east onto Alder Street. Another guide, Riley, soon joined Edwards and Calderon. Meanwhile, EID officer Hall approached from the east side of Fourth Avenue and confronted petitioner on the south sidewalk of Alder between Fourth and Fifth Avenues. Riley also approached. Eyewitness accounts of subsequent events differ in some details, but shortly after Hall and Riley approached petitioner, he ran from them and the scene soon devolved into a running gun battle that would ultimately leave Edwards seriously injured and Hall dead.

Edwards testified that she and Calderon were about a half a block away from petitioner when Hall approached and spoke to him. She further testified that Riley approached and stood behind petitioner. Shortly thereafter petitioner swung his arms out and back, apparently to strike Riley. Riley put his hands out to block petitioner's swing and petitioner fled, running northeast across Alder towards Fourth Avenue. Edwards watched Hall and Riley chase petitioner around the corner of Fourth and Alder, at which time she lost sight of them. She testified that shortly thereafter,

Hall came back around the same corner in a crouch, moving west on Alder towards Edwards and Calderon and telling everyone to "get down." Transcript Designation, Part J at 67. She testified that immediately thereafter, Riley appeared from the same direction and ran past her. Edwards next saw petitioner reappear from around the corner, point his firearm directly at her, and fire three shots, hitting her in the arm and breast.

Calderon also witnessed Hall and Riley confront petitioner on Alder Street. She saw petitioner swing his arm and Riley raise his to block petitioner. She testified that petitioner ran around the corner pursued by Hall and Riley. She recalled hearing three shots before Riley, Hall and petitioner came back around the corner near Mr. Mike's. Upon hearing gunshots, Calderon yelled, "Val [Edwards], get down. He has got a gun." *Id.* at 109. Following two more gunshots that Calderon heard but did not see, Hall joined her behind a parked car and began unholstering his gun. According to Calderon, Hall fired twice at petitioner. She remembered this because two bullet casings struck her shoulder.[12] After instructing Calderon to stay behind the car, Hall chased petitioner north on Fourth Avenue. Calderon remained hidden for a time but then followed Hall at a distance. She eventually saw Hall stagger and fall after hearing gunshots near the intersection of Fourth Avenue and Stark Street. As she approached with other EID staff, she could see that Hall had been hit twice and was gasping for air. One of the rounds had passed through his wrist and the other struck his arm and traveled to his heart and lungs. Calderon testified that in his final moments, he said, "I love my kids. I love my family, and I really love my wife. I don't want to die." *Id.* at 122.

---

[12] The parties generally agree that these shots by Hall penetrated the window of Mr. Mike's.

33 - OPINION AND ORDER

Bystander Diana Walsh testified that she was walking northbound on Fourth Avenue, nearing Alder Street, when she saw petitioner running. She saw him pull a paper bag out of the back of his pants, but her view was immediately blocked by Hall and Riley who were chasing him. She saw petitioner raise his hand holding the paper bag and "felt" that petitioner had a gun, although she did not see one and did not see him shoot anyone. *Id*. at 143. She turned away to check on the four teenage girls she was supervising. She testified that she heard no gunshots before seeing petitioner pull the paper bag from his pants. She did not see what occurred next but remembered hearing "three different bursts of shots of probably four to six shots each time." *Id*. at 146. She testified that she was concerned with the safety of the children and did not see anyone fire any shots.

Riley testified that he first saw petitioner as Edwards and Calderon followed him on Fifth Avenue. Eventually petitioner passed immediately in front of Riley and he soon saw Hall approach from the opposite direction. Hall raised his arm and asked to have a word with petitioner. As Riley approached the pair, petitioner threw his hands in the air and asked, "[w]hat did I do wrong," then swung his arm backwards towards Riley. *Id*. at 168. Riley raised his arm to block petitioner's blow. Immediately thereafter, petitioner turned and ran north on Fourth Avenue as Hall and Riley gave chase. Moments later, Hall yelled, "He has got a gun. He has got a gun. Get down." *Id*. at 160. Riley saw petitioner turn and tear a paper bag open, revealing a gun in his hand. Riley testified that petitioner fired two or three shots in his direction. Riley retreated south around the northwest corner of Fourth and Alder, where he immediately saw Edwards standing on Alder Street's north sidewalk. According to Riley, Edwards was not moving as he ran past her so he turned and pulled her into the doorway of Mr. Mike's and initially had difficulty opening the door. Riley heard at least one

more gunshot and saw petitioner approaching through the window. Once the door was finally opened, Riley noticed Edwards fall immediately to the ground. He continued into the store and found shelter behind a merchandise rack for a short time before running up a flight of stairs where he stayed hidden for five to ten minutes.

Roberta McEnry was downtown shopping on the day in question. Hall trotted past her as she was walking on north on the east side of Fourth Avenue. Moments later, as she continued across Alder, she heard one gunshot, then another. When she turned to look back toward Fourth and Alder she saw petitioner with a gun in his hand. She saw him fire his gun west up Alder Street, then turn and run north along Fourth Avenue. She testified that Hall then appeared at the corner, stopped and fired a single shot in petitioner's direction and petitioner returned fire.

Mary Gates testified that she was standing on the southwest corner of Fourth and Alder when she became aware of a commotion. She recalled seeing "a man push his wife or his girlfriend down on the ground." Transcript Designation, Part M at 125. At about the same time, Gates heard someone say, "Oh, he has got a gun." *Id*. At trial, Gates testified that she could not remember whether she heard a gunshot first, but as she looked from the south to the north side of Alder Street, she saw petitioner pull a gun from the back of his pants. Both parties' attorneys questioned Gates about whether she heard the gunshot before she witnessed petitioner brandish his gun. Gates had initially told investigators that she heard a gunshot *before* she saw petitioner pull his gun, but at trial she was no longer "absolutely sure" that was the case. *Id*. at 126. On cross, Gates testified that she was so traumatized by the events of the day that she had difficulty distinguishing between her memory of the actual events and her imagination and nightmares.

35 - OPINION AND ORDER

Gates testified that she "could not be 100 percent sure of everything." *Id*. at 131. Notably, she did not recall seeing petitioner pull his gun from a paper bag. In addition, she first saw petitioner when he was on the north side of Alder Street. She did not see Hall or Riley. Presumably Hall had already hidden behind the car with Calderon and Riley had taken refuge either in the doorway or inside Mr. Mike's. The only person besides petitioner she recalled seeing was Edwards, who was standing on Alder Street wearing a green EID vest. Thereafter, Gates watched petitioner flee north on Fourth Avenue pursued by Hall. Gates testified that as petitioner ran toward Washington Street, he fired his weapon two to three times in a southeasterly direction and Hall returned fire two to three times. Multiple witnesses testified that they saw petitioner fleeing north on Fourth Avenue, occasionally turning to exchange fire with Hall. Bullet holes, generally understood to have been fired from Hall's weapon, were found in the windows of Mr. Mike's, in potted plants in front of a restaurant on the west side of the intersection of Fourth Avenue and Washington Street and also in the window of a Scientology office on the east side of Fourth Avenue. Witnesses testified that when petitioner reached Washington Street, he veered to the left then took a right on Fifth Avenue. Meanwhile, Hall continued moving north on Fourth Avenue. Their paths crossed again at the southwest corner of Fifth Avenue and Stark where petitioner attempted to commandeer a car at gunpoint. Hall, seeing petitioner threaten the driver, yelled from behind the cover of a concrete pillar for petitioner to get away from the car, to "[l]eave the innocent alone." Transcript Designation, Part K at 12. The driver, Kim Keaton, attempted to drive away, but her vehicle stalled. She helped her grandson unlock his door. The boy got out and ran toward Hall. Keaton threw her keys into the street and laid down on the car seat, expecting to be shot. Instead, she heard several

shots and saw petitioner running away east on Stark Street. After waiting a few minutes, she got out and saw that her front tires had been shot out.

Renatta Burke testified that she saw the exchange of gunfire on Fourth Avenue and Stark. She initially became aware of the incident when she saw Hall, gun drawn, telling bystanders to get down and take cover. She recalled seeing petitioner in the middle of the intersection pointing his gun at Hall. Next, she saw Keaton's grandson in the middle of the action and as Hall attempted to draw the boy to the safety of the concrete column, he was struck by a bullet and fell to the ground grasping his chest. This account was largely corroborated by Valvette Thorpe. Thorpe heard a gunshot shortly after he saw petitioner aiming his weapon at Keaton in her car.

After he fled, petitioner commandeered a pickup truck at gunpoint and sped across the Burnside Bridge and crashed into some parked cars after a short flight. After firing shots at an officer responding to the scene in his police vehicle and unsuccessfully trying to escape in two other vehicles, petitioner dropped his gun and surrendered to Portland Police.

<u>c.</u>      <u>*Analysis*</u>

While petitioner alleges that the evidence presented at trial was insufficient as a matter of law to allow a jury to find him guilty of aggravated murder under Or. Rev. Stat. § 163.095, the Court's review of the record reveals that he cannot demonstrate that the Oregon Supreme Court's conclusions pertaining to this claim were contrary to or involved an unreasonable application of *Jackson*. Specifically, the Court agrees with the Oregon Supreme Court that viewing the evidence in the light most favorable to the prosecution, the jury could rationally determine that after shooting Edwards, petitioner attempted to flee the scene and engaged in the gun battle with Hall in order to avoid capture for attempting to murder Edwards. In addition, the jury could reasonably infer that

petitioner intentionally killed Hall and fled the area in order to conceal petitioner's identity as the perpetrator of Edward's attempted murder. Given the evidence presented at trial, jurors could rationally adduce that although petitioner killed Hall in a public place in front of many witnesses, Hall's up-close confrontation with him before the shooting made it likely that Hall would be able to identify petitioner as the person who shot Edwards. Thus, the Court is satisfied that the jury had sufficient evidence to conclude that petitioner intentionally shot and killed Hall in order to avoid being identified as Edwards' shooter. Accordingly, given the significant burden placed on petitioners challenging the sufficiency of evidence in federal habeas, it is clear that petitioner has not and cannot demonstrate that the Oregon Supreme Court's conclusions pertaining to this claim were contrary to or involved an unreasonable application of *Jackson* such that he is entitled to relief on this claim.

B. Actual Innocence of Aggravated Murder

Petitioner alleges that, "based on evidence not presented to the jury together with the trial evidence, [he] is actually innocent of aggravated murder as well as the crime of attempted murder of Valencia Edwards." Brief in Support of Petition at 46.

*1. Exhaustion, Procedural Default and Herrera and Schlup*

Respondent contends that to the extent petitioner presents a free-standing actual innocence claim regarding his aggravated murder conviction under *Herrera v. Collins*, 506 U.S. 390 (1993), it is procedurally defaulted because he did not raise it on direct review or in his PCR proceedings. Petitioner counters that because such a claim is not cognizable under Oregon law, raising it would have been futile, and therefore, it is not subject to procedural default. Alternatively, he contends that any default is excused because he can satisfy the fundamental miscarriage of justice exception

to procedural default via a showing of "gateway" actual innocence under *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Under *Schlup*, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id*. (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). To meet this threshold, a petitioner must establish that, "it is more likely than not that no reasonable juror would have convicted him in light of [] new evidence." *Id*. Notably, where a petitioner cannot meet the *Schlup* standard, he is necessarily foreclosed from meeting the "extraordinarily high" standard in *Herrera*. *House v. Bell*, 547 U.S. 518, 554-55 (2006) (citations omitted). Accordingly, the Court first examines the question of whether petitioner can satisfy *Schlup*'s gateway actual innocence test.[13]

Briefly, in addition to the evidence presented at trial, petitioner suggests that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt of aggravated murder had he or she been privy to the following "new" evidence: (1) damning character evidence about Hall; (2) evidence pertaining to Hall and other EID employees involved in the August 22, 1992, incident and Oregon law governing self-defense and citizen arrests; (3) the excluded audio testimony of witness Mary Gates; and (4) the impact of cultural and familial trauma and violence on petitioner's psyche.

---

[13] The parties disagree whether a freestanding actual innocence claim is cognizable in the Oregon courts. Respondent contends that the issue has yet to be resolved by the Oregon courts or legislature. Nevertheless, he asserts that even if such a claim is not a valid basis for PCR relief, petitioner had an obligation to fairly present it to the state courts. Petitioner maintains that insofar as it remains unclear whether a freestanding actual innocence claim is cognizable in the Oregon courts, his claim cannot be procedurally defaulted because respondent cannot point to the existence of a clear and consistent state procedural rule precluding federal review if petitioner failed to present it to the state courts. Brief in Support of Petition at 47-48 (citing *Collier v. Bayer*, 408 F.3d 1279, 1284 (9th Cir. 2005)).

Respondent argues that *Schlup* is inapplicable here because his claim is not based on "newly discovered" evidence, but rather evidence that was available at the time of trial and either properly excluded or not introduced. Response at 70. The Court disagrees. To satisfy *Schlup* a petitioner must present "new reliable evidence . . . not presented at trial," and a habeas court must make "a holistic judgment about all the evidence, and its likely effect on reasonable jurors." *See House*, 547 U.S. at 539-40. "The habeas court must make its determination concerning petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted . . . and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Schlup*, 513 U.S. at 328. Accordingly, evidence supporting claims of gateway actual innocence need only be "new" to the extent it was not previously presented to the jury.

<u>*a.*</u>    <u>New Evidence</u>

i.    Hall - Character Evidence

According to petitioner, the prosecution presented the jury with an incomplete and misleading picture of Hall. In support of this assertion, petitioner submits the June 18, 2015 declaration of Laddie Hancock. Hancock supervised Hall in the late 1980's during Hall's probationary police officer training in Boardman, Oregon. In his 2015 declaration, Hancock averred that he initially hired Hall based on Hall's representation that he had previously been a certified police officer in Pensacola, Florida, which according to Hancock, turned out to be false. Hancock indicated that based on this misrepresentation about Hall's qualifications, coupled with his poor performance, he planned to recommend that Hall *not* be certified as a police officer in Boardman. Hancock also averred that he felt Hall had demonstrated poor judgment in both his professional and personal life.

Petitioner also submits an April 1992 affidavit from Hall's wife, Cynthia, regarding a domestic relations case then pending in Clackamas County, Oregon. Cynthia averred that Hall left her alone to care for their four young children after their separation. She claimed that because Hall was not paying court-ordered child support, she was unable to properly care for their children due to financial constraints, despite her full-time job. She further indicated that Hall was refusing to provide financial support out of "spite," and she asked the court to compel him to pay child support during the pendency of their divorce proceeding. Petitioner's Exhibit 23, Volume 49-2 at 2.

        ii.     EID Employees and Oregon Law on Self-Defense and Citizens Arrests

Petitioner proffers evidence regarding the propriety of EID employee conduct on the date in question. He asserts that no reasonable juror would have found him guilty beyond a reasonable doubt of aggravated murder had the court instructed the jury that the non-police-certified EID guides and officers had "no special right to seek to enforce any laws on the streets of Portland." Petitioner at 115. He insists that the jury instruction that the trial court did give, advising the jury that the EID employees had the right to make a citizen's arrest, including the use of force, was inaccurate because none of the EID employees witnessed petitioner commit any crimes before they confronted him. Petitioner further contends that the EID employees' conduct violated their own policies and procedures and that their actions in following, stopping, and chasing him caused him to form the belief that he needed to defend himself.

        iii.    Mary Gates Audio Tape

In addition, petitioner argues that had jurors heard the audio recording of Mary Gates, who initially told investigators that she heard a gunshot before she saw petitioner pull a gun from the back of his pants – testimony suggesting that petitioner did not fire the first shot on August 22,

1992 – it is more likely than not that not one of them would have found him guilty beyond a reasonable doubt of aggravated murder.

iv.    Impact of Cultural and Familial Trauma and Violence on Petitioner's Psyche

Finally, petitioner argues that the jury never heard significant evidence regarding the multigenerational trauma inflicted on him, his Klamath-Modoc Tribe and Native Americans in general. He insists that this trauma shaped many aspects of his character, including his defiance of authority figures and the law. He also suggests that it contributed to drug and alcohol abuse, fetal alcohol exposure, history of family violence, mental illnesses, personality disorders, PTSD and paranoia. He suggests that had the jury been presented with this evidence, it is more likely than not that not one juror would have found him guilty beyond a reasonable doubt of aggravated murder.

*b*.    *Analysis*

As noted above, in determining whether petitioner meets the *Schlup* threshold, the Court must consider whether upon being presented with *all* of the evidence, including new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty of aggravated murder beyond a reasonable doubt.

The Court considers first the impact of evidence suggesting that Hall had never been certified as a police officer, that he had lied about that fact (possibly even to procure his position as an EID officer) and that he was known to display poor judgment in situations where he had to make independent law enforcement decisions. Presumably, petitioner contends that had the jurors heard this evidence they would have had a reasonable doubt about whether petitioner committed aggravated murder when he shot Hall on the theory that Hall provoked petitioner and/or was the aggressor in the situation, and therefore, petitioner acted in self-defense.

42 - OPINION AND ORDER

In Oregon, an individual has a right to use physical force to defend himself from what the individual "reasonably believes to be the use or imminent use of unlawful physical force." Or. Rev. Stat. § 161.209. He or she may use a degree of force "which the person reasonably believes to be necessary for the purpose" of self-defense. *Id*. However, such force is not justified if the aggressor was initially provoked by unlawful physical force by the individual; or the individual was the initial aggressor (unless he or she later attempts to withdraw and effectively communicates to the second aggressor the intent to do so, and the second aggressor continues to assail the individual). Additionally, an individual is not justified in using deadly physical force upon another unless the individual reasonably believes that the other is: (1) committing or attempting to commit a felony involving the use or threatened use of physical force upon another person; (2) committing or attempting a burglary in a dwelling; or (3) using or imminently using deadly physical force against a person. Or. Rev. Stat. § 161.219.

After careful review of the record, and taking petitioner's arguments and proffered new evidence into consideration, the Court identifies the moments shortly before, during and after Hall and Riley initially confronted and chased petitioner, as the period in which petitioner might plausibly contend that he acted in self-defense.[14]

As noted, testimony was mixed as to whether shots were fired before Hall and Riley, tailed by petitioner, reappeared on Alder Street after they initially pursued petitioner when he ran away

---

[14] The Court considered whether petitioner could argue that he acted in self-defense when he came back into contact with Hall on the corner of Fourth Avenue and Stark Street. However, eyewitnesses, including Keaton, testified that petitioner had his gun pointed at Keaton's head before Hall fired any shots in petitioner's direction. Accordingly, petitioner was without question the initial aggressor against Keaton and any shots fired by Hall were justified by Hall's reasonable belief that petitioner was about to use deadly force against a third party.

from their initial confrontation. Edwards did not testify that she heard any shots before she saw petitioner come back around the corner. Riley testified that he heard petitioner shoot in his and Hall's direction before they returned to Alder Street. Calderon testified that she heard shots while the men were out of sight around the corner. Several bystanders also weighed in: Walsh testified that she saw petitioner raise something in his hand that she believed was a gun, although it was covered in a paper bag; McEnry testified that she heard a gunshot before she saw petitioner fire westward on Alder; and Gates ultimately testified that she was unsure whether she heard gunshots before or after she saw petitioner with his gun on Alder.

However convincing petitioner's argument that he acted in self-defense following his confrontation with Hall and Riley on Alder Street might be, he has not persuaded the Court that it is more probable than not that not one juror, hearing all of the evidence—including the proffered new evidence—would have rejected the self-defense argument and found petitioner guilty of aggravated murder beyond a reasonable doubt. Rather, a juror could reasonably conclude that petitioner's conduct following the confrontation was disproportionate to any force exerted upon him. And even assuming that Hall and Riley had no right to stop him on the street because such a stop constituted an unjustified citizen's arrest or involved an illegal use of physical force, a reasonable juror could nevertheless conclude that petitioner was not entitled to rely on self-defense to justify his use of deadly force. Under Oregon law a person is entitled to use the degree of force which he reasonably believes necessary to defend himself. Whatever threat Hall and Riley posed when they initially approached petitioner to "have a word" and then pursued him when he ran, a reasonable juror could conclude that petitioner was not justified in defending himself with a gun.

Moreover, the bulk of the of the evidence, consistent with the eyewitness testimony of Riley, Walsh and McEnry, suggests that in an effort to end the pursuit by Hall and Riley, petitioner stopped running, pulled out a gun prompting his pursuers' retreat, and fired. In so doing, petitioner raised the stakes by initiating the use of deadly force. Even assuming petitioner did not fire his gun prior to shooting Edwards, a plausible interpretation of the evidence has Hall and Riley retreating upon seeing the gun. In that scenario, a reasonable juror could conclude that petitioner's subsequent pursuit of them back around the corner from Fourth onto Alder and his firing on the unarmed Edwards was not reasonably necessary to defend himself. Or. Rev. Stat. § 161.219(3) (person is not justified in using deadly physical force upon another unless the person reasonably believes that the other person is using or about to use unlawful deadly force against a person).[15]

Similarly, even assuming the new evidence suggesting that Hall was poorly trained, dishonest, had a history of showing bad judgment in similarly stressful situations, and otherwise possessed poor moral character, might plausibly lead one fact finder to conclude that Hall was the initial aggressor or that he, not petitioner, fired the first shot, calls into question Hall's character and judgment. This evidence does not call into question the trial testimony of eyewitnesses and bystanders, summarized above. Thus, another juror reviewing all of the evidence could still reasonably conclude that petitioner was never justified in defending himself with a gun and reject

_____

[15] Citing *Middleton v. McNeil*, 541 U.S. 433, 434-35 (2004), petitioner implies that the facts of his case may be consistent with an "imperfect self-defense" theory wherein a person's unreasonable belief that they are subject to the use of imminent use of unlawful physical force reduces the criminality of his conduct from intentional homicide to voluntary manslaughter. Petition at 109. He further suggests that imperfect self-defense is "a defense available under Oregon law," based on *Aponte v. State*, 257 Or. App. 421, 423 (2013). *Id.* I disagree. *Aponte* mentions that the petitioner's defense counsel discussed "the concept of 'imperfect self-defense,'" with him, but there is no indication that the court found it cognizable under Oregon law and Oregon's statute does not contain a provision on imperfect self-defense.

petitioner's defense of self-defense. Accordingly, even considering the proffered new evidence along with the evidence presented at trial, he cannot show that no reasonable juror would have found him guilty beyond a reasonable doubt of aggravated murder.

Petitioner also argues that Gates' testimony supported a theory that Hall was the first to discharge his weapon and that the trial court's decision to exclude her recorded statements to investigators undermined his defense. However, even taking Gates recorded comments at face value, her account suggests that she either did not witness the entire sequence of events or did not recall important details. For example, contrary to the testimony of Riley, Edwards, Calderon, Walsh and McEnry, Gates testified that petitioner fired shots from the north to the south side of Alder. Indeed, she testified that she only witnessed petitioner go around the corner on Fourth and Alder one time, after which he continued to Washington Street and beyond. In addition, Gates did not recall seeing petitioner pull his gun from a paper bag. Finally, at trial she testified that due to the traumatic nature of the incident, she had difficulty distinguishing between her memories and imagined nightmares. In short, Gates' testimony differed from that of other eyewitnesses, she seemed not to have witnessed key events prior to petitioner shooting Edwards, and by her own admission, the reliability of her recollection is suspect. Accordingly, even had the trial court allowed the jury to hear the audiotape of Gates stating that she heard gunfire prior to seeing petitioner brandish his weapon, given the issues noted above, coupled with the fact that the substance of the tape was cumulative of evidence the jury did hear, it is unlikely that with the audiotape's admission, not one reasonable juror would have found petitioner guilty of aggravated murder beyond a reasonable doubt.

Petitioner further suggests that had evidence of the multi-generational trauma experienced by him and the Klamath-Modoc community where he was raised been introduced at trial, no reasonably juror would have found him guilty of aggravated murder beyond a reasonable doubt. He argues that since colonial times, government policies imposed on American Indians of all tribal affiliations have resulted in their genocide on a continental scale. He maintains that in the wake of many decades of government-sponsored oppression, removal, relocation, eradication and assimilation, families, tribes, communities, and entire cultures have been irreparably damaged. He further contends that the tremendous upheaval and institutionalized racism that European explorers first wrought some 500 years ago has continued to impact American Indians through the present day as cycles of substance abuse, poverty and violence continue to persist.

In addition, petitioner argues that he suffered this cultural trauma personally and acutely. He states that his childhood was marred by fetal alcohol exposure, neglectful and violent family relationships, and run-ins with racially-motivated and abusive law enforcement. As a consequence, he declares that he developed several mental health issues including PTSD and paranoid schizophrenia and that these mental problems often manifested as a "deeply paranoid [belief] . . . that law enforcment[] intended to kill him." Petition at 117. In short, petitioner asks the Court to conclude that had evidence of this multi-generational trauma been properly presented during his trial to bolster his theory of self-defense, no reasonable juror would have found him guilty beyond a reasonable doubt of aggravated murder.

In support of his argument, petitioner references the affidavit of California defense attorney, J. Tony Serra, who averred that he represented a defendant who killed a police officer in 1978 and who shared a similar cultural background with petitioner. The defendant in the other case had been

convicted and sentenced death, but the California Supreme Court reversed the judgment of conviction for murder, attempted murder and robbery on the ground that the trial court had incorrectly instructed the jury on principles of aiding and abetting. *People v. Croy*, 41 Cal.3d 1 (1985). In the new trial, Serra introduced extensive evidence of his client's cultural background and the jury acquitted him on all charges finding that he had acted in self-defense. Serra contends in his affidavit that petitioner's counsel here acted ineffectively when they failed to "effectively investigate, research and present evidence" relating to the treatment of Native Americans by all levels of government, law enforcement and the non-Native American community. Respondent's Exhibit 673, Volume 28-60. He credits the "cultural defense" evidence he proffered in *Croy*, including experts in Native American history and culture, a Native American psychologist and a professor of sociology, with educating the jury about the pressures placed on that defendant by the dominant culture and how those pressures impacted his life and his state of mind during the pertinent events. *Id*. at 101.

Petitioner asserts that his counsel did not introduce sufficient evidence of multi-generational trauma experienced by him and his Klamath-Modoc community. But, in fact, his counsel did give the jury significant evidence to consider on that point from multiple witnesses. Dr. True testified for the defense that it was likely that petitioner developed his "paranoid condition" following abuse by his own family members, and that as a result, he could not appreciate the criminality of his conduct at the time of his crimes. Transcript Designation, Part N at 142-43. The jury also heard from Dr. Whittington, a forensic psychiatrist, who had evaluated petitioner in the early 1980's. Dr. Whittington provided evidence that petitioner had a "disturbed and chaotic" childhood which was significantly impacted by alcoholism, frequent run-ins with law enforcement and racial

discrimination. And the jury heard additional testimony from neuropsychiatrist Dr. Plazak who had a special interest in the problems faced by Native Americans. He detailed petitioner's turbulent childhood and noted that cultural consideration of petitioner's Klamath/Modoc heritage was essential for proper diagnosis of him. He noted that even as a youth, tests indicated that petitioner suffered from developing stages of a schizophrenic disorder. He diagnosed petitioner with paranoid schizophrenia and noted that he also met some criteria for antisocial and borderline personality disorder characteristics.

Serra's affidavit notwithstanding, petitioner fails to explain how, given the facts in his case, a more comprehensive presentation of his cultural heritage – beyond the evidence the jury did hear, including allegations of significant trauma inflicted on him by law enforcement – *necessarily* would have swayed every juror not to convict him of aggravated murder based on the events of August 22, 1992. As discussed above, evidence in the record of petitioner's display of his gun, his pursuit of Hall and Riley, and his firing on Edwards undermines any self-defense theory regardless of his cultural background or any potentially heightened fear of authority figures he had stemming from multi-generational trauma.[16]

Based on the foregoing, although counsel did not present evidence concerning petitioner's Native American background and cultural experiences via a cultural expert or as comprehensively as he could have, defense experts did discuss those topics, including petitioner's turbulent upbringing and references to his cultural identity and history. In addition, trial counsel attempted in both his opening statements and closing arguments to link that history to petitioner's conduct.

---

[16] Respondent's argument that the affirmative defense of extreme emotional distress (EED) does not apply to charges of aggravated murder, and therefore is not applicable here, is well taken.

As noted above, *Schlup* sets a high bar for demonstrating entitlement to excuse procedural default and is seldom met. Here, assuming that the jury heard all of the evidence, including the new evidence proffered by petitioner here, it is not clear to the Court that no reasonable juror would find him guilty beyond a reasonable doubt of aggravated murder. Significantly, the new evidence is not based on the discovery of new exculpatory physical evidence, mistaken identity, or credible confessions or retractions. *See e.g., Sawyer v. Whitley*, 505 U.S. 333, 341 (1992). Instead, it rests primarily on an *argument* that jurors would have been swayed by the proffered new evidence to such extent that none of them would have found him guilty of aggravated murder. The Court does not agree. In fact, for the reasons discussed above, it is not clear to the Court that based on this new evidence the outcome would have been different for any single juror, let alone all twelve.

Because the Court concludes that petitioner cannot satisfy *Schlup*, it also finds that he cannot prevail on a "free-standing" claim of actual innocence under *Herrera*. *See House*, 547 U.S. at 555 ("It follows, given the closeness of the *Schlup* question here, that House's showing falls short of the threshold implied in *Herrera*.").

C.    Actual Innocence of Future Dangerousness

Petitioner contends that his actually innocent of being a future danger and therefore does not qualify for a death sentence under Oregon law. At the time of petitioner's trial, the future dangerousness question under Oregon law read as follows: "Whether there is a probability – meaning is more likely than not – that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Or. Rev. Stat. § 163.150(1)(b)(B). Oregon's death penalty sentencing scheme employed this question both to narrow the class of murderers eligible for the death penalty and to select from that pool those to sentence to death.

However, several recent developments are relevant to and affect the resolution of this issue. First, the Oregon legislature enacted Senate Bill ("SB") 1013 which, among other things, substantially narrowed what crimes can be punished by death. Or. Laws 2019, ch. 635; *see also State v. Bartol*, 368 Or. 598, 602-05, 496 P.3d 1013 (2021) (reviewing the legislative history of SB 1013). SB 1013 reclassified the various forms of murder and redefined "aggravated murder" to: 1) murders of children younger than 14 years old, 2) murders of law-enforcement officers, 3) terrorist attacks that kill at least two people, and 4) prison killings carried out by someone who'd previously been convicted of murder. Or. Rev. Stat. Ann. § 163.095 (West). All the forms of murder that had previously constituted "aggravated murder" were converted to "murder in the first degree." *See* Or. Laws 2019, ch. 635, §§ 1, 3. Lawmakers also removed the future dangerousness question from death-penalty jury instructions. *See* Or. Rev. Stat. Ann. § 163.150 (West).

Moreover, the Oregon legislature specifically provided that SB 1013 did not apply retroactively. However, in 2021, the Oregon Supreme Court overturned the death sentence of David Ray Bartol, finding that his death sentence, imposed prior to SB 1013's enactment, violated the Oregon State Constitution's prohibition on disproportionate punishments. *State v. Bartol*, 368 Or. 598, 600 (2021). And, in December 2022, Oregon Governor Kate Brown commuted the death sentences of all 17 prisoners on the death row, including petitioner, and they were resentenced to life without the possibility of parole. Unopposed Motion to Lift Stay, Attachment A (ECF No. 127).

In light of these legislative, judicial and gubernatorial actions, petitioner's challenges to his death sentence, including the question of his future dangerousness, are denied as moot because he is no longer sentenced to death.

III.    **Claim 3 - Deprivation of the Right to Notice of the Charges Sufficient to Prepare to Confront the Evidence and Present a Defense**

Here, petitioner alleges that Count Three of his indictment was constitutionally flawed in that it charged him with killing Hall while fleeing to avoid being identified as the perpetrator of an attempted murder without identifying the individual petitioner had attempted to murder – even though the attempted murder victim could have been any one of a number of individuals.

He concedes that his trial counsel failed to demur or otherwise object to the indictment as providing insufficient notice of the charges and that the Oregon Supreme Court on direct review specifically declined to review this claim as plain error. Nevertheless, he argues that trial counsel was constitutionally ineffective assistance in failing to properly challenge the indictment, and that pursuant to *Martinez*, his PCR counsel's failure to raise that ineffective assistance of counsel claim should excuse any default of both the underlying due process claim at issue here and the ineffective assistance of counsel claim. He also insists that his PCR counsel did not raise a claim faulting trial counsel with failing to demur the indictment, but rather alleged that trial counsel failed to properly research and raise issues regarding the constitutionality of the charging instrument and that such failure prejudiced petitioner in various ways, including that it "led trial counsel to fail to demur to the indictment." Brief in Support of Petition at 49.

Petitioner's representations notwithstanding, the Court's review of the PCR Petition reveals that petitioner did raise an ineffective assistance of trial counsel claim faulting counsel with failing to demur or otherwise challenge the indictment and that the PCR court denied such claim on the merits. Indeed, petitioner specifically alleged that due to counsel's failure to demur or otherwise object to the aggravated murder counts in the indictment (Counts 1-3), he "was subjected to a trial under an indictment that was unconstitutionally vague because Counts 1, 2, and 3 did not inform

52 - OPINION AND ORDER

Petitioner who he had allegedly robbed, kidnaped or attempted to murder a necessary predicate to the three Aggravated Murder counts." Respondent's Exhibit 542, Volume 28-13 at 4. Moreover, the State addressed the claim on the merits, arguing that the Oregon Supreme Court had settled the issue in *State v. Hale*, 335 Or. 612, 75 P.3d 448 (2003), *cert. denied* 541 U.S. 972 (2004).

> There, noting that it had left the issue open in *Lotches*, the court held:
>
>> We continue to agree with defendant that, in this case, where the record would support more than one incident of third-degree sexual abuse, defendant was entitled to know the state's precise theory of the case and which facts and circumstances the state was relying on to support the aggravated murder counts. However, we do not agree that requiring the trial court to sustain defendant's demurrer to the indictment is the proper (or only) vehicle for ensuring that defendant obtains the information that he seeks. Defendant had other avenues available to him for acquiring that information, such as later moving the court to require the state to elect a specific incident of third-degree sexual abuse, or requesting special jury instructions that clarify the matter.
>>
>> In light of the foregoing, we now confirm that, as this court so many times has held, an indictment generally is sufficient if it charges an offense in the words of the statute.

*Id*. at 621 (citations omitted). Accordingly, the State maintained that even if petitioner's counsel had challenged the indictment, the trial court would have denied the challenge on these same grounds.

In denying relief on petitioner's claims, the PCR court found: (1) that while the Oregon Supreme Court declined to address petitioner's sufficiency of the indictment claim on direct review, it later rejected the same argument in *Hale*; and (2) that petitioner had presented no argument or persuasive evidence supporting his claim that trial counsel were ineffective for failing to demur the indictment on the ground that Oregon's death penalty statutes are unconstitutional on their face or as applied to petitioner.

Based on the foregoing, the Court concludes that petitioner's PCR counsel *did* raise a claim of ineffective assistance of trial counsel faulting counsel with failing to demur the indictment, including as to Count Three, and that the PCR court denied such claim on the merits. Accordingly, petitioner cannot rely on *Martinez* to excuse the default of either the ineffective assistance of counsel claim or the due process claim presented here (Claim 3). *See Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (As a threshold matter, to demonstrate cause under *Martinez* sufficient to excuse the procedural default of an ineffective assistance of trial counsel claim a petitioner must establish his PCR counsel was ineffective under *Strickland*).

Petitioner alternatively argues that even if PCR counsel raised the relevant ineffective assistance of counsel claim, the Court should excuse its procedural default because counsel's failure to adequately "prosecute" the claim prevented him from raising it on appeal except as plain error. Brief in Support of Petition at 50. The Court rejects this argument. Petitioner's reliance on *Peeples v. Lampert*, 345 Or. 209 (2008) and *Gallow v. Cooper*, 570 U.S. 933 (2013) notwithstanding, the Court concludes that petitioner adequately preserved this claim for appeal regardless of whether he specifically objected to the PCR court's findings of fact and conclusions of law as to that claim. As set out in *Peeples* itself:

> The general requirement that an issue, to be raised and considered on appeal, ordinarily must first be presented to the trial court is well-settled in our jurisprudence. *See, e.g., State v. Lundy*, 103 Or. 443, 509-10 206 P. 290 (1922) (identifying preservation rule; citing earlier cases). For some years, the requirement also has been part of Oregon's Rules of Appellate Procedure, which provide that "[n]o matter claimed as error will be considered on appeal unless the claimed error was preserved in the lower court[.]" ORAP 5.45(1). The principal exception to preservation requirements is for so-called "plain error"—that is, an error apparent on the record, about which there is no reasonable dispute. *See, e.g., State v. Brown*, 310 Or. 347, 355-56, 800 P.2d 259 (1990(describing plain error). An appellate court has discretion to consider such an error, but it must to so with the "utmost caution," because of the strong policy reasons favoring preservation. *Ailes v. Portland*

*Meadows*, *Inc.*, 312 Or. 376, 382, 823 P.2d 956 (1991) (identifying procedure and bases for consideration of plain error).

345 Or. at 219.

The court in *Peeples* narrowly focused on the question of whether a petitioner needed to have preserved a procedural issue contending that the PCR court failed to make specific findings explaining why a lesser sanction than dismissal was not adequate when petitioner failed to cooperate in a properly scheduled deposition. Notably, even under those circumstances, the court determined that the petitioner had properly preserved the substantive issue challenging the merits of the PCR court's dismissal of the petition. Here, no special findings were at issue. If anything, *Peeples* underscores the fact that petitioner was under no obligation to take further action to fairly present this substantive claim to the PCR court in order to preserve it for appeal because he adequately satisfied the prudential and pragmatic policies underlying the preservation requirement when: (1) he presented the claim in a way that gave the PCR court the chance to consider and rule on it, provided a fair opportunity for respondent to respond, and allowed for adequate development of the record; and (2) given the nature of the claim and the PCR court's resolution of it on the merits, procedural fairness does not favor requiring petitioner to file perfunctory objections to that court's findings of fact and conclusions of law on the subject claim in order to preserve it for appeal.

With regard to *Gallow*, I note that Justices Breyer and Sotomayer's statement that "[a] claim without any evidence to support it might as well be no claim at all" is dicta, and, unlike the compelling facts at issue in *Gallow*, wherein PCR counsel appears to have been egregiously ineffective in failing to support the underlying ineffective assistance of counsel claim with critical and available support, PCR counsel here adequately presented both the ineffective assistance claim and relevant legal arguments supporting it. Moreover, unlike the facts in *Gallow*, where due to PCR

counsel's failings, the PCR court rejected trial counsel's affidavit essentially admitting to his ineffectiveness on state evidentiary grounds and thereby leaving the claim with virtually no evidentiary support, PCR counsel here adequately presented the issue and legal arguments to the PCR court such that it was able to resolve it on the merits and did so.

The PCR court considered and denied petitioner's ineffective assistance claim based on his trial counsel's failure to demur the indictment on the merits. Subsequently, petitioner opted not to challenge this denial on appeal. Accordingly, the claim is defaulted. *Martinez* cannot excuse the default of an ineffective assistance of counsel claim based on the ineffective assistance of PCR *appellate* counsel. Accordingly, petitioner cannot rely on *Martinez* to excuse the default of either Claim 3 or a related ineffective assistance of trial counsel claim.

Finally, petitioner inexplicably suggests that Oregon's preservation rules barring review of alleged errors not objected to at trial and raised on direct appeal are inadequate. The Supreme Court has held that federal courts shall "not review a question of federal law decided by a state court if the decision of that court rests on a state law ground," be it substantive or procedural, that is "independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729 (citations omitted). An adequate and independent finding of procedural default precludes federal habeas review of the federal claim, unless the habeas petitioner can show "cause" for the default and "prejudice" attributable thereto, *Murray*, 477 U.S. at 485, or demonstrate that the failure to consider the federal claim on habeas will result in a "fundamental miscarriage of justice," *id*. at 495 (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)).

However, federal review is precluded under this doctrine only when the state ground is both an "independent" basis for, and "adequate" to support the decision. *See Harris*, 489 U.S. at 261-

62. For a state ground to be considered "independent," it must be "clear from the face of the opinion" that the court intended to rely on the state rule in disposing of the federal claim. *Coleman*, 501 U.S. at 735. A procedural bar will be deemed "adequate" only if it is based on a rule that is "firmly established and regularly followed" by the state in question. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991). Whether application of the procedural rule is firmly established and regularly followed must be examined in the context of the specific circumstances presented in the case and of the asserted state interest in applying the procedural rule in such circumstances. *Lee v. Kemna*, 534 U.S. 362, 386-87 (2002).

Here, in denying this claim, the Oregon Supreme Court relied solely upon Oregon's preservation rule requiring the defense to object contemporaneously to an alleged error at trial to preserve such error for appellate review. The Oregon courts, including the Oregon Supreme Court on direct review in death penalty cases, consistently demand compliance with this preservation rule. Petitioner's counsel failed to comply with this procedural rule with a demur to the indictment. This federal district court and the Ninth Circuit have concluded that the state preservation rule (Or. R. App. P. 5.45(1)) is adequate to support a state-court judgment. *See Sanders v. Mills*, 2014 WL 1322986, at *7-8 (D. Or. Apr. 1, 2014); *Bohannon v. Franke*, 2013 WL 3766555, at *3-*4 (D. Or. July 16, 2013); *see also Tatarinov v. Premo*, 533 Fed. Appx. 778 (9th Cir. July 18, 2013) (concluding that plain error rule of Or. R. App. P. 545(1) is firmly established and regularly followed) (unpublished).

Petitioner suggests that in the context of a mandatory direct appeal to the Oregon Supreme Court in a death case brought pursuant to ORS 138.012(1) there is no way to predict which unpreserved issues the Oregon Supreme Court will or will not address. Consequently, he contends

the preservation rule related to death penalty cases is inadequate to support a state-court judgment because it is not consistently applied. He relies on *State v. McAnulty*, 356 Or. 432 (2014) and his own case to support his argument. They do not. In *McAnulty*, the Oregon Supreme Court specifically indicated that it was rejecting without discussing certain issues on the basis that they were unpreserved. *Id*. at 437 n.1. Petitioner seizes on the court's willingness to review an alleged error surrounding the admission of McAnulty's statements during the penalty phase despite the fact that her counsel did not object to their admission. Contrary to petitioner's suggestion, however, the Oregon Supreme Court did not bypass the preservation rule. Rather, it relied on "the rule of preservation that permits a reviewing court to consider issues previously litigated and decided notwithstanding a lack of relitigation at trial." *Id*. at 665 (citations omitted). In other words, the court concluded that because the trial court in *McAnulty* had already considered the merits and ruled on the question of whether the statements were admissible in the context of defendant's pretrial motion to suppress those statements, that court was on notice of defendant's position regarding that evidence during the penalty phase, and therefore, under those circumstances where the judge already gave a final ruling, the issue was adequately preserved for review even though a new objection was not made during the penalty phase.

Similarly here, petitioner suggests that the Oregon Supreme Court's refusal to look past his failure to object to the sufficiency of the indictment and consider that claim on the merits contrasted with its willingness to do so on the sufficiency of the jury instructions issue, buttresses his argument that the preservation rule as applied to capital cases in Oregon is not an adequate state procedural rule. This too is incorrect. Once again, the Oregon Supreme Court did not bypass the preservation rule. Rather, its decision to examine the potential errors on the merits turned on whether it found

plain error sufficient to excuse petitioner failure to preserve the error below. That it found plain error as to the jury instruction issue, but not as to the sufficiency of the indictment claim, in no way supports petitioner's argument that the state preservation rule is inadequate. Based on the foregoing, the Court concludes that even in the context of a capital case, Oregon's preservation rule is adequate to support a state-court judgment. Accordingly, the Court denies Claim 3 on the basis that it is procedurally defaulted and petitioner cannot demonstrate entitlement to excuse the default.

## IV.    Claim 4 - Deprivation of Right to Testify

Petitioner alleges that the trial court deprived him of his Constitutional rights to due process, to confront the evidence against him, to present a defense, and to a fundamentally fair criminal proceeding, when it refused to allow him to testify during the guilt phase of his trial. He contends that he repeatedly made his wish to testify clear, but that the trial court put his testimony off to accommodate expert witness testimony. He insists that he relied on the trial court's representation that he could testify "tomorrow or next week or at the end of the trial" and points to discussions about what form his testimony might take and whether he would be subject to the rules of evidence. Petition at 128. When the defense rested its case, however, the trial court did not ask petitioner whether he was going to testify and did not take a personal waiver from him waiving his right to testify. Instead, the prosecution and defense presented rebuttal and sur-rebuttal witnesses. Thereafter, petitioner raised the issue of testifying and told the court he understood from its prior statements that he had to wait until the end of the case to testify. He maintains that the trial court ultimately declined to allow him to testify because it did not know what he was going to testify to and the defense had rested its case.

In denying this claim on the merits, the Oregon Supreme Court held:

59 - OPINION AND ORDER

After reviewing the record, we agree with the state that the trial court was entitled to conclude that defendant had waived his right to testify on his own behalf at the close of the defense case. Although it is true that, at various times, defendant had expressed a desire to testify, he remained silent at all critical moments when his lawyers and the court discussed resting the defense case. Given defendant's loquacious participation in earlier discussions on the topic, his silence at that moment spoke volumes. Defendant does not argue that trial courts have an affirmative duty to determine whether a silent defendant has knowingly and intentionally waived his constitutional right to testify. Indeed, defendant concedes that the courts do not have such a duty.[] Accordingly, when defendant's counsel rested the case in open court, without calling defendant to testify or notifying the court of his desire in that regard, the trial court was permitted to assume that defendant and his lawyers mutually had decided that defendant would not testify.

\* \* \*

We consider the facts as they appeared to the court at the time when the defense rested. Because defendant remained mute while his lawyers rested the defense case, the court was entitled to assume and, as is apparent from the court's remarks, did in fact assume that defendant acquiesced in his lawyers' actions.

Additionally, the record does not support defendant's assertion that the trial court separately denied defendant the right to reopen the case so that his testimony could be received. It is apparent from the trial court's remarks to defendant on the second-to-last day of the trial that defendant would have been permitted to testify the next day if he had been willing to follow the rules of evidence. Defendant conferred with his lawyers on the matter and defendant's lead counsel informed the court that defendant "does inform me that he has said to the court what he's wished to say to the court, and that he has nothing further to say to the court." Defendant does not contend that the trial court should have allowed him to testify without restrictions. Under the circumstances, then, defendant waived his right to testify a second time at the conclusion of the trial. The trial court did not deny defendant his right to testify; there was no error.

*Lotches*, 331 Or. at 484-85.

As noted above, determinations of factual issues made by a state court shall be presumed correct and petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. The Oregon Supreme Court assessed the record and determined that petitioner waived his right to testify: (1) at the close of the defense case when he remained silent; and (2) after the case was closed when he failed to indicate a willingness to testify subject to the

60 - OPINION AND ORDER

rules of evidence. While petitioner plainly disagrees with this assessment, he fails to rebut the court's finding by clear and convincing evidence. Moreover, the Court's independent review of the record is consistent with the Oregon Supreme Court's findings concerning what petitioner knew surrounding his right to testify and what the trial court could have fairly concluded based on petitioner's silence and his failure to unequivocally express a willingness to testify subject to the rules of evidence. Accordingly, the Court concludes that petitioner cannot show that the Oregon Supreme Court's factual findings were unreasonable in light of the evidence in the record or that its denial of relief on this claim was contrary to or involved an unreasonable application of Federal law as determined by the Supreme Court.

Petitioner alternatively alleges that his trial attorneys were constitutionally ineffective in failing to ensure that the trial court respected his right to take the stand in his own defense and in failing to ensure that it gave him the opportunity to do so, such as by discussing with him how he could testify within the parameters of the rules of evidence. In that vein, he alleges that counsel failed to ensure that any waiver of his right to testify was knowing, intelligent and voluntary. Petitioner raised this ineffective assistance claim in his PCR proceedings. However, in denying relief on this claim, the PCR trial judge found:

42.    Petitioner's trial attorneys advised petitioner not to testify, in part because he consistently said that he could not remember anything about the shootings, but they did not prevent him from testifying. Both counsel understood that petitioner had the right to decide whether to testify.

43.    Petitioner knew that he had the right to testify, and that issue was discussed periodically throughout the underlying criminal trial. Petitioner also knew that he needed to testify before the close of the defense's case-in-chief, but he said nothing when the defense closed its case-in-chief.

44.    Although neither of petitioner's attorneys could clearly recall for this proceeding when petitioner made the decision not to testify, the court finds that petitioner knew he could testify and had decided not to testify before the

defense closed its case-in-chief. If any question had remained about whether petitioner wanted to testify at the time that Manning closed the defense's case-in-chief, Manning would not have done so without first confirming whether petitioner was going to testify. He would not have simply forgotten to call petitioner as a witness.

45.    In any event, petitioner presented no persuasive evidence to prove that he still wanted to testify when the defense closed its case-in-chief.

46.    When petitioner raised the issue of his testifying after the defense rested its case, he consistently disagreed with the requirement that any testimony he would give would be regulated by the rules of evidence. Even if petitioner would have been permitted to testify after the close of the defense case-in-chief, he submitted no persuasive evidence to show that he would have chosen to testify given the application of the rules of evidence.

47.    When discussing his desire to testify after the defense closed its case-in-chief, petitioner said he wanted to testify about the circumstances of his life. He submitted no evidence or argument to show that his general testimony in that respect would have been relevant or admissible in the guilt/innocence phase of the trial. Any suggestion by petitioner that he would have testified in accordance with his deposition testimony about the circumstances of the crime is not credible.

Respondent's Exhibit 565, Volume 28-14 at 10-11.

A tactical decision exercised by counsel deserves deference when counsel makes an informed decision based on strategic trial considerations and the decision appears reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). On the other hand, "it cannot be permissible trial strategy, regardless of the merits or otherwise, for counsel to override the ultimate decision of a defendant to testify contrary to his advice." *United States v. Mullins*, 315 F.3d 449, 453 (9th Cir. 2002). This is so because "a defendant in a criminal case has the right to take the witness stand and testify in his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49 (1987). The defendant may, however, waive this right, either explicitly or implicitly. *United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir.), *cert. denied*, 528 U.S. 989 (1999). Such waiver may be inferred from a defendant's failure to testify at trial or to notify the court of his desire to

testify. *Id*. at 1094-95. "Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to testify," but he "can reject his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir.), *cert. denied*, 510 U.S. 1019 (1993).

Here, beyond his own assertions, petitioner has not rebutted by clear and convincing evidence the PCR findings above. Petitioner was aware of his right to testify, but he waived that right by his silence at the critical juncture when defense rested its case-in-chief and again by later equivocating as to whether he would testify in accordance with the rules of evidence. In *U.S. v. Gillenwater*, the Ninth Circuit specifically held that a court can infer that a defendant has personally waived the right to testify when defense counsel elects not to call the defendant and, despite being present, the defendant takes no affirmative action to demonstrate his disagreement with counsel. 717 F.3d 1070, 1080 (9th Cir. 2013). Accordingly, petitioner cannot show that the Oregon court's denial of this ineffective assistance claim was contrary to, or involved an unreasonable application of *Strickland*, or that it was based on an unreasonable determination of the facts.

## V. Claim 5 - Trial Court's Evidentiary Rulings Violated Petitioner's Constitutional Rights

### A.    Claim 5.B. - Taped Statement of Mary Gates[17]

Petitioner alleges that the trial court violated his rights to due process, to equal protection, to compulsory process, to confront the evidence against him, and to present a defense when it denied admission of witness Mary Gates' taped statement. As discussed above, Gates witnessed the initial shooting between Hall and petitioner and initially reported that she heard shots *then* saw

---

[17] There is no "Claim" 5.A. in the Petition. For ease of tracking, the Court refers to the claims it identifies as petitioner numbered them in the Petition.

petitioner pull his gun from the back of his pants—suggesting that the first shots came from Hall. Several months later and less than a month before trial, a defense investigator took a taped statement from Gates confirming that she heard the shots before she saw petitioner draw his gun. Shortly thereafter, however, an assistant district attorney and a Portland police officer visited Gates and at this meeting she began to question her recollection. She testified at trial that she was not absolutely sure whether she heard the gunshot before or after she saw petitioner pull out the gun. Given this equivocation, the trial court permitted the defense to introduce notes of the police investigator who interviewed Gates the day after the shooting which were consistent with what she told the defense investigator about the order of events. The court refused, however, to allow the defense to introduce its investigator's audiotape to rehabilitate Gates' credibility and to substantiate her prior consistent statement on the gunfire issue. It found that because the witness testified that she told the police investigators and a defense investigator in separate interviews that she heard the gunshot before seeing petitioner pull out his gun, there was nothing to rehabilitate. The court also noted that the audiotape evidence was cumulative, that it likely contained matters not in dispute, and that the jury should see and rely on Gates' demeanor in open court.

Petitioner challenged the trial court's ruling on direct appeal. The Oregon Supreme Court determined that even if the trial court erred in refusing to admit the tape, petitioner failed to show such error affected the verdict. It noted that while one witness testified that petitioner pulled his gun out before shots were fired and Gates testified that she told investigators that he did so after, *all* the witnesses, including Gates, testified that the words "He's got a gun," preceded the first shot and all of the witnesses who knew Hall testified that he was the one who said it. *Lotches*, 331 Or. at 487-88. Accordingly, the Oregon Supreme Court concluded that the only reasonable inference

to draw from Hall's exclamation that petitioner had a gun, was that "Hall felt that either he or others nearby were in danger from defendant and his gun. Under those circumstances, it would not matter whether Hall or defendant fired the first shot [because] [i]f Hall perceived that defendant was about to use his gun, Hall would have been justified in firing the first shot, which undercuts defendant's self-defense theory." *Id.* at 488.

Petitioner suggests that the Oregon Supreme Court's decision denying his claim rests on an unreasonable determination of the facts in light of the state record. Seemingly, however, the key factual finding in the court's ruling is that based on his yelling "He's got a gun," Hall felt that either he or others nearby were in danger. Petitioner does not dispute this finding and the question that the audio tape was meant to clarify, *i.e.*, whether Gates heard shots before seeing petitioner pull his gun out, does not bear on that finding. Petitioner also asserts that respondent ignored his subclaims dealing with due process, equal protection and compulsory process. The Court disagrees. Respondent noted that petitioner's claims center on the question of whether the audiotape was admissible and that he does not appear to take issue with the Oregon's Supreme Court's ultimate conclusion—that any error in disallowing the tape was harmless beyond a reasonable doubt. Moreover, in noting that petitioner asked the trial court to admit the tape under OEC § 801(4)(a)(B) as a prior consistent statement necessary to rehabilitate Gates' credibility and that he raised this same argument on direct review, respondent contends that petitioner failed to preserve for appellate review other trial court error claims related to the trial court's refusal to admit the tape, such as an equal protection claim.

Respondent's arguments are well taken. The Court concludes that petitioner has failed to demonstrate that the Oregon Supreme Court's denial of this claim was based on an unreasonable

65 - OPINION AND ORDER

determination of the facts or that it was contrary to or involved an unreasonable application of Federal law as defined by the Supreme Court. Alternatively, even assuming petitioner's broader claims were properly before the court, the Court would conclude on *de novo* review that the trial court did not violate petitioner's rights to due process, equal protection and/or compulsory process when it declined to admit the tape because as the trial court determined, the evidence was largely cumulative. Any difference in Gates' tone on the tape would have had minimal probative value, and its admission was unlikely to have affected the outcome of trial. Ultimately, the Court's review of the relevant portions of the record, including other witnesses' testimony describing the circumstances leading to the first gunfire exchange between Hall and petitioner, Gates' testimony itself and relevant police notes/reports, compels it to reject petitioner's argument that the trial court's failure to admit the audiotape violated his rights to due process, equal protection or the guarantee of a fundamentally fair criminal trial.

B.    Claim 5.C. - Hall's "Dying Declaration"

Petitioner faults the trial court with admitting Hall's "dying declaration"[18] while failing to allow in evidence that Hall was not recommended for certification as a police officer, that he showed bad personal and professional judgment as a probationary officer, and that he lied about having been a certified officer in Florida and in Boardman, Oregon. Respondent contends that this Sixth Amendment claim is procedurally defaulted because petitioner failed to exhaust a claim that Hall's statement should have been excluded because its probative value was outweighed by its prejudicial effect.

---

[18] "I love my kids. I love my family, and I really love my wife. I don't want to die." Transcript Designation, Part J at 122.

Petitioner concedes that the claim is defaulted but argues that the Court should excuse the default because his PCR counsel, while including an ineffective assistance of counsel claim based on trial counsel's failure to object to the admission of Hall's statement on due process, equal protection and compulsory process grounds, failed to adequately *prosecute* the claim. He notes that PCR counsel filed objections to the proposed findings of fact and conclusions of law which referenced the claim but failed to address their deficiencies. Consequently, petitioner insists that PCR counsel's failure to raise specific objections precluded him from raising the claim on appeal. In addition, he contends the Court should excuse any default of this claim because Oregon's rule barring review of alleged errors not objected to at trial and raised on direct review is inadequate.

In his PCR Petition, under the subheading "Failure in Trial Evidence and Presentation and Objections," petitioner alleged that his trial counsel:

> P.    Failed to object to William Hall's dying statements on the proper ground that the evidence was irrelevant under OEC 402 and that any probative value to said statements was outweighed by its prejudicial effect under OEC 403 and that further the admission of said statements violated Petitioner's rights under Article I, sections 11, 12, 13, 15, 16, 33, and 40 of the Oregon Constitution and the Sixth and Eighth Amendments of the United States Constitution as well as the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Respondent's Exhibit 542, Volume 28-13 at 10. In its trial memorandum, the State contended that given the brevity and relative innocuousness of the testimony about Hall's dying words (basically Hall said that he did not want to die, that it hurt, and that he loved his wife and children) petitioner was unlikely to show that a court would have been required to exercise its discretion to keep the evidence out if petitioner had objected to it on alternative grounds, including arguing that the statement's probative value was outweighed by its prejudicial impact.

Ultimately, the PCR court denied relief on all of petitioner's claims. With regard to this claim, it found:

> 30.     Petitioner's trial counsel objected to William Hall's dying statements as hearsay. The trial court overruled the objection, and the Oregon Supreme Court affirmed the trial court's ruling admitting the evidence. **Petitioner presented no argument to prove there is a reasonable probability that argument based on any other legal grounds would have caused the criminal trial court to exclude those statements, or that exclusion of Hall's statements would have made any difference**.

Respondent's Exhibit 565, Volume 28-14 at 8 (emphasis added).

Based on the foregoing, the Court concludes that petitioner's PCR counsel raised an ineffective assistance of counsel claim faulting counsel with failing to object on broader constitutional grounds to the admission of Hall's dying statement at trial, including as violative of the Sixth and Fourteenth Amendments. The PCR court considered and denied this ineffective assistance claim on the merits. Subsequently, petitioner opted not to challenge this denial on appeal.

Accordingly, for the reasons discussed in Claim 3, above, the claim is defaulted. *Martinez* does not apply to ineffective assistance of PCR appellate counsel and therefore petitioner cannot rely on it to excuse the procedural default of the due process claim here or a related ineffective assistance of trial counsel claim. Similarly, as noted above, Oregon's preservation rule is adequate to support a state-court judgment even in a capital case. Accordingly, petitioner cannot demonstrate entitlement to excuse the default of Claim 5.C. and the Court denies it on that basis.

C.    Claim 5.D. - Complete Evidence Surrounding Allegations of Malingering at Colorado State Hospital

Petitioner alleges that the trial court, while allowing Colorado State Hospital employees to testify that petitioner malingered his mental illness, violated his rights to due process, equal protection, compulsory process, right to confront the evidence against him and to present a defense

when it: (1) refused to admit letters Drs. Caster and Conde sent Scott Jurdem, petitioner's former

Colorado public defender, alleging a pattern of institutionalized bias in the Colorado State Hospital

predisposing doctors to misdiagnose its mentally ill patients as malingerers; (2) limited Jurdem's

testimony regarding the bias of two other doctors who had diagnosed petitioner as a malingerer;

and (3) refused to allow Drs. Caster and Conde to testify at trial.

      In denying relief on direct appeal to petitioner's challenge to the trial court's determination

that Jurdem's testimony was not relevant under OEC 401, the Oregon Supreme Court found:

> Defendant has not shown how Jurdem's opinion concerning the credibility of the
> two Colorado doctors who had diagnosed defendant as malingering would have had
> any tendency to affect the jury's assessment of the credibility of witnesses who
> testified for the state in its case-in-chief. Moreover, the trial court gave defendant an
> opportunity to establish relevance by showing that the state's mental health experts
> had relied on those doctors' conclusions in forming their own opinions, but
> defendant never established the necessary link.

*Lotches*, 331 Or. at 490-491. In addition, that court found that petitioner had not preserved at trial

constitutional arguments asserting that evidence of bias is always relevant and that the trial court

violated his rights under the compulsory process and confrontation clauses of the Sixth Amendment

and that no such error was apparent on the face of the record. Similarly, it held that the letters to

Jurdem were inadmissible hearsay and not sufficiently connected to petitioner to be relevant.

      With regard to Jurdem's testimony and the two proffered letters, petitioner apparently

concedes that the Oregon Supreme Court considered the non-state law constitutional evidentiary

question as possible plain error and renews his argument that when that court does this plain error

analysis, it necessarily considers the merits of the claim.[19] For the reasons discussed in Claim 3,

---

[19] Petitioner notes that the Oregon Supreme Court did not say that the claim was
unpreserved, but rather that it did not rise to the level of plain error. The Court disagrees. The court
specifically noted that "[d]efendant did not raise those constitutional arguments [arguments that the

above, the Court rejects this argument and denies these claims as procedurally defaulted. Moreover, even if petitioner did properly exhaust these claims, he cannot show that the Oregon Supreme Court's determination that the evidence was not relevant or that its omission did not prejudice the jury's verdict is contrary to or involved and unreasonable application of Federal law as determined by the Supreme Court.

Petitioner also concedes that any claim alleging the trial court erred in refusing to allow Drs. Caster and Conde to testify is procedurally defaulted. Nevertheless, he argues that the Court should excuse the default because his PCR counsel failed to claim that direct appellate counsel rendered ineffective assistance in failing to raise the claim on direct appeal. The Court rejects this argument. As noted above, *Martinez* only excuses the default of substantial ineffective assistance of trial counsel claims.

Accordingly, the Court denies relief on Claim 5.D. in its entirety.

D.      Claim 5.E. - Admission of Prior Convictions

Petitioner alleges that the trial court violated his rights to due process, equal protection and to a fundamentally fair criminal trial when it erroneously admitted certain of his prior convictions even though a Colorado court had ruled that they had been unconstitutionally obtained. Respondent maintains that this claim is procedurally defaulted because petitioner did not raise it on direct appeal or in his PCR proceedings. In addition, he argues that it lacks merit because petitioner put his prior invocations of the insanity defense at issue when he raised an insanity defense in this case. As such, respondent insists petitioner's criminal history was highly relevant to this defense.

---

trial court's exclusion of the evidence violated his rights under the compulsory process and the confrontation clauses of the Sixth Amendment] before or during trial . . . ." *Lotches*, 331 Or. at 491.

For his part, petitioner contends that the ineffective assistance of his direct appellate counsel in failing to raise this claim on appeal excuses its default and that the Court can reach its merits because his PCR trial attorney failed to raise such an ineffective assistance of direct appellate counsel claim. Again, *Martinez* only excuses the default of substantial ineffective assistance of trial counsel claims. Moreover, as discussed in Claim 3, above, Oregon's preservation rule is adequate to support a state court judgment even in a capital case. And finally, even on the merits, petitioner's reliance on the arguments set forth in his petition do not demonstrate that the trial court's ruling on this issue was contrary to or involved an unreasonable application of clearly established Federal law. Based on the foregoing, the Court denies this claim on the basis that it is procedurally defaulted and petitioner cannot demonstrate entitlement to excuse its default. Alternatively, the Court denies it on the merits.

E.    Claim 5.F. - Admission of List of Books

Petitioner alleges that the trial court violated his rights under the First Amendment and his right to due process, equal protection and fundamental fairness in his criminal proceedings when it admitted State's Exhibit 47, a list of books and pamphlets found in petitioner's residence.[20] Petitioner alleges that the only rationale for admitting the list was to urge the jury to convict him based on his bad character and to inflame the passions and prejudices of the jury in violation of his constitutional rights. Petitioner concedes that this claim is procedurally defaulted but suggests that the Court should excuse its default pursuant to *Martinez*.

---

[20] The list includes books and pamphlets touching on the following subjects: weapons, combat tactics, terrorist activities and false identification. Respondent's Exhibit 781, Volume 31-3 at 1-4.

Critically, however, trial counsel objected to the admission of the list of books. First, he argued that the First Amendment protected petitioner's right to read whatever he wishes. In addition, he asserted that the list had no relevance to the subject incident because the evidence presented at trial indicated that the meeting between Hall and petitioner was by chance and that there was nothing premeditated about it. Moreover, even by their titles he argued that the list was far more prejudicial than probative. And finally, counsel argued that other evidence the court already allowed in gave the State the opportunity to make its point about petitioner's mental state. In response, the State maintained that they were offering the list as circumstantial evidence of petitioner's mental state and condition. Specifically, counsel argued:

> Again, we did not offer it in our case in chief. The defense has raised this issue that his act on August 22nd was a result of some delusional act in which either [he] was shooting his uncle, or you know, whatever choice they, you know, whatever spin they want to put on it. But it's clear they were saying he was acting out of some delusional response, yet here's a guy who shows foresight to obtain a reading list of items that are absolutely consistent with somebody who is prepared for violence, knows weapons, and is prepared to use them.

> And we believe that that is relevant to rebut the defense contention that his state of mind, his mental condition and his actions were a result of mental disease and mental illness. Instead, they are a result of somebody who is aware of what's going on, has planned ahead, has an intellectual curiosity about weapons and their use and violence and that kind of thing.

Transcript Designation, Part R at 83. In overruling the defense's objection, the trial court noted that the evidence cuts both ways in that the State was arguing that it shows deliberate thinking and an individual who is reading things relevant to ways he likely conducts himself, but that defense experts would say that the list of these titles fits with his paranoid schizophrenia and his paranoid overlay and his personality. Ultimately, the court found that the evidence "does have some circumstantial relevance to the mental state that is an issue in the case." *Id*. at 85. The Court also notes that on direct appeal, in concluding that any error in admitting the list of books was harmless,

the Oregon Supreme Court found that where "the jury had heard evidence of defendant's extensive criminal background, including his 17 convictions for violent felonies, such as armed robbery and escape," "it was highly unlikely to have convicted defendant of aggravated murder on the basis of his possession of a list of books on weapons. . . ."*Lotches*, 331 Or. at 494.

As a preliminary matter, per *Davila*, the Court rejects petitioner's argument that ineffective assistance of direct appellate counsel in failing to raise this constitutional challenge on direct appeal excuses the default of this claim. Moreover, its review of the record reveals that any claim of ineffective assistance of trial counsel for failing to adequately challenge the admission of the list of books is not substantial under *Martinez*. Accordingly, the Court denies Claim 5.F. as procedurally defaulted.

Alternatively, it denies this claim on the merits because petitioner cannot show that the Oregon Supreme Court's reasoned determination that any error in admitting the list was harmless, is contrary to or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (habeas corpus relief warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict.").

F.    Claim 5.G. - Admission of Petitioner's "Pig" Statements

During the penalty-phase of petitioner's trial, Detective Nelson testified that, as guards led petitioner out of the courtroom, petitioner looked at Nelson and had called him a "pig." Transcript Designation, Part U at 139. Petitioner argues that trial counsel was ineffective in failing to object

to this testimony.[21] As discussed in Claim 2.C., in light of SB 1013, the Oregon Supreme Court's

holding in *Bartol*, and Governor Brown's commutation of petitioner's death sentence to life without

parole, claims regarding the penalty-phase of petitioner's trial are moot. Accordingly, this claim is

denied.

## VI.    Claim 6 - Trial Court Violated Petitioner's Constitutional Rights When it Provided the Jury with Erroneous, Misleading, and Constitutionally Infirm Instructions and Failed to Provide the Jury with Critical Instructions Required by Law

Importantly, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises

to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). A claim of

instructional error does not raise a cognizable federal claim unless the error "so infected the entire

trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991);

*Henderson v. Kibbe*, 431 U.S. 145, 154-55 (1977); *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).

Moreover, the claimed instructional error must be viewed in the light of the instructions as a whole,

as well as the trial record. *See Estelle*, 502 U.S. at 72; *Cupp*, 414 U.S. at 146-47. Because an omitted

instruction is less likely to be prejudicial than a misstatement of law, a petitioner seeking habeas

relief based on the failure to give a particular instruction bears an especially heavy burden.

*Henderson*, 431 U.S. at 155.

Furthermore, generally, federal habeas relief does not lie for alleged errors of state law.

*Lewis*, 497 U.S. at 780. The only relevant question on federal habeas review is "whether a

---

[21] I note that petitioner's trial counsel *did* object to Detective Nelson's testimony as irrelevant in that it had no connection to the crime and was not historical in nature. The State argued that the testimony was relevant to show petitioner's continued state of mind toward law enforcement and countered petitioner's testimony that he only reacted negatively or aggressively toward law enforcement when they mistreated him. The trial court overruled the defense's relevancy objection.

conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68 (further observing that "it is not the province of a federal habeas court to reexamine state-court determinations on state law questions").

A.    Claim 6.A. - Instruction Pertaining to Hall's Legal Authority to Act

Petitioner argues that the trial court should have instructed the jury that under Oregon law, and based on the facts established by the prosecution, Hall (and Riley) had no right to confront, arrest or detain him. Moreover, he maintains that the trial court erred in instructing the jury that:

> A private person acting in his own account is justified in using physical force on another when and to the extent he reasonably believes it is necessary to make an arrest.

Petition at 149. Petitioner insists that this instruction erroneously implied that Hall and Riley had some right to make a citizen's arrest and that such error precluded the jury from considering his affirmative defense of self-defense and deprived him of his right to the presumption of innocence.

The parties agree that petitioner failed to raise this claim in any of his state court proceedings and that it is procedurally defaulted. Nevertheless, petitioner suggests that the Court may reach the merits of this claim because: (1) PCR counsel was ineffective when he failed to raise a claim of ineffective assistance of direct appellate counsel for failing to raise this claim on direct review and/or when he failed to raise a claim of ineffective assistance of trial counsel for failing to raise this issue; and (2) Oregon's procedural rule barring review of errors not objected to at trial and raised on direct review is inadequate.

75 - OPINION AND ORDER

First, *Davila* makes clear that PCR counsel's failure to raise an ineffective assistance of direct appellate counsel cannot excuse the default of a related habeas claim. In addition, as discussed above, I reject petitioner's contention that Oregon's procedural rule barring review of errors not preserved at trial and not raised on direct review is inadequate. Moreover, the subject claim is one of trial court error to which *Martinez* does not apply. However, even considering a potential ineffective assistance of trial counsel claim for failing to object to the trial court's instructions pertaining to Hall's conduct, the Court disagrees that, taken in the context of the jury instructions related to the petitioner's defense of self-defense as a whole, the instruction discussing when a private person is justified to use force to make an arrest was either erroneous or that it precluded the jury from considering petitioner's defense.

While petitioner focuses on the facts surrounding his interaction with Hedges and what authority Hall and Riley had to arrest or detain him based on that interaction, a broader swath of evidence bears significantly on events surrounding the actions petitioner claims were justified because he was acting in self-defense, including petitioner reportedly attempting to strike Riley then fleeing, his pursuit by EID employees, Hall yelling, "He's got a gun. Get down," shots being fired and petitioner raising his gun, aiming at Edwards and shooting her. Based on these events, the Court cannot say that the trial court's instruction was erroneous under an interpretation of the facts that the jury may have reasonably reached.

Similarly, based on this record, the Court cannot conclude that the trial court erred when it did not instruct the jury that Hall and Riley had no legal right to confront, arrest or detain petitioner. To the contrary, the Court is satisfied that the trial court's actions in this regard, as well as any related alleged failure on trial counsel's part in failing to object to the instructions, did not so infect

the entire trial that petitioner's conviction violates due process. Based on the foregoing, the Court denies petitioner's Claim 6.A. trial court error claim as procedurally defaulted. Moreover, with regard to any related ineffective assistance of counsel claim, the Court concludes that petitioner fails to demonstrate that such claim is a substantial one under *Martinez*, that PCR counsel's failure to raise the subject ineffective assistance of trial counsel claim constituted deficient performance, or that, even assuming deficient performance, there is a reasonable probability that, absent the deficient performance, the result of the PCR proceedings would have been different.

B.    Claim 6.B. - Omission of Instruction Regarding Petitioner's Conduct with Hedges

Petitioner contends that the trial court should have instructed the jury that his interaction with Hedges involved, at most, harassment, a misdemeanor for which petitioner would not have been subject to arrest. The parties agree that petitioner failed to raise this claim in any of his state court proceedings and that it is therefore procedurally defaulted. As above, the Court rejects petitioner's arguments that it should excuse this default based on petitioner's allegations of ineffective assistance of appellate counsel or his contention that Oregon's procedural rule barring review of errors not preserved at trial and not raised on direct review is inadequate. In addition, the Court notes that *Martinez* cannot excuse the default of this trial court error claim.

Nevertheless, even considering a related ineffective assistance of trial counsel claim alleging counsel failed to propose that the trial court instruct the jury that under Oregon law petitioner's conduct concerning Hedges amounted to, at most, misdemeanor harassment, the Court concludes that such claim is not a substantial one for *Martinez* purposes. Even if misdemeanor harassment was the most serious offense petitioner faced based on his interaction with Hedges, Hedges' testimony describing how petitioner slapped/struck his helmet and humiliated him, gave

the jury a fair picture of what had transpired between the two. Accordingly, the Court's assessment of the merits of this ineffective assistance claim does not lead it to conclude that reasonable jurists could debate whether counsel's failure to seek an instruction advising the jury that at most petitioner committed misdemeanor harassment fell below an objective standard of reasonableness and/or whether petitioner was prejudiced by the omission of such instruction.

Based on the foregoing, the Court denies Claim 6.B. as procedurally defaulted and further concludes that petitioner cannot show that the Court should excuse the procedural default of a related ineffective assistance of counsel claim because he cannot show that such claim is a substantial one under *Martinez*.

C.     Claim 6.C. - Omission of Instruction on "Imperfect Self-Defense"

Petitioner argues that the trial court erred in failing to instruct the jury that even if petitioner's belief about his need to defend himself was unreasonable when "accosted" by Hall and Riley, if it was honestly held in light of petitioner's background, experience, and psychological state, it formed the basis for an "imperfect self-defense" and was an affirmative defense to aggravated murder. Petition at 150. Again, the parties agree that petitioner failed to raise this claim in any of his state court proceedings and that it is therefore procedurally defaulted. For the reasons discussed above, the Court rejects petitioner's arguments that it should excuse this default based on petitioner's allegations of ineffective assistance of appellate counsel or his contention that Oregon's procedural rule barring review of errors not preserved at trial and not raised on direct review is inadequate. In addition, the Court notes that *Martinez* cannot excuse the default of this trial court error claim.

78 - OPINION AND ORDER

Nevertheless, even considering a related ineffective assistance of trial counsel claim alleging counsel failed to propose that the trial court instruct the jury on a so-called imperfect self-defense as an affirmative defense to aggravated murder, the Court concludes that such claim is not a substantial one for *Martinez* purposes. As discussed in Claim 2.B., above, respondent's contention that Oregon law does not recognize an imperfect self-defense as a defense to aggravated murder is well taken. The Court denies Claim 6.C. as procedurally defaulted and further concludes that petitioner cannot show that it should excuse the default of a related ineffective assistance of counsel claim because he cannot show that such claim is a substantial one under *Martinez*.

### D.      Claim 6.D. - Failure to Instruct on the Elements of Count Three

Petitioner alleges that the trial court failed to adequately instruct the jury on the elements of the aggravated murder charge alleging petitioner personally and intentionally caused Hall's death while fleeing in order to avoid being identified as the perpetrator of an attempted murder. Specifically, he contends that neither the indictment on this count nor the instructions identified the victim of the attempted murder and, therefore, it is impossible to know whether the jury reached a unanimous agreement on who the victim of the attempted murder on this charge was, and, consequently, it is possible that the jury was not unanimous on this issue.

The Oregon Supreme Court reached the merits of this claim as plain error. Accordingly, it is exhausted. That court concluded that while the instructions pertaining the Count Three were deficient, the error was harmless. Specifically, it held:

> The jury acquitted defendant of the attempted murder of Riley (10-2), but it unanimously convicted him of the attempted murder of Edwards. Because that conviction proves that all 12 jurors agreed that defendant attempted to murder Edwards, that conviction provides the predicate for defendant's conviction on the third count of aggravated murder.

79 - OPINION AND ORDER

*Lotches*, 331 Or. at 471-72. Petitioner makes no attempt to demonstrate that this ruling is contrary to or involves an unreasonable application of federal law. Accordingly, the Court denies this claim on the merits.

The Court notes that petitioner raised a related ineffective assistance of counsel claim during his PCR proceedings, but that court denied relief on the basis that petitioner did not prove prejudice for counsel's failure to raise this issue at trial because the jury verdict established that the jury was not confused by the instructions. Petitioner did not challenge the PCR court's denial on appeal. Nevertheless, he argues that the Court should excuse its procedural default because his PCR counsel failed to adequately address the claim and, because counsel did not object to the PCR court's ruling, he was precluded from raising the claim on appeal except as plain error. The Court disagrees. The PCR court considered and denied this ineffective assistance claim on the merits. Subsequently, petitioner opted not to challenge this denial on appeal. Therefore, the claim is defaulted and *Martinez* does not apply to allegations of ineffective assistance of PCR appellate counsel. Accordingly, petitioner cannot rely on it to excuse the procedural default here.

    E.    <u>Claim 6.E. - Failure to Adequately Instruct on the Issues of Duress</u>

Petitioner argues that the trial court failed to instruct the jury on issues of duress as requested by the defense even when the evidence supported such an instruction. Initially, petitioner insisted here that his trial counsel asked the court to instruct the jury generally regarding duress, including as applied to his Count Three aggravated murder charge, but that the trial court refused to do so. However, in his sur-reply he alleges that trial counsel was ineffective in failing to seek the duress instruction on Count Three, concedes that the claim is procedurally defaulted, and argues that *Martinez* should excuse the default of this related ineffective assistance claim.

The Court's review of the jury instruction discussion between counsel and the court reveals that trial counsel clearly did *not* ask the trial court to give a duress instruction with respect to Count Three because he did not believe it applied:

> MR. BRENNAN: I understand that, Your Honor. However, duress would be a defense to the crimes of Kidnap, Attempted Kidnap, Robbery, or Attempted Robbery. And it would be a defense to an actual robbery. So certainly where the state has charged in its Aggravated Murder counts the aggravating factors of A, attempting to hide identity [Count 3], B, of attempting to kidnap, and C, of attempting to rob Miss Keaton's vehicle here [Counts 1 & 2]. If the court gives the instruction of duress, **at least with respect to those crimes for which a duress is a defense, in other words, if Mr. Lotches is, and the jury finds that he was acting under duress so that the crimes of Attempted Kidnap and the crimes of Robbery would be justifiable, or that that defense would apply, then certainly that would negate the aggravating elements of those two counts of Aggravated Murder.** That is my reasoning for putting in the instruction of the duress instruction.

Transcript Designation, Part S at 46-47 (emphasis added).

> The trial court instructed the jury on the duress defense as follows:

> The defense of duress has also been raised. It does not apply to the Murder charges that are involved in the case but you may choose to consider it with respect to the other charges, but it does not apply to the charges of Murder.

> The definition is as follows: The commission of acts that would otherwise constitute an offense is not criminal if the person engaged in the conduct because he was coerced. The coercion must be by the use or threatened use of unlawful physical force on the person or on some other person. The force or threatened force must be of such a nature or important degree as to overcome earnest resistance.

> Duress is not a defense if a person has intentionally or recklessly placed himself in a situation in which it is probable that he will be subjected to duress. The threat of future injury is not sufficient to constitute duress. The danger must be present, imminent, and impending.

> The burden of proof is on the state to prove beyond a reasonable doubt that this defense does not apply.

Transcript Designation, Part T at 74.

On direct appeal, petitioner argued that the trial court erroneously instructed the jury on the applicability of the defense of duress to the first two counts of aggravated murder based on the underlying felonies of robbery and attempted aggravated kidnaping. The Oregon Supreme Court denied this claim as moot because it reversed the convictions on those counts on other grounds. Petitioner does not contend that this ruling was in error. Respondent, in addition to maintaining that this claim and any related ineffective assistance of trial or appellate counsel claims are procedurally defaulted, argues that the trial court refused to give the duress instruction as petitioner requested because that defense, as a matter of state law, is not available with respect to a charge of murder and therefore the claim lacks merit. Petitioner, however, insists that Oregon law does not preclude duress as a defense to the underlying felony of attempted murder.

As noted above, because this subclaim involves an omitted instruction, the burden on petitioner to show that any error in failing to give the instruction so infected the entire trial that his resulting conviction violates due process, is especially heavy. Petitioner does not cite to any authority and the Court can find none supporting his implausible suggestion that Oregon law distinguishes between murder and attempted murder for purposes of a defendant being able to raise duress as a defense. Accordingly, the Court concludes that any underlying ineffective assistance of counsel claim is not substantial under *Martinez* and therefore the default of such claim is not excused. Alternatively, even on *de novo* review, the Court would deny this claim on the merits. The trial court correctly instructed the jury on the issue of duress and petitioner cannot demonstrate that any error in that regard so infected the entire trial that petitioner's resulting conviction violated his right to due process.

F.    Claim 6.F. - Failure to Instruct the Jury that It Should Presume Petitioner Insane Under Oregon Law

82 - OPINION AND ORDER

Petitioner contends that because he had two prior adjudications of not guilty by reason of insanity the trial court should have instructed the jury that he was presumed to be insane and that the burden to prove that he was not insane rested with the prosecution.

Respondent argues that this trial court error claim as well as the related ineffective assistance of counsel claim are procedurally defaulted. In addition, he maintains that these claims are without merit because Oregon law does not recognize the asserted presumption. On this point, the Court notes that petitioner raised the ineffective assistance of counsel claim during his PCR proceedings, but that court denied relief on the basis that petitioner did not prove that the proposed instructions were correct statements of Oregon law. Petitioner did not challenge this denial on appeal, but nevertheless argues that the Court should excuse its procedural default because his PCR counsel failed to adequately prosecute the claim, and, because counsel did not object to the PCR court's ruling, petitioner argues that he was precluded from raising the claim on appeal except as plain error. The Court disagrees. The PCR court considered and denied this ineffective assistance claim on the merits. Subsequently, petitioner opted not to challenge this denial on appeal. Accordingly, for the reasons discussed in Claim 3, above, the claim is defaulted and petitioner cannot rely on *Martinez* to excuse its default.

> G.  Claim 6.G. - Failure to Provide the Jury with Appropriate Instructions that Adequately Narrowed the Concept of Future Dangerousness, that Required Proof Beyond a Reasonable Doubt for All Sentencing Elements, that Allowed the Jury to Give Adequate Consideration to All Mitigating Factors, and that Accurately Explained the Concept of True Life

Respondent argues that this trial court error claim, as well as the related ineffective assistance of counsel claim, are procedurally defaulted. In addition, he maintains these subclaims are without merit because petitioner does not explain how the instructions given were erroneous or

incomplete and because the ones given were prescribed by Oregon law and fully complied with the federal constitution.[22] As discussed in Claim 2.C., in light of SB 1013, the Oregon Supreme Court's holding in *Bartol*, and Governor Brown's commutation of petitioner's death sentence to life without parole, claims and any sub claims relating to petitioner's future dangerousness and penalty-phase are denied as moot.

## VII. Claim 7 - Trial Court Violated Petitioner's Constitutional Rights When it Concluded that He Must Wear Leg Shackles During Both Phases of His Trial

In Claim 7, petitioner asserts that the trial court violated his constitutional rights when it concluded that he must wear leg shackles during the guilt and penalty phases of his murder trial. He maintains that the trial court failed to consider relevant factors necessary to justify the shackling. Citing *Castillo v. Stainer*, 983 F.2d 145, 147 (9th Cir. 1992), he asserts that the trial court failed to weigh the harms involved with shackling, namely: (1) reversal of the presumption of innocence; (2) impairment of the defendant's mental ability; (3) impeding communication between petitioner and his counsel; (4) detraction from the decorum of the trial; and (5) pain to petitioner. He further asserts that the trial court failed to consider less restrictive—and less prejudicial-measures. *Id*. In addition, petitioner alleges that the jury was able to see his restraints and that he is aware of no evidence in the record that any efforts were made to prevent this occurrence.[23]

---

[22] The Court notes that petitioner raised the ineffective assistance of counsel claim during his PCR proceedings, but that court summarily denied relief. Petitioner did not challenge the PCR court's denial on appeal, but argues that the Court should excuse its procedural default because his PCR counsel failed to adequately prosecute this claim, and, because counsel did not object to the PCR court's ruling, petitioner was precluded from raising the claim on appeal except as plain error. I disagree. The PCR court denied this ineffective assistance claim on the merits and petitioner opted not to challenge this denial on appeal.

[23] In fact, the trial court specifically provided for covering petitioner's leg irons during trial. Respondent's Exhibit 601, Volume 28-17 at 186-90.

Respondent contends that this claim is procedurally defaulted. He insists the related claim petitioner raised on direct appeal: alleging that he was denied a fundamentally fair trial because he was shackled and dressed in jail clothing in front of the jury, is different from the one presented here: alleging that the trial court failed to consider relevant factors before ordering that he be shackled at trial. Regardless, respondent argues this claim lacks merit.

Shackling is an inherently prejudicial practice which "should be permitted only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986). "First, the court must be persuaded by compelling circumstances that some measure was needed to maintain security of the courtroom . . . Second, the court must pursue less restrictive alternatives before it imposes physical restraints." *Jones v. Meyer*, 899 F.2d 883, 885 (9th Cir. 1990) (internal quotation marks and citations omitted); *see also Castillo*, 983 F.2d at 147.

Here, the trial court addressed the issue of restraints during two pre-trial hearings. In the initial hearing on the prosecution's motion to allow restraints, petitioner's counsel expressed concern that he would be prejudiced by the jury seeing him shackled in hand and leg irons. However, in support of its motion, the prosecution called Charles L. Turney, a classification officer at Multnomah County Corrections. Turney testified that petitioner was housed in administrative segregation, the maximum security part of the jail. Turney also testified about his review of petitioner's history of misconduct while in custody which included: a conviction for felony escape in Marion County in 1975; his commandeering a vehicle and using it to escape from a corrections facility in Canyon City, Colorado in June 1980; an attempted escape (aided by accomplices who smuggled in weapons, held individuals at gunpoint, assaulted a guard with a wrench, and involved at least one shot fired in the courthouse) from a Colorado courtroom in October 1980; an escape

from a maximum security unit of the Colorado State Hospital, again with the help of outside accomplices; and at least two walk-away escapes from the Colorado State Hospital and an Oregon work camp in 1988 and 1992. While acknowledging that petitioner had not displayed behavioral problems at the jail in the months leading up to trial, Turney testified that, based on the above history coupled with petitioner's history of exhibiting good behavior just prior to past escapes and attempted escapes, he believed petitioner was an "extreme escape and assault risk." Transcript Designation, Part A at 85. He recommended the court shackle both his legs and wrists at trial, but at a minimum recommended the court require a set of leg irons.

At the conclusion of this hearing, the court found that petitioner was an "extraordinary danger and risk not only to court personnel and jail guards and the prosecutors, but also even a very potential threat to defense counsel" and allowed the State's motion for wrist and leg shackles. *Id*. at 99-101. The court did promise to reconsider at a future hearing whether the handcuffs could be removed during the trial. It indicated that it was aware that shackling typically required a showing of "immediate disruptive behavior," but found that petitioner's pattern of displaying good behavior up until he committed his escapes and attempted escapes, coupled with "his prior past background, prior record, escape attempts, violence, use of weapons and so forth" justified the restraints despite the passage of time since his past escapes. *Id*. at 99-100. Based on this detailed record, the Court is satisfied that the trial court found clearly compelling circumstances warranting "some measure" of restraint to address courtroom security. *See Jones*, 899 F.2d at 885.

In addition, the Court is satisfied that the record reveals that the trial court considered less restrictive alternative measures before requiring petitioner's legs to be shackled. In the second pre-trial hearing held April 26, 1993, petitioner's counsel asserted that he had spoken to officials in

86 - OPINION AND ORDER

Colorado familiar with the 1980 courtroom escape attempt who indicated that petitioner was not shackled in subsequent proceedings. Accordingly, counsel requested that the court allow petitioner "at least have his hands free" to be of assistance during the trial. Transcript Designation, Part A at 189. The State agreed to allowing petitioner's wrists to remain uncuffed and stated that the courtroom could be arranged so that petitioner's leg shackles would be hidden beneath defense counsel's table behind a barrier of some kind. The court ultimately ordered: (1) that petitioner's hands and wrists would be free and he be allowed to take notes with a pen or pencil; and (2) he would wear leg restraints, but a screen would be placed under counsel's table to block any view of the restraints by the jury and he would be seated prior to the jury's entrance into the courtroom.

Thus, considering the *Castillo* factors, the Court finds that the trial court addressed concerns surrounding how restraints might act to reverse petitioner's presumption of innocence when it determined that petitioner's hands could remain free, his shackled legs would be screened off from the jury's view and he would be moved in and out of the courtroom outside the jury's presence. The Ninth Circuit has approved comparable action. *See, e.g., Morgan v. Bunnell*, 24 F.3d 49, 51-52 (9th Cir. 1994) (trial court's decision to remove the petitioner's handcuffs but retain leg irons and removing the jury when the petitioner walked to and from the stand, were reasonable measures); *U.S. v. Fernandez*, 388 F.3d 1199, 1245 (9th Cir. 2004) (same).

In addition, petitioner suggests that his due process rights were violated because the jury could see his restraints. This assertion notwithstanding, there is no evidence in the record that the guilt-phase jury saw petitioner's leg irons and petitioner himself advised the penalty-phase jury that he was shackled: "I'm not ashamed to tell you people I'm shackled right now." Transcript Designation, Part V at 51-52. Accordingly, with regard to the penalty phase, where petitioner

disclosed his shackling, he cannot complain that he was harmed by the jury learning he was wearing restraints. And even assuming that the jury inadvertently saw petitioner's leg irons during the guilt phase (though the record does not bear this out), it is not per se prejudicial for a jury to become aware of a petitioner's restraints. *See King v. Rowland*, 977 F.2d 1354, 1358 (9th Cir. 1992) (district court did not err in determining that the petitioner was not prejudiced insofar as "even if the jury did see [his] leg irons, they were not sufficiently and constantly exposed to the jury's attention so as to reverse the presumption of innocence."). In that vein, the trial court specifically noted: "Jurors are not stupid. They're going to know that a man is in custody charged with death penalty murder and they're going to know he's in custody." Respondent's Exhibit 601, Volume 28-17 at 187.

Regarding the second *Castillo* factor, mental impairment due to shackling, petitioner presents no evidence, and the Court's review of the record reveals none showing that his mental ability was impaired from wearing leg shackles. *Cf. Spain v. Rushen*, 883 F.2d 712, 722 (9th Cir. 1989) (defendant filed declaration describing the detrimental effects of being restrained by leg irons, waist chain, wrist chains, and a chain securing him to his chair, including difficulty in concentrating).

The trial court specifically addressed the third *Castillo* factor, impeding communication between a defendant and his counsel, in the pre-trial hearings. Ultimately, the court allowed petitioner to keep his hands free so that he could take notes and allowed him to sit at the table alongside his defense counsel. *Cf. King*, 977 F.2d at 1358 (the petitioner was seated close enough to his attorney that leg restraints did not prevent communication between them). Petitioner does not allege here that his leg restraints interfered with his ability to communicate with his counsel.

88 - OPINION AND ORDER

With regard to detraction from the decorum of the trial, *Castillo*'s fourth factor, the Court concludes that by ordering leg restraints the trial court did not so diminish the "dignity and decorum" of the judicial proceeding as to violate petitioner's due process rights. The court provided for the restraints to be hidden from the jury's view, petitioner was moved in and out of the courtroom outside the jury's presence and it even appears that the courtroom was cleared when he was moved.

Finally, with regard to the final *Castillo* factor, pain caused by the restraint, neither petitioner nor his counsel ever suggested that the restraints caused petitioner pain during his trial. *Cf. Spain*, 883 F.2d at 723-24 (defendant immediately complained of pain with shackling and examining doctor suggest that the chains be removed to ease the pain).

Accordingly, the Court concludes that the trial court did not abuse its discretion surrounding imposition of appropriate restraints at trial. It held two hearings addressing the issue and implicitly considered potential harms bearing on the reversal of the presumption of innocence, impairment to petitioner's ability to interact with his counsel and decorum in the courtroom. Insofar as the trial court failed to consider the impact of restraints on petitioner's mental acuity or whether restraints caused petitioner physical pain, any error in that regard is harmless because there is no evidence in the record that either of these posed an issue. *See Castillo*, 983 F.2d at 149 (trial court's failure to consider shackling criteria was harmless error because petitioner failed to demonstrate shackling affected presumption of innocence, impaired his mental ability, inflicted pain, or impeded communication with counsel). Finally, while the trial court may not have specifically discussed less restrictive measures, the Court is satisfied that its decision to allow petitioner to have his hands free embodied such consideration.

Based on the foregoing, and bypassing the issue of procedural default, the Court concludes on *de novo* review that the trial court did not abuse its discretion in requiring petitioner to wear leg restraints during his trial and denies this claim on the merits.

## VIII.    Claim 8 - Trial Court Deprived Petitioner of His Constitutional Right to be Present at Critical Stages of His Trial

In Claim 8, petitioner asserts that his constitutional rights were violated when he was deprived of his right to be present at critical stages of his trial. Specifically, he contends that he was not present at the following proceedings: (1) August 25, 1992 hearing on a motion to preserve evidence; (2) September 15, 1992 bail hearing that was rescheduled; (3) November 30, 1992 hearing on a scheduling motion; (4) during trial court's remarks to jurors prior to their release for the weekend during guilt-phase deliberations; and (5) an ex-parte contact between defense counsel and the trial court wherein the court granted a defense request for an extension of the trial date. Respondent argues that this claim is procedurally defaulted because petitioner failed to fairly present it to the state courts. Alternatively, he maintains that petitioner cannot show that he had an unqualified constitutional right to attend these proceedings, that they were critical, or that, even if his rights were infringed, he suffered constitutional harm.

Because petitioner did not object or raise any constitutional challenge to his absence from these proceedings at trial and did not raise a related claim in his direct appeal to the Oregon Supreme Court, this claim is procedurally defaulted. Nevertheless, petitioner argues that *Martinez* excuses any default of this claim because his trial attorneys were ineffective in failing to object to his absence from these critical proceedings and direct appellate counsel failed to raise this claim on review. However, as previously noted, *Martinez* cannot excuse the default of a claim based on ineffective assistance of direct appeal counsel. *Davila*, 582 U.S. at 530. And although *Martinez*

may potentially excuse the default of an ineffective assistance of trial counsel claim, this claim involves an allegation of trial court error.

Nevertheless, even bypassing the issue of procedural default, the Court would deny this claim because petitioner has failed to demonstrate that any of the identified proceedings involved "critical stages" such that his absence from them violated his constitutional rights.

"Due process clearly requires that a defendant be allowed to be present to the extent a fair and just hearing would be thwarted by his absence." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934)). In other words, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Id*. The right to be present at every hearing, however, is not without limit. In *Stincer*, the Court held that the petitioner's due process rights were not violated when he was excluded from a competency hearing for two minors who testified against him at trial. *Id*. at 745-46. The Court noted that the petitioner "has given no indication that his presence at the competency hearing in this case would have been useful in ensuring a more reliable determination as to whether the witnesses were competent to testify." *Id*. at 746. The Court further explained that "there is no indication that respondent could have done anything had he been at the hearing nor would he have gained anything by attending." *Id*. (quoting *United States v. Gagnon*, 470 U.S. 522, 527 (1985) (internal brackets omitted). Similarly here, petitioner fails to provide evidence that the proceedings in question were critical, or that his attendance and contribution at any of the proceedings would have resulted in a more favorable outcome in his case.

91 - OPINION AND ORDER

The Court's review of the record reveals that the proceedings pertained either to non-substantive procedural issues, and/or that they were resolved in petitioner's favor. For example, petitioner argues that he suffered constitutional harm by his absence from the August 1992 hearing addressing preservation of crime-scene evidence. Despite his absence, however, the court ultimately ruled in his favor allowing evidence to be preserved "so as to provide the defense with the opportunity to independently test [it]." Respondent's Exhibit 121, Volume 28-1 at 1. Because petitioner prevailed on the motion, he cannot show that he suffered harm by his absence from the proceeding. Similarly, although he did not attend the bail hearing on September 15, 1992, it was set over and he was present at the new hearing on November 13, 1992 when the court denied bail. Petitioner cannot show that his absence from the original bail hearing was of any consequence.

Petitioner further claims that his due process rights were infringed because he was not present for an ex parte meeting between his counsel and the court on November 30, 1992. Although petitioner indicates that he missed two other hearings, it appears that the ex parte contact encompasses both issues regarding scheduling of motions and the extension of the trial date. *See* Respondent's Exhibit 131, Volume 28-1 at 1; Exhibit 609, Volume 28-46 at 755 (duplicate). Regardless, because the court granted petitioner's requests, he cannot show that his attendance at these proceedings would have resulted in a more favorable outcome. Moreover, petitioner has not shown that the ex parte contact involved substantive issues or that his absence impacted the outcome of his trial.

The Court turns next to petitioner's assertion that his due process rights were violated because he was not present when the trial court released jury members for the weekend during their guilt-phase deliberations. While it appears the trial court did address the jury in open court outside

92 - OPINION AND ORDER

of petitioner's presence, his attorneys were aware of this fact and did not object. Respondent's

Exhibit 603, Volume 28-36 at 2155-156. Moreover, petitioner provides no evidence as to how his

presence or contribution to this proceeding would have impacted the court's address, let alone

evidence showing that his presence or any contribution would have positively impacted the

outcome of either phase of his trial. Moreover, my review of the record reveals that the court simply

restated basic instructions applicable to all deliberating juries, including advising them not to

discuss the case with anyone and to refrain from undertaking any independent investigation of the

facts. As such, petitioner cannot demonstrate that his would have had a beneficial effect on his trial.

Finally, petitioner argues that no waiver was ever taken from him regarding his right to be

present at these proceedings and that he never voluntarily relinquished his right to attend critical

stages of his trial. This argument, however, presumes that the portions of the trial petitioner missed

were "critical stages," and that his attendance would have had a favorable impact. For the reasons

set forth above, the Court concludes that petitioner has not and cannot make this showing in either

regard. Accordingly, the Court denies this claim on the basis that it is procedurally defaulted and

petitioner has not shown entitlement to excuse the default. Alternatively, on *de novo* review, the

Court would deny this claim on the merits.

## IX.    Claim 9 - Trial Court Denied Petitioner His Constitutional Right to a Trial Before a Fair, Impartial and Representative Jury

### A.    Claim 9.B.[24] – Failure to Move for a Change of Venue

Petitioner alleges that his trial counsel acted ineffectively when they failed to move for a

change of venue on the basis that pretrial publicity prejudiced the jury against him and he requested

---

[24] There is no "Claim" 9.A. in the Petition. For ease of tracking, the Court refers to the claims it identifies as petitioner numbered them in the Petition.

that counsel seek a transfer of venue to Warm Springs, a community located on the Warm Springs Indian Reservation with a predominately Native American population. Petitioner concedes that this claim is procedurally defaulted but states that he will move to expand the record to prove ineffective assistance of PCR counsel in failing to raise an ineffective assistance of trial counsel claim for failing to move for change of venue, and thereby, pursuant to *Martinez*, excuse any default of this claim. For his part, respondent contends that even setting the procedural default issue aside, the claim has no merit because there is no evidence in the record that any significant portion of the potential jurors in Multnomah County at the time of trial were acquainted with the crime or that they had any bias against petitioner.

As a preliminary matter, the Court's review of the record shows that expansion of the record is unwarranted and unnecessary for resolution of this claim. First, while the record supports petitioner's contention that he asked counsel to move the court for a change of venue to Warm Springs, presumably so that he might draw a jury of his Native American peers, petitioner fails to provide any authority suggesting that the trial court would have granted counsel's motion on that basis had he made it.

Under the Sixth Amendment, a criminal defendant has a right to be tried by a jury drawn from a representative cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). There is no constitutional requirement, however, that the juries reflect the various distinctive groups in the population. And contrary to petitioner's suggestion, defendants are not entitled to a jury of any particular composition, let alone one composed in whole or in part of persons of their own race. *Taylor*, 419 U.S. at 538. Accordingly, even on *de novo* review, the Court rejects this claim.

Moreover, considering petitioner's allegations regarding pretrial publicity, in *Hayes v. Ayers*, 632 F.3d 500, 507-08, 510-11 (9th Cir. 2011), the court outlined the law governing due process violations arising out of a denial for change of venue:

> The Sixth and Fourteenth Amendments "guarantee[] to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). When a trial court is "unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere[,] . . . due process requires that the trial court grant defendant's motion for a change of venue." *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988) (citing *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)).
>
> In this circuit, we have identified "two different types of prejudice in support of a motion to transfer venue: presumed or actual." *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996). Interference with a defendant's fair-trial right "is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris*, 885 F.2d at 1361. Actual prejudice, on the other hand, exists when voir dire reveals that the jury harbors "actual partiality or hostility [against the defendant] that [cannot] be laid aside." *Id*. at 1363. The Supreme Court applied this two-pronged analytical approach in [] *Skilling v. United States*, 561 U.S. ___, 130 S.Ct. 2896, 2907, 177 L.Ed.2d 619 (2010) (considering, first, whether pretrial publicity and community hostility established a presumption of juror prejudice, and then whether actual bias infected the jury).

* * *

*

"A presumption of prejudice" because of adverse press coverage "attends only the extreme case." *Skilling*, 130 S.Ct. at 2915; *see also Harris*, 885 F.2d at 1361 ("The presumed prejudice principle is rarely applicable and is reserved for an extreme

situation." (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 49
L.Ed.2d 683 (1976) (citation and internal quotation marks omitted)).

* * *

*

Where circumstances are not so extreme as to warrant a presumption of prejudice,
we must still consider whether publicity and community outrage resulted in a jury
that was actually prejudiced against the defendant. This inquiry focuses on the
nature and extent of the voir dire examination and prospective jurors' responses to
it. *See Skilling*, 130 S.Ct at 2917-23. Our task is to "determine if the jurors
demonstrated actual partiality or hostility [toward the defendant] that could not be
laid aside." *Harris*, 885 F.2d at 1363.

Critically, petitioner does not take issue with respondent's assertion that the record contains no

evidence of that any significant portion of the potential jurors in Multnomah County at the time of

trial were acquainted with the crime or that they had any bias against petitioner. The Court notes

that potential jurors filled out questionnaires comprehensively inquiring into their knowledge of

any of the relevant events surrounding the crime and/or of any of the parties or witnesses. In

addition, the record reflects that during voir dire, counsel inquired about any admissions of

knowledge about the incident reflected in the questionnaires and made a record of whether jurors

had any bias based on their exposure to news or other accounts of the incident. Based on foregoing,

the Court is satisfied that petitioner cannot demonstrate that the trial court would have granted a

motion for change of venue based on undue pretrial publicity and/or bias against petitioner had

counsel so moved. Accordingly, the Court concludes that any claim that trial counsel rendered

ineffective assistance when he failed to move for a change of venue on that basis is not a substantial

one for purposes of *Martinez*.

      **B.**      <u>Claim 9.C. - Use of a "Death Qualification"</u>

Petitioner maintains that the trial court's use of a "death qualification" process to select jurors also violated his constitutional rights in that: (1) it resulted in the impanelment of an unduly death-prone, and thus guilt-prone, jury, and deprived petitioner of his right to be presumed innocent; (2) it deprived petitioner of his right to a jury that constituted a representative cross-section of the community; (3) it deprived petitioner of his right to equal protection under Oregon law in that Oregon law did not provide for the "death qualification" of a capital jury, but it did constitutionally prohibit utilization of religion as a basis for selection of jury members (petitioner argues that at least one juror was removed for cause because he/she opposed the death penalty based on his/her religious beliefs); (4) the process resulted in removal of jurors whose refusal to impose death was a product of their sincerely held religious beliefs in violation of the First Amendment and Article I, § 6 of the Oregon Constitution; and (5) it interfered with jurors' duty and right to serve on a jury and to freely exercise their religion.

Respondent argues that petitioner largely defaulted this subclaim and that it fails on the merits. Specifically, he maintains that in *Lockhart v. McCree*, 476 U.S. 162, 176-77 (1986) the Supreme Court held that "death qualification" of a jury does not violate a defendant's right to an impartial jury selected from a fair cross-section of the community notwithstanding studies suggesting that such jurors might be more conviction prone. In addition, he contends that petitioner has failed to prove that any juror was excused from his jury based solely on his or her views on the death penalty. With regard to petitioner's allegations that the death qualification process violates Equal Protection, the First Amendment and the Sixth Amendment, respondent argues that these claims fail on the merits because the governing authority that allows a court to exclude a juror whose views concerning capital punishment would prevent or substantially impair his or her ability

to fairly consider imposition of the death penalty operates with equal force regardless of whether the juror's negative or positive views on capital punishment happen to be religiously or otherwise based. Moreover, respondent argues that petitioner does not identify any prospective juror who was excluded from jury service because of his or her religious affiliation. Utilization of a death qualification process in accordance with *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968) and *Wainwright v. Witt*, 469 U.S. 412, 416 (1985) is settled law. The Supreme Court reaffirmed the *Witherspoon/Witt* standard in *Uttecht v. Brown*, 551 U.S. 1, 17 (2007). It held that to balance the criminal defendant's and the State's interests, "a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible." *Id*. at 9 (citing *Witt*, 469 U.S. at 424).

In addition, the Court concludes that this death qualification process necessarily contemplates the constitutionality of excusing jurors from service who are unable or unwilling to set aside their personal opposition to the death penalty, religious or otherwise, to follow the law even when: (1) questioning jurors about these views, religious or otherwise, is unique to death penalty cases; (2) some prospective jurors are barred from participating in the decisions as to whether death is an appropriate sentence; and (3) state constitutional and statutory provisions bar individuals from being rendered incompetent as jurors based on their opinions on matters of religion and provide that opportunities for jury service shall not be denied or limited on the basis of religious belief. Accordingly, even on *de novo* review I deny this subclaim.

    C.    <u>Claim 9.D. - Excuse of Prospective Jurors for Cause</u>

Petitioner alleges that the trial court violated his constitutional rights during voir dire when it excused potential jurors Warren and Robothan for cause and refused to excuse potential juror Nunez for cause even though Nunez stated both his questionnaire and during follow-up questioning that he would vote for death regardless of the evidence presented. Nunez, initially an alternate juror, was placed on the panel shortly after the trial started and deliberated in both phases of the trial. The Oregon Supreme Court addressed each of these allegations on direct review and found that the trial court did not err.

Federal courts reviewing challenges to voir dire must defer to the judgment of the trial court. The Supreme Court has stressed that the process of jury selection falls "particularly within the province of the trial judge." *Skilling*, 561 U.S. at 386 (citations and quotation omitted).

> Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record – among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty.

*Id.* (citing *Reynolds v. United States*, 98 U.S. 145, 156-57 (1878)). Even in death penalty cases, trial courts receive "special deference" because they actually observe jurors. *Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *Wainwright*, 469 U.S. at 426. However, in *Gray v. Mississippi*, the case petitioner relies on, the Supreme Court held that exclusion of a juror in a capital case who expressed general reservations to capital punishment, but who could have followed the court's instructions and voted for the death penalty, *i.e.*, exclusion of a death-qualified juror, is reversible error not subject to harmless error analysis. 481 U.S. 648, 665 (1987).

       1.     *Prospective Juror C. Warren*

With regard to this juror, the Oregon Supreme Court held:

99 - OPINION AND ORDER

> [T]he trial court gave due consideration to all of Warren's statements and based on those statements and on the court's observation of her demeanor and candor, determined that she would be unable to be fair and impartial. Because of the contradictory nature of Warren's various responses, we think it particularly important to defer to the trial court's determination. *See Nefstad*, 309 Or. at 538 [] (according to trial court's conclusions great weight under similar circumstances). The record supports the trial court's factual findings respecting Warren's ability to perform her role as a juror. We find no error.

*Lotches*, 331 Or. at 476. The Court has reviewed the pertinent parts of the record and agree with the Oregon Supreme Court that Warren equivocated about whether she thought she could make the decision to sentence someone to death.[25] The Court's review also reveals that the trial court took all of Warren's responses into account, including her final assertion that she could, in fact, vote "yes" on the death penalty questions, but found that *on whole* her beliefs were such that they would substantially interfere with her ability to answer the penalty phase questions. It based this conclusion on what it deemed was a change in her beliefs since she filled out her questionnaire, its impression that she was prone to agree with pretty much any proposition put to her by the parties or the court, and her forthright indication to the court that she could not properly consider imposing death based on her conscientious beliefs.

---

[25] During voir dire she told petitioner's counsel, "I myself – I am not against it. I am not really for it. I just feel it is really – I wouldn't think I could make a decision if someone should die or not. I feel that's God's decision. If it should be, it should be. But I don't think I could ever condemn somebody to death. I don't think I could." Shortly thereafter, however, she told counsel she *could* follow the court's instructions and answer the four penalty-phase questions yes or no. Then on questioning by the prosecutor she indicated that regardless of what the evidence was she did not think she could ever say he should die or not, that "it is God's decision if the man should die or not. It is not up to [her]." When the court questioned her, she stated that her thinking had changed since she filled out her questionnaire and that she did not think she could vote for somebody to die. And finally, when petitioner's counsel questioned her again, she said that despite her feelings that only God can take a life, she could follow the court's instructions and answer yes or no to the penalty-phase questions even knowing that it could result in a death sentence for petitioner.

2. *Prospective Juror Robotham*

Similarly, the Oregon Supreme Court noted that Robotham expressed contradictory views about the death penalty. Specifically, in his questionnaire he indicated that he had such strong feelings against the death penalty that he would be unable to be fair and impartial, but that during voir dire he indicated that he thought he could follow the court's instructions and answer the four penalty-phase questions fairly and impartially. He said he would make an effort to be fair, but could not say with certainty whether his opposition to the death penalty or the defendant's presence during the trial might impair his ability to follow the law. When pressed, he estimated that there was a 60 percent chance he could set his views about the death penalty aside. In granting the state's motion to excuse Robotham for cause, the trial court concluded that a 60-40 percent difficulty in setting aside his opinions amounted to "a substantial infringement upon his capacity to follow the court's instructions and follow the law that applies." Transcript Designation, Part I at 85.

The Oregon Supreme Court found:

> [T]he trial court, having had the opportunity to observe Robotham's demeanor and to listen to the tone of his answers, was in the best position to determine whether Robotham would be able to be a fair and impartial juror. The trial court concluded that Robotham's strong opposition to the death penalty would prevent him from following the court's instructions, notwithstanding his firm and sincere commitment to try to do so. As our recitation of the record shows, there was evidence to support the trial court's conclusion. We find no error.

*Lotches*, 331 Or. at 478. Again, the Court has reviewed the relevant portions of the record. Robotham said he would change his answer on the questionnaire where he indicated he would be unable to be fair and impartial. However, he indicated that his views against the death penalty and sitting in the presence of the defendant for a number of weeks *might* impair his ability to follow the law. And later he said he thought he could be fair to both sides.

101 - OPINION AND ORDER

Both Warren and Robotham gave inconsistent and shifting responses concerning their ability to set aside their opposition to the death penalty, to fairly and impartially consider the evidence and to follow the court's instructions. The Court is satisfied that the trial court understood and appropriately applied relevant governing authority in making its decision. Moreover, the Court is satisfied that in denying these claims, the Oregon Supreme Court appropriately deferred to the trial court's in-person observations and appraisals of these prospective jurors. Accordingly, at a minimum, petitioner cannot demonstrate that the Oregon's Supreme Court's denial of relief on these claims, based in large part on its view that the trial court having had the opportunity to observe these jurors' "inflection, sincerity, demeanor, candor, body language, and apprehension of duty," was in the best position to determine whether they could be fair and impartial jurors, was contrary to or involved and unreasonable application of federal law as determined by the Supreme Court. *Skilling*, 561 U.S. at 386

### 3.    *Prospective Juror Nunez*

In reviewing petitioner's allegation that the trial court should have granted his request to excuse this juror for cause, the Oregon Supreme Court found there was evidence in the record supporting the trial court's conclusion that Nunez could serve as a fair and impartial juror. Specifically, the Oregon Supreme Court found that both in his questionnaire and in his response to defense questioning, Nunez indicated that he did not think the death penalty was appropriate in all cases of aggravated murder. It also noted that Nunez stated that he believed he could put his feelings about the death penalty aside and make a decision based on the evidence and the court's instructions. Finally, the Oregon Supreme Court noted that nothing in the voir dire examination revealed that Nunez was personally biased against petitioner or unable to follow the law.

102 - OPINION AND ORDER

The Court has reviewed the relevant record pertaining to this juror. Nunez expressed personal beliefs about the death penalty which called into question whether he could serve fairly and impartially. In both his questionnaire and during voir dire, he answered yes to the question asking whether he would vote for the death penalty because of his beliefs, regardless of the evidence presented and the court's instructions. However, in follow up questions, he repeatedly insisted that he could set his personal death penalty views aside and vote on the evidence presented and the law presented by the court. Again, like Warren and Robotham above, there were contradictions in Nunez's responses and the trial court was in the best position to assess the sincerity of his assurances that he could set his personal views aside and fairly and impartially serve as a juror in petitioner's case. Accordingly, based on the foregoing, petitioner cannot demonstrate that the Oregon's Supreme Court's denial of relief on this claim was contrary to or involved an unreasonable application of federal law as determined by the Supreme Court.

D.      Claim 9.E. - Biased Jury

Finally, petitioner alleges that the empaneled jurors were actually biased against him, failed to honestly answer questions during voir dire that would have provided a challenge for cause, engaged in misconduct, and refused to consider mitigating evidence. He maintains that he is statutorily prohibited from interviewing jury members under Oregon law to substantiate these allegations, but that he preserves his right to raise additional factual allegations in support of this claim after investigation and discovery in this matter. Respondent's arguments that the Court should deny this subclaim both because it is procedurally defaulted and because it is not supported by evidence are well taken. Accordingly, the Court denies this subclaim on the basis that it is procedurally defaulted and petitioner provides no credible basis for me to excuse such default.

X.      **Claim 10 - Prosecutorial Misconduct**

Petitioner alleges that prosecutorial misconduct, before and during his guilt-phase trial, violated his constitutional rights and resulted in a guilty verdict. Specifically, he alleges prosecutors: (1) intimidated witness Mary Gates before trial; (2) committed misconduct during closing arguments regarding their interactions with Gates; (3) relied on false, perjured testimony regarding Hall's dying declaration; (4) improperly denigrated defense witnesses as well as petitioner's expressions of remorse and his perceptions of the trial's fairness; and (5) improperly appealed to the jurors' passions and prejudices.

Respondent maintains that these claims are procedurally defaulted because petitioner failed to fairly present them to the Oregon courts. Moreover, he contends that petitioner's reliance on *Martinez* to excuse their default is misplaced because it does not apply to prosecutorial misconduct claims. Finally, he insists, that even if *Martinez* did apply, petitioner would not be entitled to relief here because none of these prosecutorial misconduct claims or their related ineffective assistance of trial counsel claims are "substantial" in law and fact.

As a preliminary matter, *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) governs allegations of prosecutorial misconduct. There, the Court explained that prosecutorial misconduct does not rise to the level of a constitutional violation unless it so infected the trial with unfairness as to make the resulting conviction a denial of due process. To determine whether a prosecutor's comments constitute a due process violation, the reviewing court must examine the entire proceeding so that the comments are reviewed in their proper context. *Boyde v. California*, 494 U.S. 370, 384-85 (1990). And even assuming petitioner can establish that the prosecutor engaged in misconduct, habeas relief is unwarranted unless the petitioner can show that the misconduct had

a substantial and injurious impact on the jury's verdict. *Karis v. Calderon*, 283 F.3d 1117, 1128 (9th Cir. 2002) (citing *Brecht*, 507 U.S. at 638).

A.    Claim 10.A. - Prosecutors' Intimidation of Mary Gates

Petitioner alleges that prosecutors intimidated Gates to preclude her from testifying in his favor at trial. He maintains that as late as April 14, 1993, Gates was convinced that she heard shots before she saw petitioner pull a gun from his waistband – presumably suggesting that Hall had fired his gun first. According to petitioner, Gates changed her statement two weeks before trial after a prosecutor (Horner) and Portland Police met with her. At trial, Gates confirmed that when police interviewed her over the phone shortly after the incident, she told the officer that she heard a shot prior to seeing the person pull a gun from the back of his pants; and she similarly told a defense investigator that after she heard the shot she saw petitioner pull the gun from the back of his pants. Nevertheless, at trial she testified that "upon later reflection, [she was] not absolutely sure" about the sequence of events. Transcript Designation, Part M at 126. She testified that after meeting with the prosecutor she became a little doubtful of her own recollection. She further testified, however, that "[she didn't] feel that [she] was pressured by the district attorney." *Id*. at 136.

Petitioner concedes that he did not raise this claim in any of his state-court proceedings and that it is procedurally defaulted. Nevertheless, he argues that the Court may reach its merits because his PCR trial counsel was ineffective in failing to raise a claim that his trial counsel was ineffective in failing to raise a due process claim based on the prosecutor's above-described actions. The Court disagrees.

First, as noted above, *Martinez* applies only to claims of ineffective assistance of trial counsel and cannot excuse the default of this prosecutorial misconduct claim. Accordingly, the

Court denies it as procedurally defaulted. In addition, even examining the related ineffective assistance of counsel claim based on trial counsel's alleged failure to object to the aforementioned alleged prosecutorial misconduct, I conclude that petitioner cannot show that such claim is a substantial one under *Martinez* because: (1) there is no evidence in the record that the prosecutor inappropriately pressured Gates into second guessing her former recollection – to the contrary, she specifically testified that she did *not* feel pressured by him; (2) the jury heard the chronology of Gates shifting recollection of events, including her admission that it was only after she spoke to Horner that she became doubtful of her recollection, and thus, the jury could assess the credibility of her new-found uncertainty about the order of events and decide whether her earlier statements were the more reliable ones; and (3) petitioner cannot show he was prejudiced by his counsel's failure to object to the prosecution's alleged misconduct vis-a-vis Gates. As the Oregon Supreme Court concluded in its denial of petitioner's claim alleging that the trial court erred when it excluded an audiotape of the interview Gates had with a defense investigator, given the fact that all the witnesses to the exchange of gunfire, including Gates, agreed that the words, "He's got a gun," were uttered before any shot was fired,[26]

> [I]t would not matter whether Hall or defendant fired the first shot. If Hall perceived that defendant was about to use his gun, Hall would have been justified in firing the first shot, which undercuts defendant's self-defense theory. Thus, even if the trial court erred in excluding the audiotape from evidence, there is little likelihood that the error affected the verdict. We conclude that any error was harmless beyond a reasonable doubt.

*Lotches*, 331 Or. at 487-88. Based on this same analysis, the Court concludes that any claim based on trial counsel's alleged ineffectiveness for failing to object to the prosecutor's actions in meeting

---

[26] The witnesses who knew Hall testified that he uttered the words "He's got a gun" in reference to petitioner possessing a gun.

with Gates or prejudice petitioner suffered as a result, is not substantial within the meaning of *Martinez* and cannot excuse the default of this claim.

    B.    <u>Claim 10.B. – Prosecutors' Gross Misconduct during Guilt-Phase Closing Arguments</u>

Petitioner alleges that Assistant District Attorneys Horner and Frink committed gross misconduct in their closing arguments when: (1) Horner improperly testified regarding his interactions with Gates; and (2) Frink improperly testified about Horner's character and vouched for his credibility. Petitioner argues that it is improper and unethical for lawyers to become witnesses and that he was deprived of the ability to confront and cross-examine important evidence bearing on Horner's meeting with Gates. Respondent argues that petitioner never raised this claim in his state-court proceedings.

Petitioner alleged in his direct appeal that the prosecutors' comments during closing arguments involved constitutionally inappropriate personal vouching for their case, but conceded that his defense counsel failed to object to the prosecutors' comments at trial. Petitioner asked the Oregon Supreme Court to review the unpreserved claim as plain error. It declined to do so. Accordingly, the claim was not presented to the state courts in a procedural context in which its merit would be considered and it is now defaulted. Petitioner apparently concedes as much but argues that the Court may reach its merits via *Martinez*. As noted above, *Martinez* applies only to claims of ineffective assistance of trial counsel and cannot excuse the default of this prosecutorial misconduct claim. Accordingly, the Court denies it as procedurally defaulted and concludes that petitioner cannot demonstrate entitlement to excuse its default.

Moreover, even examining the related ineffective assistance of counsel claim based on trial counsel's alleged failure to raise this prosecutorial misconduct argument at trial, the Court would

conclude that petitioner failed to show it is a substantial one under *Martinez* because, at a minimum, its review of the relevant record reveals that taken in context, including Gates testimony that Horner did not pressure her, other witnesses testimony that petitioner pulled his gun out before the first shot was fired, and testimony from all witnesses, including Gates, that the words "He's got a gun" were uttered before any shot was fired, petitioner cannot show that the prosecutors' comments, even if improper, impaired the jury's ability to fairly judge the evidence or undermined the fundamental fairness of the trial. Accordingly, the Court's assessment of the merits of this ineffective assistance claim does not lead it to conclude that reasonable jurists could debate whether counsel's performance fell below an objective standard of reasonableness and/or whether petitioner was prejudiced by counsel's failure to object to the prosecutor's comments.

C.     Claim 10.C. - Hall's "Dying Declaration"

Petitioner suggests that prosecutors knowingly introduced false and perjurious testimony regarding Hall's "dying declaration." Specifically, he "alleges on information and belief" that documents in the record, including the affidavit of Cynthia Hall filed in their pending divorce, prove the testimony was false. Petition at 178. Respondent argues that petitioner never raised this claim in his state-court proceedings and therefore the Court should deny it as procedurally defaulted. Petitioner does not dispute that this claim is procedurally defaulted, but again argues that the Court may reach its merits via *Martinez*. As noted above, *Martinez* applies only to claims of ineffective assistance of trial counsel and cannot excuse the default of this prosecutorial misconduct claim. Accordingly, the Court denies it as procedurally defaulted and concludes that petitioner cannot demonstrate entitlement to excuse its default.

In addition, even were the Court to examine a related ineffective assistance of counsel claim based on trial counsel's alleged failure to raise this prosecutorial misconduct argument at trial, it would conclude that petitioner fails to meet his burden of showing it is a substantial one under *Martinez* because he fails to offer any substantive argument in support of the claim.

D.    Claim 10.D. – Prosecutors Denigrated Defense Witnesses during Guilt-Phase Closing Arguments

Petitioner alleges the prosecution improperly denigrated defense witnesses when a prosecutor: (1) made faces, laughed and shook his head at the jury during Dr. Plazak's testimony; (2) improperly denigrated Fred Hoffman, a former Oregon State Police officer who testified that Hall's conduct was not proper under established police procedures, and improperly argued during closing arguments that Hoffman was trying to "kick dirt" on Hall; and (3) improperly denigrated defense experts because they were hired by the defense. Respondent argues this claim is procedurally defaulted and should be denied.

On direct appeal, petitioner alleged that the trial court erred in failing to declare a mistrial when Dr. Plazak informed the court that the prosecutor communicated with a juror about Plazak's testimony – specifically that the prosecutor had been making gestures indicating disbelief, such as head shaking, scoffing, and laughing, toward one of the jurors in the front row. In denying this claim, the Oregon Supreme Court specifically declined to consider for the first time on appeal what it identified as unpreserved constitutional objections that "the prosecutor improperly vouched for the state's case by commenting on and impugning Plazak's credibility" or that "the prosecutor, by his conduct, violated defendant's due process rights under the United States Constitution." *Lotches*,

331 Or. at 496. Accordingly, respondent's contention that petitioner failed to fairly present this claim to the Oregon courts in a procedural context in which its merit could be considered is well taken.

With the exception of the allegations related to Dr. Plazak, petitioner concedes that this claim is procedurally defaulted, but argues that the Court may reach its merits via *Martinez*. As noted above, *Martinez* applies only to claims of ineffective assistance of trial counsel and therefore cannot excuse the default of this prosecutorial misconduct claim. Accordingly, the Court denies this claim as procedurally defaulted in its entirety and conclude that petitioner cannot demonstrate entitlement to excuse its default.

In addition, even were the Court to examine a related ineffective assistance of counsel claim based on trial counsel's alleged failure to raise this prosecutorial misconduct argument at trial, it would conclude that petitioner failed to meet his burden of showing it is a substantial one under *Martinez*. As discussed below, the Court's review of the pertinent parts of the record do not reveal that the prosecutors' alleged actions/comments, to the extent they were improper at all, so infected the trial with unfairness as to make petitioner's conviction a denial of due process.

### 1.    Dr. Plazak

When Dr. Plazak raised his concerns, petitioner's counsel moved for a mistrial at petitioner's request. The court denied petitioner's motion noting that it had not seen the prosecutor gesticulating. In addition, the judge noted that in his experience lawyers acting in the manner Plazak described harm their own cases. The trial court also declined counsel's request to interview the allegedly affected juror because he did not want to overemphasize the matter, particularly if the

juror had not noticed the prosecutor's gestures or had not been influenced by them. In reviewing

the trial court's denial of petitioner's motion for mistrial, the Oregon Supreme Court stated:

> [b]ecause the trial court clearly was in the best position to consider the effect of the prosecutor's alleged gesticulations on all of the participants, that court's perception of the comparative effects of that conduct and any remedy that the court might have fashioned is entitled to deference, even though that court did not observe that conduct.

***

> Assuming the prosecutor's conduct to have been improper as Plazak asserted, that conduct was not so prejudicial that the trial court's decision not to grant a mistrial or to question the allegedly affected juror can be said to have denied defendant a fair trial.

*Lotches*, 331 Or. at 496-97.

> ### 2.    *Fred Huffman*

The Court has reviewed the entire record of Huffman's offer of proof, testimony and

references to him in the prosecutor's closing arguments. It finds nothing improper or unduly

disparaging in the manner the prosecutor questioned him. In closing arguments, the prosecutor

argued, contrary to Huffman's view, that Hall's actions showed courage:

> I don't care what the state trooper says, this ex-state trooper, about how this guy was supposedly acting recklessly.

> If that didn't stick in your stomach when he said that, here's this guy that gives his life up, and they have the gall to put somebody on and come in and try to kick dirt on him, because he's around the corner, kind of peeking around, and sees this guy, the defendant, putting a gun in a grandmother's face as this little boy runs out, and he's got to make a decision like that. He's got, what, one second, two seconds to make a decision. Lotches firing away at him, and sees this little boy. And they have the gall to kick dirt on him.

Transcript Designation, Part S at 92-93. While tough, the Court does not find that these comments

rise to the level of being improperly disparaging. In choosing to call an expert to opine that Hall

acted carelessly in the incident and that he had better, safer options, the defense opened itself up to

an argument that it was deflecting responsibility away from petitioner by blaming the victim for his own death.

### 3.    *Paid Experts*

Similarly, the Court concludes that prosecutors did not improperly disparage expert witnesses hired by the defense to testify on petitioner's behalf by contrasting them with court-appointed experts and experts who treated petitioner during the course of their work. As a matter of course, parties suggest that paid witnesses may be biased. Based on the foregoing, the Court concludes that petitioner cannot show either that counsel acted ineffectively when he failed to raise prosecutorial misconduct claims based on prosecutors' treatment of expert witnesses or that any failure to do resulted in prejudice to petitioner.

### E.    Claim 10.E. – Prosecutors Denigrated Petitioner during Guilt-Phase Closing Arguments

Petitioner alleges that during closing arguments prosecutors improperly denigrated his expressions of remorse for Hall and petitioner's statements regarding his perception of the fairness of the trial. Petitioner appears to concede that he did not raise this claim in any of his state-court proceedings and that it is procedurally defaulted. He also acknowledges that *Martinez* cannot excuse defaulted claims of ineffective assistance of direct appellate counsel. Nevertheless, he argues that the Court may reach the merits of this defaulted claim because his PCR trial counsel was ineffective in failing to raise a claim that his trial counsel was ineffective in failing to raise a due process violation before the trial court based on the prosecutor's above-described actions.

First, as noted above, *Martinez* applies only to claims of ineffective assistance of trial counsel and therefore cannot excuse the default of this prosecutorial misconduct claim. Accordingly, the Court denies it as procedurally defaulted and concludes that petitioner cannot

demonstrate entitlement to excuse its default. In addition, even were the Court to examine a related ineffective assistance of counsel claim based on trial counsel's alleged failure to raise this prosecutorial misconduct argument at trial, it would conclude that petitioner fails to show that such claim is a substantial one under *Martinez* because he fails to offer substantive argument in support of the claim.

      F.      Claim 10.F. - Prosecutors Improperly Appealed to Jurors' Passions and Prejudices during Penalty-Phase Closing Arguments

Upon the conclusion of the presentation of the evidence during the penalty-phase of petitioner's trial, the court submitted four questions to the jury. The fourth question was, "Should the defendant should receive a death sentence?" *See* Transcript Designation, Part V at 96, 104, 119. Petitioner alleges that prosecutors improperly appealed to the jurors' passions and prejudices and inflamed them against him when they urged them to consider issues such as petitioner's prior escapes and crimes when answering the fourth question in their closing statement. As discussed in Claim 2.C., in light of SB 1013, the Oregon Supreme Court's holding in *Bartol*, and Governor Brown's commutation of petitioner's death sentence to life without parole, petitioner's penalty-phase claims are denied as moot.

**XI.**    **Claim 11- Ineffective Assistance of Trial Counsel**

      A.      Claim 11.B. - Counsel was Unqualified, Took the Case to Trial Too Soon and Failed to Obtain a Qualified Defense Team[27]

---

[27] There is no "Claim" 11.A. in the Petition. For the sake of tracking, the Court refers to the claims it identifies as petitioner numbered them in his Petition.

Here, petitioner emphasizes that: (1) the relevant ABA guidelines confirm that capital representation is a specialized area requiring specialized training and skills; (2) this was co-counsel Manning's first murder case; (3) counsel failed to hire a qualified defense team to investigate the crime and petitioner's entire unique and compelling background; (4) counsel failed to develop a relationship of trust and confidence with petitioner; and (5) counsel took the case to trial in less than eight months—an insufficient amount of time to prepare a capital case in general, but particularly this one given the volume of documents related to petitioner's criminal record and hospital stays.

Respondent acknowledges that isolated aspects of this claim might overlap with some arguments petitioner raised in his PCR proceedings, but contends that even with those, he did not raise them in his PCR appeal. Accordingly, respondent argues that this claim is procedurally defaulted. Moreover, he contends that under *Strickland,* in evaluating counsel's performance at trial, the Court must focus on counsel's actual performance not on their qualifications. To that end, respondent maintains that several of petitioner's assertions, *e.g.*, his assertion that this was Manning's first murder case, do not speak to counsel's actual performance and do not bear on whether counsel rendered ineffective assistance.

With respect to the general assertions of ineffective assistance set out in this subclaim, petitioner does not contest respondent's argument that they are procedurally defaulted. Accordingly, the Court denies relief on this subclaim on the basis that it is procedurally defaulted and petitioner has failed to demonstrate entitlement to excuse its default. However, the Court addresses some related and more specific claims below.

B.    Claim 11.C. - Pre-trial Stages

*1.    Counsel failed to protect petitioner's right to competency at trial.*

Respondent contends that petitioner raised claims in his PCR proceedings faulting trial counsel with failing to: adequately investigate petitioner's competency; to ensure petitioner was being properly medicated; discern the impact of administered medications and protect him from forced medication; move for a competency hearing before trial; and monitor petitioner's competency throughout the trial and move for a competency hearing when doubts arose. Despite having raised these claims in his PCR Petition, however, respondent maintains that petitioner opted not to challenge the PCR trial court's denial of relief on appeal.

Petitioner concedes that these claims are defaulted but suggests that the Court should excuse their default because his PCR trial counsel failed to adequately prosecute them so that they could be raised on appeal.[28] The Court has reviewed petitioner's PCR Petition and is satisfied that he raised the aforementioned ineffective assistance of counsel claims related to petitioner's competency there. Moreover, he raised the claims in a manner permitting the PCR trial court to consider and rule on their merits, which it did. Indeed, in denying these claims on the merits, the PCR trial court made extensive findings of fact. As noted above, no further action on PCR counsel's part was necessary to preserve these claims for appeal. Petitioner simply opted not to challenge their denial on appeal. Accordingly, the Court denies these subclaims on the basis that they are procedurally defaulted and petitioner has not shown that the Court should excuse their default.

*2.    Counsel failed to adequately investigate all aspects of the case before trial.*

---

[28] Petitioner also asserts that Oregon's procedural rule barring review of alleged errors not objected to at trial and raised on direct appeal is inadequate. As noted above, this argument is without merit. Moreover, it is inapplicable here because in Oregon ineffective assistance of trial counsel claims can only be pursued during PCR proceedings.

*a.*    *Petitioner's cultural and tribal background.*

Petitioner faults counsel with failing to investigate and learn about: multi-generational trauma suffered by the Klamath-Modoc Tribe resulting in alcoholism, drug addiction, violence and other dysfunction among surviving tribal members; evidence of racism against and assaults on tribal members by persons in authority, including police; and evidence of petitioner's suffering during his formative years as a victim of violent alcoholism and abuse from his own family and local Klamath law enforcement. According to petitioner, this information was readily available and necessary for an appropriate diagnosis of his mental illnesses both to substantiate the existence of his mental illnesses and to explain how he would have perceived being chased, accosted and fired upon by EID employees. He contends that without investigating and obtaining this information, no accurate mental health evaluation could occur and counsel could not appropriately analyze available defenses and make a reasonable strategic decision about which direction to take petitioner's defense. Petitioner notes that despite sufficient information to put counsel on notice of petitioner's background and the need to investigate these issues, counsel admitted that he conducted no investigation into petitioner's background as a member of the Klamath-Modoc Tribe.

Respondent concedes that petitioner adequately exhausted a claim faulting trial counsel with failing to investigate and use petitioner's personal history and the history of the Klamath-Modoc people to support a defense based on cultural self-defense. To that end, the PCR court made the following relevant findings of fact and conclusions of law:

FINDINGS OF FACT

5.    When discussing the case with his attorneys, petitioner consistently told them that he could not remember anything that happened on August 22, 1992, after the headslapping incident with Donald Hedges in O'Bryant Park. Petitioner told Dr. Richard Lazere the same thing before trial. Petitioner also

116 - OPINION AND ORDER

testified during the penalty phase that he did not remember the shooting and that he had told police that all he could remember about that day was that he had been drinking. (Ex 104, Penalty Tr 2481). Petitioner's testimony during his deposition that he told his trial attorneys about the events that occurred throughout the entire incident is not credible.

6.      The fact that petitioner could not, or would not, tell his attorneys about the circumstances of the shooting made the job of defending petitioner difficult for trial counsel.

* * *

18.     Petitioner is a member of the Klamath-Modoc tribe. His trial attorneys did not consider presenting a "cultural self-defense" at the guilt/innocence stage that would have been based on the dominant white culture's historic and modern abuse of the Klamath-Modoc people or of Native Americans generally. However, counsel's current assessment of whether they could have used that kind of defense was that it did not fit the facts of the crimes, and that they would have risked losing credibility with the jurors if they had pursued such a defense. The court finds that testimony credible and persuasive.

19.     Petitioner's testimony at deposition in which he described the events of the shooting (Ex 114, 3/20/2006 depo 255-56), even if true and even if he had shared that version of events with his trial counsel, would not have supported a "cultural self-defense," because he testified that his reaction to William Hall's approach, which triggered the events leading to the shooting, stemmed from his years living among inmates in prison, not from his experiences as a Native American.

* * *

35.     Petitioner's trial counsel thoroughly investigated petitioner's successful use of the insanity defense in earlier criminal proceedings in Colorado and Multnomah County, and they developed a defense based on that information. Petitioner wanted his counsel to present an insanity defense, and he was heavily invested in that defense. Given the past success of that defense, and considering the circumstances of this case, counsel acted reasonably by presenting that defense again. Petitioner presented no evidence or argument to support his claim that his trial counsel failed to recognize possible dangers in raising an insanity defense or that they could have eliminated those risks by engaging in pretrial motion practice. (Claims V(D, E, H), page 12).

* * *

117 - OPINION AND ORDER

39.    The jury heard about petitioner's fear and distrust of authority figures
through the testimony of defense experts, who reviewed petitioner's life
history in explaining how they reached their diagnoses. []

* * *

62.    Even without a "mitigation specialist," the defense investigation discovered
a great deal of mitigating information about petitioner's life and personal
background -including his dysfunctional family, abusive childhood, and
alcohol abuse – while developing the combined insanity/self-defense
defense that was presented in the guilt/innocence phase of the trial. During
the guilt/innocence phase of the trial, the jury heard extensive testimony
about petitioner's difficult life from the defense expert witnesses, especially
Drs. Plazak, Whittington, and True, when those witnesses explained how
they had reached their diagnoses of petitioner.

* * *

65.    The court finds credible the testimony of petitioner's attorneys that, while
preparing for trial, they attempted to elicit information from petitioner about
his family and background. Petitioner was reluctant to provide helpful
information in those respects.

* * *

71.    Dr. Robin LaDue diagnosed petitioner with post-traumatic stress disorder
(PTSD). She based that diagnosis on petitioner's personal history of trauma,
not on general evidence of generational trauma to Native Americans
generally. She expressed her personal opinion that petitioner's trial attorneys
should have presented evidence about petitioner's PTSD and, separately,
about the cultural traumas inflicted on the Klamath-Modoc tribe over the
span of several generations as mitigating evidence in the penalty phase of
the trial.


CONCLUSIONS OF LAW

5.    With respect to each of petitioner's claims for relief, petitioner did not prove
that his trial [] counsel's performance ever fell below the level of
constitutional adequacy under the standards set forth in Strickland []. In
addition, with respect to each of petitioner's claims, petitioner did not prove
that he suffered prejudice as a result of his counsel's representation.

6.    Although petitioner presented evidence that other attorneys may have
handled the case differently, and that other attorneys might have presented

testimony similar to that given by Dr. Robin LaDue in this proceeding, he did not prove that his trial attorneys acted unreasonably in their choice of defense or in their overall representation of petitioner.

Respondent's Exhibit 565, Volume 28-14.

On appeal, the Oregon Court of Appeals concluded that petitioner's argument that his counsel rendered inadequate assistance when they failed to "investigate his cultural background and offer a defense based upon the unique factors in petitioner's history, particularly the experiences he suffered as a member of the Klamath-Modoc tribe," fails because it is inconsistent with and contradicted by the PCR court's uncontested factual findings. *Lotches*, 257 Or. App. at 517-18. Specifically, it noted that court found that a "culturally attuned" defense was inconsistent with petitioner's deposition testimony attributing his reaction to Hall and other EID employees to his years spent in prison amongst inmates and not his experience as a Native American or his related family problems. *Id*. at 518. Moreover, it found that petitioner presented no evidence to show that he told his counsel about any connection between his actions on August 22, 1992 and his heritage, and no evidence that counsel "knew, or should have known, in the exercise of reasonable professional performance that the plight of the Klamath-Modoc tribe had any significant relationship to petitioner's conduct.*" Id*. Coupled with the PCR court's uncontested finding that petitioner was "heavily invested" in the insanity defense, the Oregon Court of Appeals noted that in a case like this involving extensive criminal acts and extensive evidence, *any* approach is fraught with risk. It ultimately concluded that trial counsel's investigation was legally and factually appropriate and found no legal error. *Id*. at 519.

Petitioner's arguments notwithstanding, the Court concludes that he has not and cannot show that the Oregon Court of Appeals' denial of this ineffective assistance of counsel claim was

contrary to or involved and unreasonable application of *Strickland* or that it was based on an unreasonable determination of the facts in light of the evidence presented in state court.[29] His suggestion that had counsel looked into the tragic multi-generational history of the Klamath-Modoc tribe and uncovered petitioner's personal story as a member of that tribe they would have settled on a so-called "culturally attuned" defense that would have been successful, is not supported by the record. As discussed above, that defense did not square easily with either petitioner's repeated representations that he had no memory of the critical portions of the incident or his later statements that his reaction to Hall and the other EID employees was borne out of his years of incarceration surrounded by inmates and specifically *not* related to his Native American background or family history of abuse. Moreover, the record reveals a reluctance on petitioner's part to delve into his personal background and utilize family members to shed light on his story. This reluctance casts significant doubt on whether he would have approved of such a defense. And perhaps most compelling to the Court, the record supports the PCR court's findings that petitioner wanted counsel to pursue an insanity defense and was heavily invested in such a defense.

Finally, the record reveals that any defense was wrought with risk and problems. A culturally-attuned defense, in addition to not being petitioner's preferred defense, was not well-suited to the evidence. Indeed, Dr. LaDue suggested during the PCR trial proceedings that its value

---

[29] Moreover, while not raised as an issue by respondent here, the Oregon Court of Appeals specifically noted in its resolution of this Oregon constitutional claim that while the federal and state constitutional standards are similar, "petitioner failed to offer a separate argument under the Sixth Amendment to the United States. Consequently, we do not separately address his federal claim." *Lotches*, 257 Or. App. at 514, n.1.

was not as a specific defense in the guilt phase of the trial but as mitigation in the penalty phase.

The Court agrees.[30]

> ### b.    *Petitioner's mental health issues, including his time at the Colorado State Hospital.*

According to petitioner, counsel rendered ineffective assistance in his investigation of petitioner's mental health issues in the following ways. First, counsel filed a notice of intent to raise the defense of insanity under Oregon law even before he obtained or reviewed any of petitioner's mental health records, including those from the Colorado State Hospital. Second, as late as six weeks before trial, counsel had not obtained an evaluation of petitioner from a psychiatrist to support the defense of guilty but insane, nor did he ever do so. Third, because counsel conducted such a limited investigation into petitioner's personal background (see above subclaim), he could not provide retained experts with adequate information to allow for an appropriate diagnosis of petitioner's mental state. And finally, counsel had not completed his investigation of petitioner's stay at the Colorado State Hospital even after the guilt phase of the trial had commenced.

Petitioner appears to concede that this claim is defaulted. Nevertheless, the Court notes that in denying relief on the petition, the PCR court made the following findings relevant to this claim:

17.    Petitioner's trial counsel reviewed thousands of pages of records relating to petitioner's mental health diagnoses, consulted with multiple doctors who had evaluated and treated petitioner over many years, and arranged for some of those doctors to testify in petitioner's defense. []

* * *

20.    Trial counsel provided relevant background information about petitioner to the defense experts. Petitioner submitted no evidence showing that the

---

[30] The Court also notes that petitioner specifically instructed his PCR appellate counsel to make no arguments challenging the results of the penalty phase. Accordingly, no related penalty-phase claims faulting counsel's performance are properly before the Court.

defense experts needed additional background information or that any such
information would have affected their ultimate opinions.

Respondent's Exhibit 565, Volume 28-14 at 5, 6. Based on the foregoing, even assuming *Martinez*

applies to this subclaim, the Court concludes that petitioner cannot overcome the above findings to

demonstrate the Court should excuse the default of this claim because its review of the record

reveals that counsel reasonably chose the defense they did, adequately investigated petitioner's

background and mental health issues and were entitled to rely on their defense experts' opinions.

*See Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir. 2002) ("The choice of what type of expert to

use is one of trial strategy and deserves a heavy measure of deference."); *id.* at 876-77 ("Failure to

provide a psychologist with facts about a defendant's family history ordinarily cannot support a

claim of constitutionally ineffective assistance."); *Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th

Cir. 1997) (Counsel cannot be faulted for failing to track down every record that might possibly

relate to defendant's mental health.).

<u>c.</u>        <u>*Evidence pertaining to Hall and other EID employees.*</u>

Petitioner contends that his counsel was ineffective for failing to investigate: (1) Hall's

"true" background including the fact that he was not a certified officer and had lied about that fact

to obtain employment, that he displayed poor judgment as a training officer in a manner that could

lead to escalation of situations, and that he had a contentious relationship with, and had abandoned

his wife and children; (2) the backgrounds of the other EID employees; and (3) the right of any

EID employee to enforce a code of conduct on Portland's city streets. In addition, petitioner alleges

that counsel failed: (1) to present fact and expert witnesses to confirm that the conduct of the EID

employees violated EID policies and procedures as well as Oregon State law; (2) to question EID

employees on their intent and goals in pursuing petitioner and what they intended to do when they

caught him; and (3) to object to an instruction that completely misstated the legality of the EID employees' conduct and gutted petitioner's assertions of self-defense. Finally, petitioner faults counsel with presenting the jury with a damaging and inaccurate stipulation regarding Hall's background which falsely implied that he had been a certified officer.

Petitioner concedes these subclaims are procedurally defaulted because he did not raise them in state court, but argues that *Martinez* should excuse any default. Respondent agrees that *Martinez* potentially applies to them. However, he contends that petitioner did allege in his PCR Petition that his attorneys were ineffective when they failed: (1) to present evidence that Hall and the other EID employees' interactions with petitioner disregarded employee conduct rules in that Hall was not qualified on the weapon he carried and none of them had authority to pursue or arrest petitioner; and (2) to present evidence that Hall did not act in accord with EID rules and regulations in his armed contact with petitioner. Respondent insists that because petitioner did not raise the PCR court's denial of these subclaims on appeal, *Martinez* cannot excuse their default.[31] In addition, the Court resolved petitioner's allegation that trial counsel failed to object to the jury instruction allegedly misstating the legality under Oregon law of Hall and Riley's conduct, in Claim 6, above.

With regard to petitioner's claims that trial counsel rendered ineffective assistance when they failed to investigate allegations that Hall lied about his status as a certified officer and that he used drugs in the past and/or that he had an extra-martial affair, and when counsel entered into a

---

[31] These claims also include allegations that counsel failed to investigate the right of EID employees to enforce any codes of conduct on Portland city streets and that trial counsel was ineffective for failing to present witnesses to confirm that Hall and the other EID employees' conduct violated EID rules and policies.

damaging stipulation falsely implying that Hall was a certified officer, the Court concludes that petitioner cannot show that these claims are substantial under *Martinez.* At a minimum, in light of the testimony the jury heard from other witnesses indicating that Hall did not follow EID guidelines in his interactions with petitioner and from a retired police officer suggesting that Hall acted carelessly and foolishly during the incident, particularly with the use of his gun, the Court concludes that reasonable jurists could not debate whether he was prejudiced by any failing on counsel's part to present the jury with Hall's so-called "true" background. Similarly, petitioner cannot demonstrate either that PCR counsel was ineffective under *Strickland* in failing to raise these ineffective assistance of trial counsel claims or that the result of his PCR proceeding would have been different had he done so.

Furthermore, the Court notes that Laddie Hancock, Hall's supervisor when he was a probationary officer for the City of Boardman, testified in an offer of proof at trial that he trained Hall approximately 5 years before the shooting and felt he performed inadequately as a police officer and that had Hall not resigned, Hancock would not have kept him on as a police officer. Specifically, he recounted "two instances in which Hall had been called to a situation that had called for an arrest, but either failed to request backup or to make an arrest. He also testified that he had had no reason to believe that Hall was a violent or aggressive person." *Lotches*, 331 Or. at 488.

Petitioner now points to a June 18, 2015 declaration from Hancock wherein he expands on the above offer with the following assertions: Hall lied in his application to the Boardman Police Department when he stated that he had been a certified police officer with the Pensacola Police Department; this misrepresentation was one of many reasons Hancock decided not to recommend Hall be certified as a police officer in Boardman; another reason was that Hancock learned that

Hall had drug usage (involving drugs much more serious than marijuana) in his background; he also learned that Hall who was married with small children was having an affair; he averred that Hall's response when Hancock told him this was inappropriate was to quote scripture stating that a man did not need to love his wife and could become involved with another woman; Hall disclosed that he was openly dating the other woman and as Hancock recalls, when Hall left Boardman, he left with both women; Hancock told Hall he was wasting his life trying to become a police officer in Oregon because Hancock was never going to recommend that he be certified by the Bureau of Police Standards and Training; and according to Hancock, Hall lied in his application to become a police officer in Central Point, Oregon, stating that he had been certified to be a police officer in Boardman. Finally, Hancock averred that while he talked briefly on the phone with petitioner's attorney before taking the stand in the preliminary hearing, counsel did not explain what he was seeking from him as a witness, so Hancock merely answered the questions put to him based on what he knew at the time. Petitioner's Exhibit 22, Volume 49-2.

There are additional unfavorable details about Hall in Hancock's 2015 affidavit compared to his offer of proof. However, none stand out as any more relevant to the issues at trial than those that the trial court determined were irrelevant and/or unduly prejudicial. Accordingly, the Court concludes petitioner cannot show that these underlying ineffective assistance of counsel subclaims claims are substantial under *Martinez* because it is evident that even if counsel had attempted to elicit these details pertaining to Hall's honesty, marital fidelity and past drug use from Hancock during the offer of proof, the trial court would have excluded the testimony. Similarly, the Court concludes that the stipulation noting that Hall and his wife were going through a divorce at the time he was shot on August 22, 1992 and that Hall had left the family home in May 1991, adequately

advised the jury of his familial situation, and, therefore, petitioner's subclaim alleging that counsel was ineffective for failing to uncover and introduce evidence that petitioner had a contentious relationship with his wife and had abandoned his kids is also not a substantial one under *Martinez*.

Finally, with regard to petitioner's allegation that counsel was ineffective in failing to question the EID witnesses about their intent and goals in following petitioner, the Court concludes that respondent's contentions that petitioner cannot show that all reasonable attorneys would recognize this as a pertinent issue before the jury because: (1) such testimony would not have been relevant to petitioner's state of mind; and (2) one could infer these witnesses' intent from the record, are well taken.[32] Accordingly, petitioner cannot show that this is a substantial claim under *Martinez* and therefore the Court denies is as procedurally defaulted.

> 3.    *Counsel failed to obtain and prepare adequate experts to analyze and support petitioner's defenses.*

At trial, the parties called a number of expert mental health witnesses. The Court briefly summarizes their testimony below.

> a.    <u>*Defense Witnesses*</u>

> i.    Donald True, Psychologist

Dr. True met with petitioner in November and December 1992 and January 1993. He performed a battery of tests including the MMPI and the Rorschach psychological test. Dr. True also evaluated petitioner in 1989 and administered these same tests in connection with another criminal matter wherein he testified that petitioner was guilty but insane and the jury agreed.

---

[32] Respondent also notes that petitioner presents no proffer of what these witnesses would have said to establish prejudice.

126 - OPINION AND ORDER

With regard to the most recent MMPI, Dr. True testified that the scales indicated that petitioner is likely to be suffering from some kind of paranoid condition, possibly a schizophrenic-like condition and possibly a bipolar condition. He conceded that based on certain "off the chart" elevations in the testing results, there was reason to question whether petitioner was trying to fake his problems. However, he argued that in looking at the testing over the course of seven years, if petitioner was trying to fake it, he was doing a bad job of it—which is not in line with his intelligence. He testified that he diagnosed petitioner with borderline personality disorder in 1989 and would do so now, along with some other unspecified dissociative disorder wherein he functions in different ego states: sometimes an ego state exhibiting a severe mental disorder (like now and at the time of the incident) and other times in an ego state like a criminal. Dr. True's bottom-line diagnosis was borderline personality disorder with a propensity, under stress, to deteriorate into psychotic functioning. He thinks that when petitioner is in an acute, stressed or disturbed state, he functions like a paranoid schizophrenic. He also testified that one of the hallmark features of borderline is that doctors disagree about what they are seeing. He conceded that petitioner probably also suffers from antisocial personality disorder (though he maintained this is not his major diagnosis) and argued that because of this, when his borderline is calm he looks like a criminal even though he is in a hospital setting.[33]

Dr. True testified that when petitioner is anxious or paranoid he is likely to self-medicate with alcohol or drugs. He noted that freedom is frightening to petitioner and his records show that within weeks or months of getting out of an institution, he gets in trouble again for strange or

---

[33] Dr. True also opined that petitioner suffers from delayed-onset post-traumatic stress disorder ("PTSD").

unplausible reasons. Petitioner reported to Dr. True and other doctors that prior to discharge he gets upset and starts to hallucinate, even though he has not hallucinated in months. Dr. True suggested that the complexity of petitioner's situation is reflected in the jail's treatment of him wherein medical staff, by administering antipsychotic medications, acknowledge that he suffers from a severe mental illness, but also indicate that they do not think that he does. Dr. True also testified about how alcohol can have a disinhibiting effect on a person with petitioner's mental health problems, calming him down, but then swinging him dramatically toward feelings of paranoia where he thinks everybody is out to get him.

Dr. True also discussed petitioner's traumatic history with authority figures and how, when he is in a dis-inhibited state, he is likely to overreact and think they are going to kill him when they may be out to confront him. To him, confrontation equals death because he has an unrealistic mistrust of the environment. Based on what he knows about petitioner's history and the events as they unfolded on the day, Dr. True opined that petitioner was unable to discern right from wrong and did not have the ability to control his acts in conformance of the law.

Dr. True opined that even the doctors at the Colorado State Hospital, whom he characterizes as "skeptical and antagonistic," admitted that petitioner suffered from a core paranoid problem or paranoid functioning. He testified that he found petitioner more disturbed today than when he saw him in 1989 when a jury found him guilty but insane. Regarding the assertions of malingering, Dr.

True noted that neither Colorado nor Oregon had good programs to deal with complex cases like petitioner's and that there is a tendency when an individual does not fit neatly in the current diagnostic system to conclude that he or she is faking, notwithstanding the fact that the science and profession is always evolving.

128 - OPINION AND ORDER

On cross examination, Dr. True stated that he did not mention multiple personality disorder in his April 1993 report because the diagnosis had not occurred to him until 3-4 weeks prior when he was trying to reconcile all the competing information in petitioner's history. And regarding petitioner's 1989 case where he was the only psychologist or psychiatrist to testify in the case, Dr. True conceded that he did not detail in his report petitioner's admissions that he faked his psychiatric symptoms. However, he noted that with an individual like petitioner who has antisocial leanings, it is expected that he or she would try to lie, fake and con. Nevertheless, True admitted that statements attributed to petitioner in Dr. Pecevich's reports, such as: "I was facing a habitual, 50 to life, that's why I pled NGRI. I got hold of a DSM III which states all types of symptoms. I got the DSM III in the Denver County Jail in the law library. It talks about all types of psychosis and the easiest one that I came across was paranoid schizophrenia. This involved hearing voices and persons plotting against you. I took the MMCI and the MMPI and I messed up those tests intentionally," were important for determining whether petitioner suffered from a mental disease or defect on August 22, 1992. Transcript Designation, Part N at 196-97.

Dr. True also conceded that there was controversy surrounding the validity of the Rorschach and that psychologists and psychiatrists have to be on guard against someone feigning, malingering and faking this test.[34] He contended, however, that the tests were part of the total picture and he did not reach his conclusions about petitioner based on the tests alone, though he did concede that an individual with a 4-9 profile on the MMPI, petitioner's profile in some tests, is impulsive, bright, sociopathic and without conscience, who will say and do anything to get out of the problem that

---

[34] In rebuttal, Dr. True defended the use of the Rorschach psychological test. He disagreed with Dr. Colistro that its use amongst inmates was less common, contended that it is highly unusual for somebody to be able to fake the test and asserted that he did not believe that petitioner did here.

they find themselves in. He also conceded that petitioner should be suspected of malingering, but he did not think that a layperson, even one who is intelligent, would be able to read the DSM III-R and be able to fake all these tests in the manner suggested. He thinks petitioner exaggerated his symptoms and maybe tried to fake or feign, but did not do a good job. He suggested that petitioner may have tried to manipulate his psychotic experiences to try and con the state to show them he was in control and a tough guy, regardless of whether he was suffering from paranoid symptoms.

In rebuttal, Dr. True reiterated that the trauma petitioner experienced growing up could lead to antisocial personality, borderline personality, PTSD and mixed personality disorders and that its symptoms did not need to come out regularly, in dreams for example, but could be buried for a number of years and come out later.

ii.     Dr. Whittington, Psychiatrist

Dr. Whittington did not evaluate petitioner for this case. However, he did evaluate him to assess both his competence to stand trial and his mental health in conjunction with criminal charges petitioner faced in 1980.[35] Dr. Whittington met with petitioner on November 20, 1980. Dr. Whittington determined, based on petitioner's history, behavior, interview and mental status exam, that petitioner was of above-average intelligence and his primary diagnosis was schizophrenia, paranoid type. While he saw traits of antisocial personality disorder in petitioner, he viewed it as a secondary diagnosis. When Dr. Whittington saw petitioner again on October 5, 1981, he found him improved, but his diagnosis did not change and he recommended that petitioner remain at the Colorado State Hospital for further treatment. He noted that the prevailing opinion in psychiatry is

---

[35] Ultimately, petitioner was found not guilty by reason of insanity and sent to the Colorado State Hospital.

that all schizophrenic illnesses are chronic and incurable. When presented with the facts in this case, he opined that petitioner's actions were consistent with his earlier diagnosis in that they involved an escalating series of events. Moreover, he opined that the appearance of persons in uniform appears to have made petitioner feel threatened, he experienced the biological stressor of alcohol, and the stressor of being out of an institutionalized setting – which his history suggested he could not handle for very long.

When questioned about reports that petitioner told a psychiatrist at the Colorado State Hospital that he faked his symptoms when he saw Dr. Whittington in 1980, the doctor responded that this is common behavior among psychotic individuals who would rather be seen as bad than crazy and who when they are not in the throes of active psychosis will frequently say they were pretending before. He does not think he was fooled by petitioner. He also noted that it is consistent with what he knows about petitioner that he would tend not to have psychotic episodes while in a custodial setting with almost no decisions to be made. Notably, Dr. Whittington stated that petitioner had a good grasp of the legal proceedings and was able to explain quite clearly and in detail the options available at the time. Neither in 1980 or 1981 did he have any questions surrounding whether petitioner was capable and competent to proceed to trial. He stated that petitioner understood who the parties were and what the judge and jury were doing. To a certain degree he agrees with findings that petitioner's general personality traits is that of an antisocial personality because that is based on the history of an individual. He also agreed that a diagnosis of being a paranoid schizophrenic, in and of itself, does not preclude petitioner from being criminally responsible for his behavior.

       iii.    Dr. Dean Plazak, Neuropsychiatrist

131 - OPINION AND ORDER

Dr. Plazak testified that he had an abiding interest in the problems of the American Indian and that through his involvement in petitioner's case back in 1981 he became interested in the de-reservation of the Klamaths and the effects of intertribal competition between the Klamaths and Modocs in Northern California. He noted that petitioner's family had Klamath and Modoc origins and consequently he was often caught in the cross-fire of disagreements between the two families.

He met and evaluated petitioner in February 1981. He remembers talking to petitioner's juvenile probation officer and other members of the tribe to discuss petitioner's background. He relayed a detailed history of petitioner's turbulent upbringing and noted that even as a youth tests indicated he was suffering from the developing stages of a schizophrenic disorder. Dr. Plazak testified about how cultural consideration of the fact that petitioner is Klamath/Modoc was necessary for a proper diagnosis. He testified that petitioner described hallucinations that would qualify under the criteria for schizophrenic thinking disorder, noting that at times it was obvious petitioner was listening to someone other than Dr. Plazak. He diagnosed petitioner with paranoid schizophrenia. He also noted that while there was insufficient evidence to diagnose him with an antisocial personality disorder, he did meet some criteria for antisocial characteristics and arguably some problems that might fall into borderline personality disorder characteristics.

Dr. Plazak examined petitioner again in 1984 to determine whether he was receiving competent and appropriate care at the Colorado State Hospital and whether he could have voluntarily pled guilty to certain charges given his mental health challenges. Ultimately, it was determined that while petitioner was competent to proceed, his decision to waive his constitutional rights was substantially interfered with by his illness. In all, Dr. Plazak evaluated petitioner four times in 1981, 1984, 1986 and 1987. He noted that while petitioner's paranoid schizophrenia had

its ups and downs, it never left him during this period. Moreover, even without interviewing him regarding the current case, he could opine that petitioner's acts were consistent with someone suffering from paranoid schizophrenia acting out. He spoke about the shock of being free after being incarcerated for a long period and petitioner's difficulty in caring for himself, let alone anyone else. With regard to malingering, Plazak stated that while an individual could fake some symptoms, he did not believe even someone as intelligent as petitioner could read the DSM III-R and figure out how to fake something as complex as paranoid schizophrenia. He also noted that within the context of a disease like this people behave like they are powerful and commonly have the delusional idea that they can fool others.

iv.    Geraldine Leyba, RN

Ms. Leyba, a nurse at the Colorado State Hospital, testified that during the couple of months she worked with petitioner in the hospital in 1988, she met with him weekly on a one-on-one basis to discuss his treatment plan and goals.[36] She did not notice any psychosis or psychotic behavior and he did not tell her that he had faked symptoms of mental illness. While she felt he was intelligent, she did not think he could read the DSM III and fake psychotic symptoms. She found him extremely helpful on the ward and in the structured environment she did not consider him dangerous. She also testified that he was proud of his heritage and talked about coming back to help his people. She put her sons on his visitation list and they brought him reading material on Indians. In her opinion, if a paranoid schizophrenic who reacts to the stressors of being free comes

---

[36] Ms. Leyba disclosed that she first met petitioner in 1984 at a nightclub prior to her working at the hospital and had a brief sexual relationship with him.

into a secure structured setting, he or she would be more likely to be calm and less likely to show psychotic tendencies.

        *b.*      *State Witnesses*

        i.     Dr. Seymour Sundell, Psychiatrist

Dr. Sundell attempted, on September 8 & 16, 1980, to evaluate petitioner on the issue of his sanity in connection with the three Denver-area robberies and two other felony cases he had pending at the time. During these attempts to interview petitioner at the Denver County jail Dr. Sundell found that he was guarded, withheld information, and presented almost no historical information – claiming an absence of memory for large portions of his own personal history. In both interviews he presented himself as a confused, disorganized individual who had difficulty with even simple questions. Dr. Sundell noted that this presentation contrasted significantly with observations of him at other times. For example, Dr. Sundell saw him come down the hall animated, actively talking to other inmates, smiling, laughing and with an appropriate brisk walking pace. And then, upon initiation of the psychiatric interview, his entire presentation changed and he had difficulty answering questions that even a very bizarre, disorganized, clearly psychotic delusional person could have answered. For example, he claimed not to know what facility he was in, any material about his family or the definition of "attorney" or "lawyer." This also did not comport with ancillary material Dr. Sundell had showing petitioner making unassisted calls to counsel and not revealing any history of these kinds of symptoms. Dr. Sundell concluded petitioner was trying to exaggerate or feign the extent of his debilitation.

After the jury returned its verdict finding him not guilty by reason of insanity, the court appointed Dr. Sundell to examine petitioner in connection with the escape attempt from the Denver

courthouse. Petitioner refused to see him or partake in an exam. In his testimony here, Dr. Sundell opined that he would not expect a hospitalization to eliminate symptoms of paranoid schizophrenia and that a trained observer would see evidence of the illness over a 9-month time period.[37]

Dr. Sundell opined that because of his refusal to provide background information it was hard to evaluate petitioner. However, from records of his day-to-day activities provided by the jail, it was evident that petitioner was not having difficulty functioning and was not an individual who was disorganized or hallucinating on a daily basis. To the contrary, "[h]is functioning level was certainly consistent with an individual who did not have a major psychotic entity." Transcript Designation, Part Q at 60. Ultimately, Dr. Sundell diagnosed him with antisocial personality disorder and noted that the confusion, disorganization and memory lapse was clearly feigned and malingered.

On cross examination, petitioner's counsel highlighted the fact that in his September 1980 report Dr. Sundell had mistaken petitioner as being Spanish American. Dr. Sundell acknowledged that it is very important that an examiner knows exactly what cultural or ethnic background the subject is from, especially in determining whether somebody has a major psychiatric illness. He also agreed that American Indians, like other minorities, tend to be stressed and guarded with Caucasian psychiatrists, particularly in court-ordered evaluations where the doctors are viewed as

---

[37] To that end, Linda Dotson, a nursing supervisor at the Colorado State Hospital testified that she met petitioner in July 1988 and worked with him until March 1989. She had casual observation of him for several hours a day, five days a week and reviewed 24-hour summaries of his behavior. She testified that he was never on psychotropic medications during this 9-month period and never made statements indicating a true paranoid, psychotic thought process. She also stated that he never complained of auditory hallucinations or showed other indications of paranoid schizophrenia. She noted that his behavior was different from other patients suffering from psychosis or schizophrenia, including the fact that his hygiene was immaculate, he took care of himself, and, in fact, he had difficulty with patients who were psychotic or schizophrenic.

representatives of the system that locked them up. In addition, he testified that while ordinarily, if he has a question about whether someone is malingering, he will refer them for 24-hour observation at the state hospital, but here petitioner's presentation was so "so overt, so absurd" he did not feel it was necessary.

ii.    Dr. Karen Fukutaki, Psychiatrist

Dr. Fukutaki met petitioner in July 1988 and was largely responsible for his care and treatment until March 1989. Based on her contacts with him she formed the opinion that he suffered from a personality disorder, not a thought disorder. Specifically, she testified that: (1) at their first meeting petitioner told her that he read the DSM III and presented himself to two different psychiatrists to get them to diagnose him as paranoid schizophrenic, but that he did not believe he was mentally ill; (2) over the 9-month period she treated him, she did not see evidence of a psychotic thought process and her review of the logs revealed that staff did not notice any either; (3) he was always well groomed, understood what was being said, responded in a logical fashion and never appeared disorganized; (4) if he was really a paranoid schizophrenic not being treated with medications, she would have expected at times for him to look a little disorganized, suffer from delusions, express unusual ideas, appear to respond to internal stimuli and be a little disheveled; (5) at one point he was moved to a different unit due to concerns surrounding his relationship with a therapist and the potential for escape; (6) he told her he wanted to be moved off a unit because he did not like interacting with "crazy people"; and (7) observations were made consistent with him being a manipulative person.

She conceded on cross examination that every month petitioner was at the hospital between September 1985 until he was released, the hospital had to certify that he should remain there due

to his not guilty by reason of insanity finding. She understood that petitioner was released in March 1989 pursuant to an exam in December 1988 by Dr. Pecevich wherein he concluded that petitioner did not suffer from mental illness, specifically schizophrenia or psychotic thought process. Ultimately, while she opined that a patient can be an antisocial personality and be psychotic, she diagnosed petitioner as suffering from antisocial personality disorder and noted that she did not observe anything she would have called paranoia in a sense of suspiciousness or guardedness about things not based in reality. Rather, she saw behavior common amongst incarcerated people: suspiciousness of authority figures and law enforcement, and general vigilance.

### iii.    Dr. David Meyers, Psychologist

Dr. Meyers evaluated petitioner in March 1990 and administered a brief IQ test and MMPI. Petitioner scored 121 on the IQ test—a level consistent with the ability to do college-level academic work. On the MMPI, he scored abnormally high on a scale that reflects impulsiveness and received a 4-9 profile. Dr. Meyers opined the prognosis for this profile is alarming in the sense that such an individual's response to treatment is very poor. Scale 4 is the psychopathic deviance scale and an elevated Scale 9 reflects a great deal of energy, impulsiveness and restlessness. Dr. Meyers further stated that petitioner's low 2-7 scores (scale reflecting anxiety) reveal a self-satisfied, symptom free individual. He noted that it is particularly alarming when you have an antisocial personality (impulsive, hedonistic, self-centered) who is also self-satisfied because there is no incentive to reduce anxiety or depression. In his 1990 evaluation, Dr. Meyers saw no indication of paranoid or delusional disorder, post-traumatic stress disorder or multiple personality disorder.

Dr. Meyers discussed the validity scales and opined that in his March 1990 admission of the MMPI, petitioner's validity scales were well within normal range. However, in his review of

other MMPIs administered over time, Dr. Meyers noticed that with tests given when petitioner was asserting an insanity defense, the F Scale suggested an invalid profile in which the person taking the test was exaggerating his symptoms or faking his pathology.

On cross examination Dr. Meyers conceded that at the time he did his report, he did not have Drs. Plazak or Whittingtons' reports or anything else opining that petitioner suffered from paranoid schizophrenia. He also acknowledged that the vast majority of psychologists in this country tend to come from the white majority and that there has been criticism that many times when MMPIs are administered to members of minority groups, their different cultural norms and values have not been properly taken into account. He believes he was aware of petitioner's heritage at the time he administered the MMPI in 1990. Dr. Meyers also opined that with cross-cultural interpretations, the usual error that white males make in interpreting MMPIs of individuals from different cultures is to assume pathology when there is none. Dr. Meyers conceded that there was a certain class of paranoid schizophrenics who might be more apt to devolve into a psychotic episode under stress.

### iv.    Dr. Mark Pecevich, Psychiatrist

Dr. Pecevich did his initial psychiatric evaluation of petitioner in August 1987. Petitioner told him that he had faked symptoms of mental illness in 1981 to gain his initial admission to the Colorado State Hospital and again in 1984 or 1985 prior to his second admission at the hospital. Dr. Pecevich opined in 1987 that petitioner did not suffer from a major mental disorder and that he had malingered mental illness to avoid serious prosecution as a habitual offender. He concluded that petitioner suffered from antisocial personality and alcohol abuse. He did not find evidence that

petitioner suffered from paranoid schizophrenia, delusional or paranoid disorder, PTSD or multiple personality disorder.

Dr. Pecevich testified that before ever meeting petitioner, he signed a "form letter" on the superintendent's behalf stating that petitioner suffered from a mental disease. Based on Dr. Pecevich's recommendation, they developed a program allowing petitioner to go downtown on a pass. In March 1988, he escaped on one of those passes, was subsequently arrested in Oregon and extradited back to Colorado. He was charged with escape and returned to the state hospital. Dr. Pecevich conducted another mental status exam 1988. Petitioner told him in some detail how he feigned insanity in 1981, '82, '84 and '85, indicating that he was trying to avoid conviction as a habitual offender. He indicated that he had studied the diagnostic manual while in jail and faked symptoms to be found not guilty by reason of insanity. Dr. Pecevich's final conclusion in his December 1988 report was that petitioner was not mentally ill, mental health treatment was not appropriate, petitioner should be referred to the criminal justice system and he posed a future danger. Dr. Pecevich recommended an unconditional discharge of petitioner's not guilty by reason of insanity finding with a warning that petitioner may use the insanity defense to manipulate the legal system in the future.

However, upon reviewing Dr. Mathis' 1985 report wherein Dr. Mathis noted, among other things, that petitioner was non-psychotic at the present time, but that he may show psychotic symptomology during times of high stress or intoxication, Dr. Pecevich conceded that this diagnosis could be indicative of someone with paranoid schizophrenia. He also noted that a high IQ does not preclude a person from having paranoid schizophrenia or borderline personality disorder. On cross examination, petitioner's counsel had Dr. Pecevich read from several disposition

139 - OPINION AND ORDER

reports raising the possibility that petitioner did suffer from a paranoid disorder. One report included the statement that "[a]ll members of the committee felt that [petitioner] remains potentially dangerous in the foreseeable future, and that the danger relates to both the antisocial lack of concern for other people and easy acceptance of the legal [sic] behavior as a means to and end, on the one hand. His paranoid defensiveness, difficulty accepting confrontation, and logical confusion seem more related to the elements suggesting a paranoid disorder." Transcript Designation, Part R at 157-58. Dr. Pecevich testified that while he believed the staff at the Colorado State Hospital were in disagreement about their diagnosis of petitioner, he was unaware of any mental health professional during petitioner's entire time at the Colorado State Hospital who diagnosed petitioner as a paranoid schizophrenic.

v.      Dr. Frank Colistro, Psychologist

Dr. Colistro interviewed petitioner and administered an MMPI on April 21, 1993. He saw him one time for approximately 45 minutes. While aware that petitioner was taking anti-depressant and anti-psychotic medications at the time, Dr. Colistro did not see indications of the presence of any significant diagnosable mental or emotional condition. Dr. Colistro testified that petitioner told him that he had no recollection of the current offenses. In Dr. Colistro's review of witness accounts of petitioner's behavior on the day of the incident, he found no descriptions suggesting that petitioner was seeing or hearing things or acting under command delusions or other indications that he was suffering from mental illness. Rather, the police reports described an intoxicated person acting in a violent way.

Dr. Colistro considered: petitioner's decades-long, well-documented history of criminal behavior, many acts appearing to have been planned and carefully executed; his history of long

stays in correctional and mental health institutions, wherein people watching him day-to-day did not see indications of mental or emotional problems; and the fact that there was no history of him wanting or needing anti-psychotic medications in these environments. He found that the general picture was one of an individual with an antisocial personality type – a criminal personality with an anger problem, inclined to act out violently whenever he gets a chance and with more frequency and intensity when drunk.

Regarding the August 22, 1992, incident, Dr. Colistro noted that petitioner was on parole and assumes that as a condition of his parole he could not possess a firearm and perhaps could not drink. Nevertheless, he was downtown intimidating people and as a result was approached by a person in uniform. He testified that petitioner took a few shots at him and attempted to escape. Dr. Colistro finds this behavior consistent with behavior an antisocial personality, especially one with petitioner's history and who is also drinking, is likely to do.

Regarding the MMPI he administered in April 1993, the validity scales revealed a profile of someone either deliberately over-endorsing a number of bizarre items in an attempt to look psychologically disturbed or someone who could not read English or who was otherwise so confused they responded erratically to questioning. He found the apparent deliberate attempt to appear mentally ill was consistent with his interview wherein he saw no indications of mental illness. In reviewing petitioner's prior MMPIs, Dr. Colistro observed: one set similar to his where the clinical scales described quite a bit of psychopathology while the validity scales indicated negative distortion; and another set where there were no indications of mental illness and the validity scales suggested honesty and consistency in responding to the test items. In the latter, according to Dr. Colistro, the profile is one typically seen in antisocial or criminal personalities.

The doctor did not find evidence to diagnose petitioner with PTSD, multiple personality or paranoid personality disorder.

On cross, petitioner's counsel highlighted the fact that in his report Dr. Colistro, in quoting other doctors' reports, omitted their references to petitioner's paranoid thinking and/or schizophrenic illness. Dr. Colistro conceded that a number of individuals at the Colorado State Hospital diagnosed petitioner as suffering from a paranoid personality disorder, a paranoid core or related condition. He also conceded that paranoid schizophrenia is the type of illness that can go into a remission of sorts in a secure setting where all of an individual's decisions are being made for him or her and there are none of the stressors of being on the outside. He further conceded that the anti-psychotic medications petitioner was on when he examined him would reduce significant indicators if someone was suffering from paranoid schizophrenia and would make such illness more difficult to detect. Dr. Colistro noted that while the term "paranoid" comes up a lot in petitioner's mental health history, a consistent sense emerges that petitioner can see reality clearly in that he is not delusional, does not hallucinate, is very threat-sensitive and is likely to overreact to indications that he is under threat. So, he is paranoid in that sense.

With regard to the initial confrontation with Hedges, Dr. Colistro sees petitioner as an angry, dangerous guy looking to intimidate and induce confrontation and that his motivation is violence for its own sake. Dr. Colistro was aware of petitioner's troubled background and noted that such history, while it can sometimes be a precursor to borderline personality disorder and even PTSD in the case of being shot with a rifle, is most typically associated with antisocial personalities. Moreover, while he could not point out in the DSM III-R under the criteria for antisocial personality disorder any reference to one being paranoid, he maintained that having paranoia or a paranoid core

is not inconsistent with being an antisocial personality because these references are to a person who is excessively threat sensitive or suspicious and likely to blow things out of proportion, not that they are mentally ill.

> *a-b.    Counsel failed to obtain a psychiatric expert to evaluate petitioner near the time of trial and to opine on his mental state at the time of the crime.*

Petitioner argues that while counsel called Drs. Plazak and Whittington to testify on his behalf, only Dr. True, a clinical psychologist, examined him at or near the time of trial. He contends this constituted ineffective assistance because Dr. True was not a medical doctor and given his diagnosis differed from Drs. Plazak and Whittington's, counsel failed to present a coherent mental state defense. Petitioner concedes that he defaulted these subclaims by failing to raise them in state court, but argues *Martinez* excuses any default. For his part, respondent maintains that petitioner cannot establish entitlement to relief under *Martinez* because: (1) lawyers routinely employ psychologists instead of psychiatrists; (2) the State never confronted Dr. True about the fact that he was not a medical doctor and referred to him as a doctor on cross examination; (3) petitioner does not identify anything in Dr. True's training and experience that indicates he was an unqualified expert; (4) counsel called Drs. Plazak and Whittington to provide background on petitioner's mental health issues and bolster aspects of Dr. True's testimony and the overall defense; and (5) petitioner cannot show either that the court would have funded an additional expert or that had he employed a psychiatrist to do a current evaluation he would have been acquitted.

Respondent's arguments are well taken. Petitioner's primary argument here is that his counsel rendered ineffective assistance because Dr. True did not reach the same diagnostic conclusions as Drs. Plazak and Whittington and therefore counsel failed to present the jury with a

143 - OPINION AND ORDER

coherent mental status defense. While Dr. True's primary diagnosis of petitioner was borderline personality disorder and Drs. Plazak and Whittington's primary diagnosis was paranoid schizophrenia, Dr. True testified that petitioner functioned like a paranoid schizophrenic when he was in a state of deterioration and suggested that on the date in question, subject to major stressors for him, *i.e.*, freedom, alcohol, and confrontation with law enforcement figures, that was the case. In addition, True suggested that one of the hallmark features of borderline personality disorder is that experts often disagree on what they are seeing in a patient. Accordingly, while his experts' primary diagnosis of him differed, there was notable overlap in their findings, especially on the issue of whether he suffered from a paranoid disorder. The Court finds that Dr. True's testimony gave the jury an avenue for finding petitioner suffered from mental illness on the date in question and that he made a plausible effort to explain the numerous discrepancies in petitioner's records and the various experts' testimony at trial in a way that supported petitioner's mental state defense.

A fair review of the record reveals that there was a great deal for any expert to reconcile in petitioner's history and Dr. True adequately made a case for petitioner. First, he addressed the varying results of multiple MMPI exams, some of which linked credible indications of malingering with findings of severe mental illness (those coinciding with times when petitioner's legal jeopardy was the most serious); and others which linked indications of petitioner's veracity in his participation on the tests with findings of antisocial personality disorder (those coinciding with times when his legal jeopardy was relatively minimal). Second, Dr. True had to reconcile several differing medical opinions as well as indications of malingering in petitioner's medical records—including his own admissions that he purposefully faked mental illness to avoid prosecution as a habitual offender. Third, True had to account for the testimony of witnesses reporting a lack of

symptoms of mental illness, specifically paranoid schizophrenia, that petitioner displayed during his stays in mental institutions. Notwithstanding these significant challenges, the Court's review of Dr. True's testimony reveals that he gave the jury a medically supported option for concluding that petitioner was mentally ill at the time of his crimes. The Court also notes that Drs. Plazak and Whittington's testimony was consistent with True's to the extent that they were similarly dismissive of the accounts of malingering and Dr. Plazak opined that petitioner met some of the criteria for borderline personality disorder.

Importantly, "[t]he choice of what type of expert to use is one of trial strategy and deserves 'a heavy measure of deference.'" *Turner*, 281 F.3d at 876 (quoting *Strickland*, 466 U.S. at 691) (rejecting IAC claim where expert was a general psychologist and not an expert on PCP specifically, but still testified about the effects of PCP on the petitioner); *see also Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000); *Hale v. Belleque*, 255 Or. App. 653, 665 (2013) (record supports PCR court's finding that a psychiatrist would not have been more qualified than the psychologist to diagnose schizophrenia). Ultimately, counsel's tactical decisions about which experts to have testify on petitioner's behalf in support of a mental state defense is entitled to deference.

Accordingly, the Court concludes that counsel's reliance on Dr. True and the other mental health experts fell "within the wide range of professionally competent assistance." *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990). At a minimum, given the strength of respondent's expert medical witnesses and the significant hurdle of overcoming credible evidence of malingering, petitioner cannot show that he was prejudiced by any failure on counsel's part to hire a psychiatrist to evaluate him near the time of trial. Moreover, given petitioner's history of purposefully "spoiling" the results of mental health examinations related to high-stakes court

proceedings, the Court is reluctant to even speculate as to how any failure on counsel's part to engage a psychiatrist to examine petitioner at or near the time of trial might have prejudiced him. For these reasons, the Court finds that PCR counsel did not perform deficiently in failing to raise these claims and petitioner cannot show their default should be excused under *Martinez*.[38]

> c.    *Counsel failed to hire an expert to testify about the history and background of members of the Klamath-Modoc Tribes and to confirm the existence of multi-generational trauma and attendant disorders in order to give the jury context around petitioner's mental illness.*

The Court notes that, although petitioner's Native American background and cultural experiences were not presented to the jury via a cultural expert and counsel did not specifically present evidence of multi-generational trauma inflicted upon the Klamath-Modoc tribes as part of his theory of self-defense, his expert witnesses did touch on those topics — testifying about petitioner's abusive upbringing, including issues related to his cultural identity. Moreover, a defense centered on petitioner's culture was inconsistent with his own account of events and he failed to present evidence showing that counsel knew or should have known that the plight of the Klamath-Modoc tribe had a significant relationship to petitioner's conduct beyond what the experts testified to. In sum, petitioner cannot show that those experts did not provide appropriate testimony related to petitioner's background to bring adequate context to the jury's assessment of petitioner's mental health issues. Accordingly, petitioner cannot show entitlement to excuse the default of this subclaim under *Martinez*.

---

[38] Based on this same analysis the Court rejects petitioner's subclaim (Claim 11.3.b.) alleging that counsel rendered ineffective assistance when they failed to seek an extension of the trial date so they could hire a psychiatrist to evaluate petitioner, or in the alternative, when they failed to re-evaluate whether the defense of Guilty But Insane could be adequately supported.

         *d.*      *Counsel failed to obtain an expert on the cultural background of the Klamath-Modoc Tribes and therefore was unable to give adequate information to his experts so they could provide an adequate and internally consistent diagnosis of petitioner, such as Fetal Alcohol Syndrome ("FAS") and PTSD with psychotic elements.*

According to respondent, petitioner defaulted any claim related to FAS because even though he raised it during his PCR Petition and the PCR court denied it on the merits, he failed to pursue it on appeal. Petitioner argues that any default of this claim should be excused under *Martinez* because his PCR counsel failed to object to the PCR court's finding in petitioner's post-hearing brief. For the reasons set forth in Claim 3, the Court rejects this argument and denies the subclaim on the basis that it is procedurally defaulted and *Martinez* cannot excuse its default.

The parties agree that the claim regarding PTSD is exhausted. However, respondent argues that it fails on the merits because the PCR court's findings that any failure to hire an expert did not prejudice petitioner because: (1) petitioner was capable of relating appropriate background information to the expert himself; (2) Dr. True diagnosed petitioner with PTSD and testified about it at trial; and (3) counsel used the common testimony of three separate experts to argue that some kind of paranoid disorder caused petitioner to react to Hall's actions.

Significantly, "[i]n the absence of a specific request, an attorney is not responsible for gathering background material that might be helpful to a psychiatrist evaluating his client." *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995). Moreover, based on the Court's review of the record, including the expert medical testimony presented at trial, it concurs with respondent's arguments above and concludes that petitioner cannot demonstrate that the PCR court's denial of this subclaim was contrary to or involved an unreasonable application of *Strickland*. Accordingly, the Court denies it on the merits.

147 - OPINION AND ORDER

> e-f.    *Counsel failed to obtain an expert to opine on the legitimacy of psychological testing on Native Americans and to correlate those issues to the allegations of malingering mounted against petitioner based on his MMPI scores and counsel failed to obtain an expert to address allegations of malingering and failed to prepare the defense experts to address these issues.*

Petitioner concedes that he defaulted these subclaims by failing to raise them in state court, but argues *Martinez* excuses any default. Respondent maintains that petitioner cannot establish entitlement to relief under *Martinez* because his experts adequately opined on issues surrounding administering psychological tests to Native Americans and the allegations of malingering lodged against petitioner.

As summarized above, Dr. Plazak testified that for his whole 35-year career, he had an interest in the problems of the American Indian and that through his involvement in petitioner's case back in 1981, he became interested in the de-reservation going on with the Klamaths and the effects of intertribal competition between the Klamaths and Modocs in Northern California. He further testified that there are many cultural healings and beliefs that enter into situations with American Indian tribes, particularly with emotional and mental illness. He noted that people from different cultures would have different reactions to various psychiatric or psychological tests than say Anglo or African American or even Chinese people. Consequently, he opined that without a detailed history, including of the individual's culture, one cannot get a complete picture. While Dr. Plazak did not specifically correlate issues of cultural bias in testing and indications of malingering, he implied that an individual's cultural background can skew test results.

The Court also notes that petitioner's suggestion that counsel was ineffective for failing to obtain an expert to specifically testify on issues surrounding the validity of psychological tests on Native Americans and potential false indications of malingering is undermined by the inexplicable

fact that the indications of malingering and severe mental illness on his MMPI tests appeared only when his legal jeopardy was at its highest. This circumstance, coupled with evidence that petitioner admitted to faking symptoms, all but rules out an argument that the indications of malingering seen in the tests can be explained by cultural testing bias.

With regard to the allegations of malingering in general, Drs. True, Whittington and Plazak all made efforts to neutralize and/or dismiss allegations that petitioner feigned his mental illness such that their assessments and diagnosis of him were invalid. Dr. True argued that in Colorado and Oregon, where he asserted there are not good programs to deal with complex cases like petitioner's, there is a tendency when an individual, like petitioner, does not fit neatly in a current diagnostic system to determine that he or she is faking. He further opined that he did not think petitioner was capable of reading the DSM III-R and faking the tests as suggested. Rather he believes petitioner tried to manipulate his psychotic experiences to show he was a "tough guy".

For his part, Dr. Whittington dismissed the significance of allegations of malingering, stating that faking symptoms is common among individuals with psychotic illness. He opined that these individuals would rather appear bad than crazy and that when they are not in the throes of psychosis they will frequently say they were pretending before. He does not believe that he was fooled by petitioner.

Finally, Dr. Plazak stated that while an individual can fake some symptoms, he did not believe that even someone as intelligent as petitioner could read the DSM III-R and figure out how to fake something as complex as paranoid schizophrenia. He also noted that within the context of a disease like this people behave like they are powerful and commonly have the delusional idea that they can fool others.

149 - OPINION AND ORDER

As above, petitioner cannot show that these experts did not provide appropriate and fairly consistent testimony related to the allegations of malingering. As such, the Court's general assessment of the merits of this claim does not lead it to conclude that reasonable jurists could debate whether counsel's failure to secure experts to opine on the legitimacy of psychological testing on Native Americans and to address malingering fell below an objective standard of reasonableness and/or whether petitioner was prejudiced by this failure. Accordingly, petitioner cannot show entitlement to excuse his default of this subclaim under *Martinez*.

> g.    *Counsel failed to obtain and expert on self-defense to opine on issues related to the reasonableness of petitioner's response to the threat of harm he was experiencing and to testify that in the context of petitioner's personal and cultural background his response was reasonable.*

Respondent argues that to the extent this subclaim overlaps with his claim that counsel was ineffective for failing to present a culturally-attuned defense it lacks merit for the reasons discussed in Claim 11.C.2.a., above. Otherwise, respondent argues that petitioner cannot overcome the default of this claim under *Martinez* because other than to imply that an expert could have opined about the "fight or flight" response, petitioner does not allege what an expert would have testified to that would have been relevant under Oregon law and assisted the defense. Moreover, he has not proffered a potential expert who would have testified, much less asserted that such testimony would have had a reasonable probability of changing the jury's verdict. Accordingly, respondent maintains that this claim is not a substantial one under *Martinez*.[39]

---

[39] Petitioner indicates that he intends to file a motion for evidentiary hearing to expand the record and contends that the new evidence he would present will put the claim in a significantly different and stronger evidentiary posture so that it is a new claim whose default may be excused under *Martinez.* To date no motion for evidentiary hearing has been filed.

Respondent's arguments are well taken. To the extent that this subclaim is a reiteration of petitioner's claim faulting counsel with failing to put forth a cultural self-defense defense, for the reasons discussed in Claim 11.C.2.a., above, the Court denies it on the merits. In addition, for the reasons discussed in Claim 2.B. pertaining to the defense of self-defense under Oregon law, the Court finds that petitioner cannot show entitlement to excuse the default of this claim under *Martinez*.

> 4.    *Counsel failed to file appropriate pretrial motions on petitioner's behalf.*
>
> > <u>*a-c.*</u>    <u>*Counsel failed to demur and object to the Indictment; Counsel failed to raise constitutional challenges to the Oregon capital sentencing scheme; and counsel failed to have numerous of petitioner's prior convictions excluded from trial on the basis that they had been found unconstitutional.*</u>

Based on the analysis set out in Claims 2.C., 3 and 5 and 13, the Court denies these claims.

> > <u>*d.*</u>    <u>*Counsel failed to seek and obtain pretrial rulings on the admissibility of petitioner's prior convictions and of allegations by the Colorado State Hospital employees that petitioner malingered his mental illness, prior to evaluating available theories of defense.*</u>

Respondent contends that to the extent petitioner raised this subclaim during his PCR proceedings and the PCR court denied it on the merits, it is defaulted because petitioner did not pursue it on appeal. Alternatively, he contends that the PCR court's denial is entitled to deference.

In his PCR Petition, petitioner raised the following relevant ineffective assistance of trial counsel claims:

I. <u>Failures in Pretrial Proceedings</u>

***

G.    By failing to properly object and seek to suppress, limit or exclude the evidence of Petitioner's five prior convictions, which had been previously ordered suppressed by Judge Hufnagel in Denver County, Colorado, case number 84CR943, since such failure by trial counsel allowed evidence to be

introduced that was highly prejudicial to Petitioner and violated his rights
under the Sixth, Eighth, and Fourteenth Amendments to the United States
Constitution and the Due Process Clause of the Fourteenth Amendment to
the United States Constitution [].

\*\*\*

## VI. Failures in Guilty but Insane Presentation

\*\*\*

E.      Failed to recognize the dangers and prejudicial disadvantage of raising
insanity based on a paranoid schizophrenic diagnosis with either having
failed to previously determine by pretrial motion practice what evidence the
State would be allowed to present to rebut a defense or in ineffectively
recognizing that the evidence from the Colorado hospital records and
personnel, regarding Petitioner's alleged malingering, would be highly
prejudicial and would offset any possible advantage of raising this particular
insanity defense.

Respondent's Exhibit 542, Volume 28-13 at 4, 12.

In denying these claims, the PCR court made the following pertinent Findings of Fact and

Conclusions of Law:

9.      Petitioner presented no argument or persuasive evidence to support his claim
that his trial attorneys failed to "properly object and seek to suppress, limit
or exclude" evidence of petitioner's five Colorado convictions. (Claim I(G),
page 4). His trial counsel did move to suppress those convictions and to
exclude them as prior bad acts. The state opposed the motions, and the trial
court denied them. [].

\* \* \*

35.     Petitioner's trial counsel thoroughly investigated petitioner's successful use
of the insanity defense in earlier criminal proceedings in Colorado and in
Multnomah County, and they developed a defense based on that information.
Petitioner wanted his counsel to present an insanity defense, and he was
heavily invested in that defense. Given the past success of that defense, and
considering the circumstances of this case, counsel acted reasonably by
presenting that defense again. Petitioner presented no evidence or argument
to support his claim that his trial counsel failed to recognize possible dangers
in raising an insanity defense or that they could have eliminated those risks
by engaging in pretrial motion practice. (Claims V (D, E, H), page 12).

Respondent's Exhibit 565, Volume 28-14 at 4, 9.

As demonstrated above, petitioner raised the subject ineffective assistance of counsel claims in his PCR proceedings and the PCR court resolved them on the merits. Petitioner did not, however, pursue them on appeal. Accordingly, they are defaulted. Petitioner contends that "the defaults occurred because post-conviction trial-level counsel failed to preserve the claims for appeal by failing to do more than state the claim in the post-conviction petition" and suggests that due to this failure *Martinez* should excuse their default. The Court disagrees. PCR trial counsel adequately raised these claims, the PCR court resolved them on the merits and petitioner opted not to pursue them on appeal. Accordingly, *Martinez* does not apply here. The Court denies these claims on the basis that they are defaulted and petitioner cannot demonstrate entitlement to overcome such default.

5.  *Having failed to investigate and prepare this capital case for trial, counsel were wholly unable to approach the prosecution and explore any plea agreement possibility or resolution that did not involve a capital trial.*

As discussed in Claim 2.C., in light of SB 1013, the Oregon Supreme Court's holding in *Bartol*, and Governor Brown's commutation of petitioner's death sentence to life without parole, this claim is denied as moot.

C.  Claim 11.D. - Adequate Representation at Trial would have Resulted in a Conviction on the Lesser Included Offense of Involuntary Manslaughter and Certainly would have Resulted in a More Favorable Outcome for Petitioner. Trial counsel's failures include:

1.  *Failure to conduct an appropriate voir dire.*

a-b.  *Counsel failed to adequately voir dire the jury on their familiarity with the Klamath-Modoc Tribe's background and the generational trauma perpetrated on tribal members; Counsel failed to voir dire them about their awareness of the racism and violence perpetrated on Native Americans in Klamath, including by law enforcement, and*

> *if they would be able to fairly evaluate that evidence in considering petitioner's defenses.*

Respondent acknowledges that petitioner exhausted these subclaims, but argues that the PCR court's denial of them on the merits is entitled to deference. In addition, respondent argues that petitioner cannot prove prejudice because he has not attempted to show, let alone actually shown, that a different *voir dire* would have resulted in a differently comprised jury.

The PCR court made the following relevant finding regarding these claims:

> 15.    Trial counsel conducted *voir dire* by questioning potential jurors about their views on race and Native Americans. The juror questionnaires also included general questions intended to elicit potential jurors' attitudes toward people of races different from their own. Counsel did not conduct additional *voir dire* focusing on "cultural" issues because they did not plan to offer a cultural defense of the type now proposed by petitioner.

Respondent's Exhibit 565, Volume 28-14 at 5. Respondent's arguments are well taken. These subclaims allege trial counsel failed to make particular inquiries during *voir dire*. In general, such decisions involve trial strategy and, for the reasons discussed at length above, petitioner cannot show that the strategy employed by counsel, which did not involve a cultural self-defense, was objectively unreasonable. Accordingly, the Court concludes that he cannot demonstrate that the PCR court's denial of these claims was either contrary to or involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts.

> *c-h.    Counsel failed to voir dire the jury regarding petitioner's prior convictions, the conduct of EID employees and their responsibility for events, whether the jury could set aside its sympathy for Hall and other victims, and their ability to consider a mental defense in the face of evidence of malingering on petitioner's part. In addition, counsel failed to object when the prosecutor, during voir dire, repeatedly misstated the burden of proof on critical issues.*

Respondent argues that petitioner defaulted these subclaims by failing to raise them in his state court proceedings and that they otherwise lack merit. Petitioner contends that *Martinez*

excuses any default of these claims but does not discuss the particular inquiries he alleges counsel should have made and why their failure to do so constituted ineffective assistance. Nor does he attempt to show prejudice. Petitioner asserts that he is going to file a motion seeking an evidentiary hearing and expansion of the record to support these claims, but has failed to do so.

Respondent's arguments are well taken. The decision whether to question jurors on all of these issues is largely strategic—which allows for a wide range of reasonable performance. Petitioner cannot show either that all reasonable PCR attorneys would have raised these ineffective assistance of counsel claims or that his trial counsel's failure to make these inquiries prejudiced him. This is especially true with regard to the allegation that counsel failed to object when the prosecution misstated the burden of proof on critical issues because the trial court adequately instructed the jury on burdens of proof. Accordingly, the Court concludes that these are not substantial claims under *Martinez* and their default is not excused.

> 2.    *Failure to adequately represent petitioner in opening statements when counsel failed to set forth a coherent theory of defense.*

Respondent contends that this subclaim is procedurally defaulted and without merit. Petitioner contends that *Martinez* excuses any default of this claim but provides no argument discussing how the opening statement was constitutionally deficient. Again, he asserts that he is going to file a motion seeking an evidentiary hearing and expansion of the record to support this claim and respond to respondent's procedural default arguments but has not done so.

The Court has reviewed counsel's opening statement and concludes that a reasonable PCR attorney could determine that the opening statement was sufficient in setting forth a general background on the case and generally discussing witnesses and theories of defense on which petitioner would rely. Counsel made four points: (1) that petitioner's actions on the date in question

155 - OPINION AND ORDER

were senseless and without purpose or meaning; (2) that during the course of events, security guards

pursued petitioner even as he retreated; (3) that he was highly intoxicated; and (4) that he acted

under a mental disease or defect. Accordingly, the Court finds respondent's arguments well taken.

*See Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) (citing *Knowles*, 556 U.S. at 127) (In

order to show the ineffectiveness of PCR counsel, petitioner must show that PCR counsel's failure

to raise the ineffective assistance claim was an error "so serious that counsel was not functioning

as the 'counsel' guaranteed the defendant by the Sixth Amendment," and caused petitioner

prejudice. Notably, counsel is not necessarily ineffective for failing to raise a nonfrivolous claim).

> *3-6. Failure to adequately represent petitioner on mental state issues, including the defense of guilty but insane; Failure to adequately represent petitioner on issues of self-defense; Failure to raise and preserve objections to evidentiary rulings; and Failure to respect and protect petitioner's right to take the stand in his own defense.*

With the exception to petitioner's contention that his attorneys were ineffective for

presenting inconsistent defenses, respondent contends that these claims have been sufficiently

addressed in Claims 4, 5 and 6, above. With regard to the inconsistent defenses subclaim,

respondent argues that it is procedurally defaulted because petitioner did not raise it in his state

court proceedings and that *Martinez* cannot excuse its default because petitioner cannot show that

all reasonable PCR attorneys would have raised an ineffective assistance of counsel claim based

on counsel's presentation of inconsistent defenses. According to respondent, at most the primary

defenses counsel presented on petitioner's behalf, *i.e.*, self-defense and insanity, could be seen as

alternative defenses. Moreover, respondent argues that the self-defense theory, based on assertions

that Hall started the altercation by approaching petitioner, chasing him and shooting at him, is not

inconsistent with a theory that petitioner was legally insane at the time he responded by shooting

back. Finally, respondent maintains that presenting inconsistent defenses does not constitute inadequate assistance under *Strickland*.

The Ninth Circuit has refused to second-guess counsel's strategic decision to present or forego a particular theory of defense when the decision was reasonable under the circumstances. *United States v. Chambers*, 918 F.2d 1455, 1461 (9th Cir. 1990); *Seidel v. Merkle*, 146 F.3d 750, 756 (9th Cir. 1998) (self-defense and mental illness are not mutually exclusive defenses). Moreover, while a defense attorney's tactical decision to present inconsistent defenses may be subject to differences of opinion, it does not automatically constitute ineffective assistance of counsel. *See United States v. Demma*, 523 F.2d 981, 985 (9th Cir. 1975) ("The rule in favor of inconsistent defenses reflects the belief of modern criminal jurisprudence that a criminal defendant should be accorded every reasonable protection in defending himself against governmental prosecution."). Here, petitioner suggests that there was a superior and consistent defense strategy, based on petitioner's fetal alcohol exposure and PTSD with psychotic elements under stress, that would have resulted in a more favorable outcome had counsel relied on it. However, given petitioner's extensive mental health history, it was inevitable that the State and petitioner's expert witnesses would reach differing determinations as to petitioner's mental state and condition at the time of the murder. Moreover, as discussed above, petitioner was invested in the theory defense counsel used based on his success using it in other cases. Accordingly, at a minimum, my general assessment of the merits of this claim does not lead me to conclude that reasonable jurists could debate whether petitioner was prejudiced by any failure on counsel's part to adequately represent him mental health issues, including his insanity defense. Accordingly, petitioner cannot show that this a substantial claim under *Martinez* and I deny it on the basis that it is procedurally defaulted.

157 - OPINION AND ORDER

With regard to the remaining subclaims, I agree with respondent that the issues raised have been adequately addressed in my analysis of Claims 4, 5 and 6, above.

>   7.    *Failure to adequately represent petitioner in his closing statement by failing to set forth a coherent theory of defense and in presenting inconsistent defenses.*

Respondent argues that this subclaim is procedurally defaulted and otherwise is without merit. Petitioner contends that *Martinez* excuses any default of this claim but provides no argument discussing how the closing statement was constitutionally deficient. Instead, he asserts that he will file a motion seeking an evidentiary hearing, but he has not done so.

Respondent insists that given the various strategies counsel is entitled to employ, the range of reasonable performance in closing argument is wide. Accordingly, he asserts that petitioner cannot show that all reasonable PCR attorneys would have raised a claim alleging his counsel's guilt-phase closing argument was deficient. Similarly, he insists that PCR counsel could have reasonably determined on this record that he or she would be unable to prove prejudice due to any failings in counsel's closing argument.

>   The right to effective assistance extends to closing arguments. *See Bell v. Cone*, 535 U.S. 685, 701-702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Herring v. New York*, 422 U.S. 853, 865, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," *id.*, at 862, 95 S.Ct. 2550, but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. *See Bell, supra*, at 701-702, 122 S.Ct. 1843. Judicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas.

*Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003).

I have reviewed counsel's lengthy closing arguments and find that respondent's argument is well taken. In his closing arguments counsel suggested that the records demonstrate that petitioner's mental health situation was a complicated case and he blamed Colorado State Hospital with failing to appropriately treat him over an extended period of time. Counsel argued that as a consequence of this failure, petitioner was not equipped to deal with the stress of freedom on the date of the incident. Rather, he was drinking excessively to self-medicate and following his altercation with Hedges and the reckless involvement of EID personnel, the stress of the situation triggered his untreated mental illness – the hallmarks of which were paranoia and distrust, especially of authority figures and law enforcement. Counsel argued that in that situation, all petitioner knew to do was flee. He insisted that petitioner did not know the difference between right and wrong and could not conform his conduct to the law. In essence, counsel asserted that petitioner's actions made no sense and could only be explained by mental illness.

Based on my review of the record, I cannot say either that this constituted a constitutionally deficient closing argument or that counsel given a different one the outcome of petitioner's guilt-phase trial would have been different. The argument petitioner suggests counsel should have made is not so clearly more persuasive than the one he made that counsel's choice can only be attributed to professional error of a constitutional magnitude. Accordingly, I find he fails to show this a substantial claim under *Martinez* and I deny it on the basis that it is procedurally defaulted.

> 8-9.   *Failure to object to egregious misconduct in the prosecution's closing argument and this failure prejudiced petitioner; Counsel failed to seek appropriate instructions during the guilt phase and failed to object to presentation of false and inaccurate instructions that gutting petitioner's claims of self-defense.*

The parties agree that these claims were covered in Claims 5, 6 and 10, above. I agree and refer to my resolution of those claims in denying relief here.

> 10.    *After failing to conduct an appropriate pre-trial investigation, counsel rendered ineffective assistance during the penalty phase.*

Petitioner alleges that counsel: (a) had no consistent penalty-phase theory; (b) failed to present available evidence, including favorable lay and expert testimony; (c) failed to present evidence that petitioner's mental illness and life experiences precluded him from "deliberating" such that the jury could not answer "yes" to that penalty-phase question; (d) failed to explain that while it was difficult for petitioner to succeed on the outside, he had not engaged in violent conduct in prison and therefore did not pose a future danger; (e) failed to introduce evidence showing that predictions of future dangerousness are scientifically invalid; and (f) failed to preserve petitioner's right to allocute and to properly advise him regarding allocution in the penalty phase. As discussed in Claim 2.C, in light of SB 1013, the Oregon Supreme Court's holding in *Bartol*, and Governor Brown's commutation of petitioner's death sentence to life without parole, petitioner's penalty-phase claims are denied as moot.

> D.    Claim 11.E. - Counsel Represented Petitioner while Laboring under an Active Conflict of Interest.

Petitioner raised this claim in his PCR proceedings. In denying this claim, the PCR court made the following relevant findings:

> 56.    After petitioner instructed his trial attorneys not to put on any defense in the penalty phase of the trial, counsel suggested that they might have to resign from the case. The trial court ruled that it would not allow the attorneys to withdraw from representing petitioner.

160 - OPINION AND ORDER

57.    Petitioner presented no evidence to prove any of his claims that counsel were required to move to withdraw based on various alleged conflicts between petitioner and his attorneys. (Claim IV (A, B, C), page 18). In addition, the records shows that the trial court would have rejected any attempts by counsel to withdraw.

Respondent's Exhibit 565, Volume 28-14 at 14. Moreover, petitioner opted not to challenge the denial of this claim or any other penalty-phase claim on appeal: "Petitioner's appellate counsel has repeatedly made clear, most recently at oral argument, that in accordance with petitioner's directions, no arguments challenging the results of the penalty phase have been offered." *Lotches*, 257 Or. App. at 513, n.2. Accordingly, I deny this claim on the basis that it is procedurally defaulted and per *Davila* petitioner cannot rely on *Martinez* to excuse its default.

    E.    <u>Claim 11.F. - Counsel Failed to Ensure the Preparation of an Adequate Record for Review</u>

The parties agree that this claim is adequately addressed in their discussion of Claim 14, below. I concur and deny this claim for the reasons set forth in Claim 14.

## VII. Claim 12- Constitutionally Insufficient Automatic Appeal, Including Ineffective Assistance of Appellate Counsel and State Post-Conviction Proceedings

As summarized by petitioner's response, he raises the following six subclaims here:

A.    The State of Oregon has failed to create a legitimate procedure for preparing a complete record of trial court proceedings.

B.    Its procedures fail to place the burden on counsel to investigate, uncover, and raise every arguably meritorious claim, but place that burden on petitioner himself.

C.    It did not, at the time of petitioner's direct appeal and post-conviction proceedings, have or enforce rules or guidelines on the competency of counsel to handle capital appeals and post-conviction proceedings.

D.    It did not, at the time of petitioner's direct appeal and post-conviction proceedings, have training to ensure the competency of counsel handling capital direct appeals and postconviction proceedings.

E.   It did not, at the time of petitioner's direct appeal and post-conviction proceedings, adequately review the work undertaken by counsel appointed to handle capital direct appeal and post-conviction proceedings.

F.   It failed to provide adequate appellate and post-conviction proceedings, and that failure resulted in the failure of numerous issues, specified in the Petition, being litigated which would have entitled Petitioner to relief.

Brief in Support of Petition at 94-95. Respondent contends that all of these subclaims are procedurally defaulted because petitioner did not raise them in state court and cannot now do so. He further maintains that petitioner cannot rely on *Martinez* to excuse their default because none of the subclaims is an ineffective assistance of trial counsel claim. In addition, respondent contends that these subclaims alleging that the State provided petitioner with a constitutionally insufficient process could have been raised at trial and on direct review, and therefore, pursuant to *Palmer v. State of Oregon*, 318 Or. 352, 358 (1994), could not have been raised in his PCR petition. Finally, respondent notes that within Claim 12, petitioner alleges several claims of ineffective assistance of direct appellate counsel and that *Davila* forecloses any argument that petitioner's PCR counsel's failure to raise these claims during the PCR proceedings can excuse their default.

Petitioner appears to concede both that these subclaims are procedurally defaulted and that he cannot rely on *Martinez* to excuse their default. Nevertheless, he argues that I should apply the *rationale* underlying *Martinez* to excuse the default because "[h]ere, direct appeal counsel was ineffective for failure to assert any of the subclaims, and post-conviction counsel was ineffective in failing to assert direct appeal counsel's ineffectiveness in failing to challenge Oregon's appellate process. Unless the claims may be reviewed in federal habeas proceedings, they will go unreviewed by any court." Sur-Reply at 67 (ECF No. 96).

162 - OPINION AND ORDER

I conclude that petitioner's argument it is foreclosed by *Davila*. Accordingly, I deny this claim in its entirety on the basis that it is procedurally defaulted and petitioner cannot demonstrate entitlement to excuse the default.

## XIII.   Claim 13 - Oregon's Capital Sentencing Scheme is Unconstitutional

Petitioner alleges that Oregon's capital sentencing scheme is unconstitutional on its face and as-applied to his sentencing in 1993. Accordingly, he argues that he was convicted, sentenced and confined in violation of the Fifth, Eighth and Fourteenth Amendments of the United States Constitution pursuant to a scheme that results in "a completely arbitrary and capricious selection" of the few individuals who are sentenced to death in Oregon. As discussed in Claim 2.C, in light of SB 1013, the Oregon Supreme Court's holding in *Bartol*, and Governor Brown's commutation of petitioner's death sentence to life without parole, petitioner's penalty-phase claims are denied as moot.

## XIV.   Claim 14 - Lack of a Sufficiently Complete Record to Allow Review

### A.    As-applied Challenges

Petitioner argues that failings in Oregon's system resulted in a record in his case that is missing critical documents and records, including: (1) records of two initial appearances made by petitioner on August 24, 1992 and September 1, 1992; (2) a record of what occurred during trial counsel's *ex parte* contact with the court that led to an extended trial date; (3) a transcript of the advisements to the jury when they were released for the weekend during guilt-phase deliberations; (4) nineteen (19) orders for indigent expenses with accompanying motions and affidavits; (5) four videos (two from hearings and two shown to the jury at trial in support of witness testimony); and (6) numerous documents from the PCR proceedings including exhibits petitioner presented in his

numerous depositions, briefing in opposition to the motion to vacate the guardian ad litem appointed in the PCR court, and transcripts of hearings held on September 15, 2008, November 17, 2008 and April 20, 2009.

Petitioner concedes that these as-applied challenges are procedurally defaulted because he did not raise them in any state court proceedings. Nevertheless, he argues that "[a]t whatever point in state court proceedings the default occurred, former counsel rendered ineffective assistance by failing to raise or prosecute the claim," thereby suggesting that *Martinez* should excuse the default of these claims.

*Martinez* is not a potential basis for excusing the default of these claims. While petitioner contends that trial counsel may have acted ineffectively in failing to request a transcript or complete record, he does not allege that trial counsel was ineffective in failing to raise a claim that Oregon's scheme itself was unconstitutional because it prevented him from obtaining a full record on appeal and he was prejudiced as a result. *Martinez* excuses the default of ineffective assistance of trial counsel claims only. Accordingly, an evidentiary hearing to explore this issue is unnecessary. The Court denies petitioner's as-applied claims on the basis that they are procedurally defaulted and he cannot demonstrate entitlement to excuse their default.

Moreover, respondent contends that Oregon law provides a mechanism for finding or recreating records that are missing and necessary for an appeal and for supplementing the record for purposes of appeal. He argues that because petitioner did not raise these claims in state court and invoke the state-law process available for that purpose, he cannot now claim that the proceedings, as applied to him, were not constitutionally adequate. This argument is well taken.

B.      Facial Challenge

164 - OPINION AND ORDER

Petitioner alleges that the State of Oregon, in contrast to every other state in the Ninth Circuit, adopted a facially unconstitutional procedure for creating records of capital cases for review of convictions and death sentences. As discussed in Claim 2.C., in light of SB 1013, the Oregon Supreme Court's holding in *Bartol*, and Governor Brown's commutation of petitioner's death sentence to life without parole, petitioner's penalty-phase claims are denied as moot.

## XV.    Claims 15 & 16 - Cruel and Unusual Punishment, and Incompetency for Execution

As discussed in Claim 2.C., in light of SB 1013, the Oregon Supreme Court's holding in *Bartol*, and Governor Brown's commutation of petitioner's death sentence to life without parole, petitioner's penalty-phase claims are denied as moot.

## XVI.   Claim 17 - Cumulative Error

Petitioner argues that cumulative error compels me to grant relief.

> [T]he Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal . . . . [T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense "far less persuasive" and thereby had a "substantial and injurious effect of influence" on the jury's verdict.

*Parle v. Runnels*, 505 F.3d, 922, 928 (9th Cir. 2007) (citations omitted). For the reasons set forth above, I perceive no federal constitutional errors that would establish prejudice in the aggregate and that would render petitioner's trial fundamentally unfair. Petitioner is therefore not entitled to relief on this claim.

## <u>CONCLUSION</u>

For the reasons identified above, the Petition for Writ of Habeas Corpus is denied in its entirety.

165 - OPINION AND ORDER

## CERTIFICATE OF APPEALABILITY

In the event that petitioner appeals from this judgment, I have evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when a petitioner takes an appeal, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different matter" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot*, 463 U.S. at 893 n.4). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

I find that reasonable jurists could debate the resolution of the following related ineffective assistance of trial counsel claims: (1) claim alleging counsel was ineffective for failing to adequately investigate Klamath-Modoc culture to support petitioner's self-defense and mental state defenses (Claim 11.C.2.a.); and (2) claim alleging counsel was ineffective for failing to retain an expert on self-defense to opine on the reasonableness of petitioner's response to Hall and to testify that in light of his background his response was, in fact, reasonable (Claim 11.C.3.g.). Therefore, I

issue a COA on these issues. For the remaining claims and procedural issues, I decline to issue a COA for the reasons set forth in the instant order.

IT IS SO ORDERED.


_____4/11/2024_____                      _Michael W. Mosman_
          DATE                             Michael W. Mosman
                                           United States District Judge

167 - OPINION AND ORDER